1  MARC T.G. DWORSKY (SBN 157413)
   Marc.Dworsky@mto.com
2  KATHLEEN M. MCDOWELL (SBN 115976)
   Kathleen.McDowell@mto.com
3  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, 25th floor
4  Los Angeles, CA  90071-1560
   Telephone:     (213) 683-9100
5  Facsimile:     (213) 687-3702

6  DAVID H. FRY (SBN 189276)
   David.Fry@mto.com
7  CAROLYN V. ZABRYCKI (SBN 263541)
   Carolyn.Zabrycki@mto.com
8  MUNGER, TOLLES & OLSON LLP
   560 Mission Street,  27th floor
9  San Francisco, CA 94105-2907
   Telephone:     (415) 512-4000
10 Facsimile:     (415) 512-4077

11 Attorneys for Defendants
   WELLS FARGO DEFENDANTS

12

E-filing

13              UNITED STATES DISTRICT COURT

14   NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

15

16 THE CHARLES SCHWAB                CASE NO. CV 10    4030
   CORPORATION,
17                                   **DEFENDANTS WELLS FARGO ASSET**
                  Plaintiff,         **SECURITIES CORPORATION AND**
18                                   **WELLS FARGO BANK, N.A.'s NOTICE**
          vs.                        **OF REMOVAL**
19
20 BNP PARIBAS SECURITIES CORP.;
   CWMBS, INC.; BANC OF AMERICA
21 SECURITIES LLC; BANC OF
   AMERICA MORTGAGE SECURITIES,
22 INC; BANC OF AMERICA FUNDING
   CORPORATION; CWALT, INC.;
23 COUNTRYWIDE FINANCIAL
   CORPORATION; CITIGROUP
24 GLOBAL MARKETS, INC.;
   CITIGROUP MORTGAGE LOAN
25 TRUST, INC.; RESIDENTIAL
   ACCREDIT LOANS, INC.; FIRST
26 HORIZON ASSET SECURITIES INC.;
   CREDIT SUISSE SECURITIES (USA)
27 LLC; CREDIT SUISSE FIRST BOSTON
   MORTGAGE SECURITIES CORP.;
28 RESIDENTIAL ASSET MORTGAGE
   PRODUCTS, INC.; DEUTSCHE BANK

NOTICE OF REMOVAL

1   SECURITIES INC.; FIRST
    TENNESSEE BANK N.A.; GOLDMAN,
2   SACHS & CO.; GS MORTGAGE
    SECURITIES CORP.; RBS
3   SECURITIES, INC. F/K/A
    GREENWICH CAPITAL MARKETS,
4   INC.; HSBC SECURITIES (USA) INC.;
    WELLS FARGO ASSET SECURITIES
5   CORPORATION; WELLS FARGO
    BANK N.A.; MORGAN STANLEY &
6   CO. INC.; MORGAN STANLEY
    CAPITAL I INC.; SEQUOIA
7   RESIDENTIAL FUNDING, INC.; UBS
    SECURITIES, LLC; MORTGAGE
8   ASSET SECURITIZATION
    TRANSACTIONS, INC.; AND DOES I-
9   50,

10              Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that Defendants Wells Fargo Asset Securities Corporation and Wells Fargo Bank, N.A. (collectively "Wells Fargo") hereby remove Case No. CGC-10-501610, filed in the Superior Court of California, San Francisco, and all claims and causes of action therein, to the United States District Court for the Northern District of California, San Francisco Division.[1] As grounds for removal, Wells Fargo states as follows:

**I.**     **JURISDICTION**

1.     Removal to this Court is proper pursuant to 28 U.S.C. §§ 1334(b), 1367, 1441, 1446, and 1452.

**II.**     **INTRADISTRICT ASSIGNMENT**

2.     Pursuant to Local Rule 3-5(b), Wells Fargo notes that this action has been removed to the San Francisco Division of this Court because 28 U.S.C. § 1452(a) requires removal to "the district court for the district where such civil action is pending," which here was San Francisco County Superior Court.

**III.**     **BASIS FOR REMOVAL**

3.     On July 15, 2010, Plaintiff The Charles Schwab Corporation ("Plaintiff") filed a Summons and Complaint captioned The Charles Schwab Corporation v. BNP Paribas Securities Corp., et al., Case No. CGC-10-501610, in the Superior Court of California, San Francisco (the "State Court Action").

4.     On August 2, 2010, Plaintiff filed an Amended Complaint in the State Court Action.

5.     On or about August 9, 2010, Plaintiff served a copy of the Summons and the Amended Complaint on Wells Fargo Bank, N.A.. This Notice of Removal is filed within thirty (30) days of Wells Fargo's receipt of the Summons and the Amended Complaint and is therefore timely under 28 U.S.C. § 1446(b). Pursuant to 28 U.S.C. § 1446(a), copies of the Summons,

---

[1] Wells Fargo appears specially for the purpose of removal only. It reserves all defenses as to jurisdiction, service, or otherwise that may be available in this action.

1    Amended Complaint, and all process, pleadings, and orders served upon Wells Fargo Bank, N.A.

2    are attached as Exhibit A.

3        6.    Wells Fargo's time to answer the Amended Complaint has not expired, and no

4    defendant has pled, answered, or otherwise appeared in the State Court Action.

5        7.    As alleged in the Amended Complaint and the schedules attached to the Amended

6    Complaint, Plaintiff claims that it purchased certificates to three mortgage-backed securities

7    issued by Wells Fargo. Plaintiff alleges that the offering documents for these securities contained

8    untrue and misleading statements about the mortgage loans underlying the certificates and the

9    underwriting practices of the loan originators.

10       8.    Two of the three mortgage-backed securities issued by Wells Fargo, Wells Fargo

11   Mortgage Backed Securities Trust 2006-AR3 and Wells Fargo Mortgage Backed Securities Trust

12   2007-8, are backed by loans originated by American Home Mortgage ("AHM").

13       9.    On August 6, 2007, AHM filed a voluntary petition for reorganization under

14   Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the

15   District of Delaware, In re American Home Mortgage Holdings, Inc., Case No. 07-11047, et seq.,

16   (the "AHM Bankruptcy). The AHM Bankruptcy proceedings are pending before United States

17   Bankruptcy Judge Christopher Sontchi.

18       10.   Pursuant to agreements containing certain indemnification provisions for the

19   benefit of Wells Fargo, among others, and pursuant to statutory and common law, AHM owes

20   Wells Fargo indemnification and/or contribution for any claims arising out of actual or alleged

21   material misstatement or omissions by AHM about the mortgage loans at issue.

22       11.   Wells Fargo has asserted and reserved its rights to indemnification and

23   contribution from AHM in an Amended Proof of Claim filed in the AHM Bankruptcy on or about

24   August 6, 2010.

25       12.   This action relates to AHM's bankruptcy rights because AHM owes Wells Fargo

26   an indemnity obligation which, as a result of any costs and expenses incurred by Wells Fargo to

27   defend this action and any judgment against Wells Fargo, could affect the property of debtor

28   AHM.

1      13.    Accordingly, this Court has "related to" original jurisdiction over this action under

2  28 U.S.C. § 1334(b), and this action may be removed to this Court by Wells Fargo under 28

3  U.S.C. § 1452(a).

4  **IV.    <u>ADDITIONAL PROCEDURAL REQUIREMENTS</u>**

5      14.    This is not a core proceeding under 28 U.S.C. § 157(b). Wells Fargo does not

6  consent to entry of final orders of judgment by any bankruptcy judge.

7      15.    Pursuant to 28 U.S.C. § 1446(d), Wells Fargo will serve a copy of this Notice of

8  Removal on counsel for Plaintiff and will file a copy with the Superior Court of California for the

9  City and County of San Francisco.

10      16.    Wells Fargo signs this Notice of Removal pursuant to Rule 11 of the Federal Rules

11  of Civil Procedure and Bankruptcy Procedure 9011.

12      17.    All other defendants named and served in the State Court Action, according to the

13  proofs of service filed by Plaintiff in the State Court Action, consent to this Notice of Removal.

14      WHEREFORE, the Removing Defendant prays that the above-captioned matter be

15  removed from the Superior Court of California, San Francisco, to the United States District Court

16  for the Northern District of California for the reasons stated above, or for any other reasons the

17  Court deems necessary and proper.

18

19  DATED: September 8, 2010          MUNGER, TOLLES & OLSON LLP
                                      MARC T.G. DWORSKY

20                                      KATHLEEN M. MCDOWELL
                                      DAVID H. FRY

21                                      CAROLYN V. ZABRYCKI

22

23                    By: _____
                                        DAVID H. FRY

24                    Attorneys for Defendants
                    WELLS FARGO DEFENDANTS

25

26

27

28

# EXHIBIT A

**SUMMONS ON FIRST AMENDED COMPL...T**
**(CITACION JUDICIAL)**

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:** BNP PARIBAS SECURITIES CORP.; CWMBS,
*(AVISO AL DEMANDADO):* INC.; BANC OF AMERICA SECURITIES LLC;
BANC OF AMERICA MORTGAGE SECURITIES, INC; BANC OF
AMERICA FUNDING CORPORATION; CWALT, INC.; COUNTRYWIDE
FINACIAL CORPORATION; CITIGROUP GLOBAL MARKETS, INC.;

Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:** THE CHARLES SCHWAB
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* CORPORATION,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below:

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 dias, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| Superior Court of California, County of San Francisco<br>400 McAllister Street<br>San Francisco, CA 94102 | CGC-10-501610 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Goodin, MacBride, Squeri Day & Lamprey, LLP     (415)392-7900     (415) 398-4321
Robert A. Goodin; Francine T. Radford, SBN 168269; Anne Hayes Hartman, SBN 184556
505 Sansome Street, Suite 900, San Francisco, CA 94111
(Additional counsel listed on Additional Page Form attached)

| DATE: AUG 0 2 2010<br>*(Fecha)* | CLERK OF THE COURT<br>Clerk, by    M. RAYRAY<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* WELLS FARGO BANK N.A.

under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
        ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

COPY

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

| SHORT TITLE: Schwab v. BNP PARIBAS SECURITIES CORP. | CASE NUMBER: CGC-10-501610 |

1 | The Charles Schwab Corporation

2 | Lowell Haky, State Bar No. 178526

3 | 211 Main Street

4 | San Francisco, California 94105

5 | Telephone: (415) 667-0622

6 | Facsimile: (415) 667-1638

7 |

8 | Grais & Ellsworth LLP

9 | David J. Grais (pro hac application submitted herewith)

10 | Kathryn C. Ellsworth (pro hac application submitted herewith)

11 | Owen L. Cyrulnik (pro hac application submitted herewith)

12 | Leanne M. Wilson (pro hac application submitted herewith)

13 | 70 East 55th Street

14 | New York, New York 10022

15 | Telephone: (212) 755-0100

16 | Facsimile: (212) 755-0052

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court.   Page 2

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

Legal
Solutions
Plus

CRC 201, 501

SUM-200(A)

| | CASE NUMBER: |
|---|---|
| SHORT TITLE: Schwab v. BNP PARIBAS SECURITIES CORP. | CGC-10-501610 |

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

CITIGROUP MORTGAGE LOAN TRUST, INC.; RESIDENTIAL ACCREDIT LOANS, INC.; FIRST HORIZON ASSET SECURITIES INC.; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK N.A.; GOLDMAN, SACHS & CO.; GS MORTGAGE SECURITIES CORP.; RBS SECURITIES, INC. F/K/A GREENWICH CAPITAL MARKETS, INC.; HSBC SECURITIES (USA) INC.; WELLS FARGO ASSET SECURITIES CORPORATION; WELLS FARGO BANK N.A.; MORGAN STANLEY & CO. INC.; MORGAN STANLEY CAPITAL I INC.; SEQUOIA RESIDENTIAL FUNDING, INC.; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; AND DOES 1 - 50,

Page _____ of _____

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007] | **ADDITIONAL PARTIES ATTACHMENT**<br>Attachment to Summons | Legal<br>Solutions<br>Plus |
|---|---|---|

1   GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
    ROBERT A. GOODIN, State Bar No. 061302
2       rgoodin@goodinmacbride.com
    FRANCINE T. RADFORD, State Bar No. 168269
3       fradford@goodinmacbride.com
    ANNE H. HARTMAN, State Bar No. 184556
4       ahartman@goodinmacbride.com
    505 Sansome Street, Suite 900
5   San Francisco, California 94111
    Telephone:   (415) 392-7900
6   Facsimile:   (415) 398-4321

7   THE CHARLES SCHWAB CORPORATION
    LOWELL HAKY, State Bar No. 178526
8   211 Main Street
    San Francisco, California 94105
9   Telephone:   (415) 667-0622
    Facsimile:   (415) 6671638

10

11  GRAIS & ELLSWORTH LLP
    DAVID J. GRAIS (*pro hac application submitted*)
12      dgrais@graisellsworth.com
    KATHRYN C. ELLSWORTH (*pro hac application submitted*)
13      kellsworth@graisellsworth.com
    OWEN L. CYRULNIK (*pro hac application submitted*)
14      ocyrulnik@graisellsworth.com
    70 East 55th Street
15  New York, New York 10022
    Telephone:   (212) 755-3550
16  Facsimile:   (212) 755-0052

17  Attorneys for Plaintiff
    The Charles Schwab Corporation

18

19              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

20              IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

21  THE CHARLES SCHWAB CORPORATION,          No.  CGC-10-501610

22              Plaintiff,                    **PLAINTIFF'S APPLICATION FOR
                                              APPROVAL OF COMPLEX
23  v.                                        LITIGATION DESIGNATION**

24  BNP PARIBAS SECURITIES CORP.;
    et al
25                                            Date of Filing:   July 15, 2010
                                              Trial Date:       Not yet set
26              Defendants.

27

28
                                                             CGC-10-501610

    **PLAINTIFF'S APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

AUG 0 8 2010

CLERK OF THE COURT
BY: CAROLYN BALISTRERI
Deputy Clerk

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Pursuant to the Amended General Order re: Procedure for Approval of Complex Litigation Designation of this Court, and California Rules of Court Rules 3.400 et seq., PLEASE TAKE NOTICE THAT Plaintiff The Charles Schwab Corporation ("Schwab") hereby applies for an order approving the complex litigation designation of plaintiff and assigning this case for all purposes to the appropriate complex litigation department.

1.      The complaint in this action was filed on July 15, 2010, naming 27 separate entity defendants; a First Amended Complaint was filed on August 2, 2010. Plaintiff designated this case as complex and paid the required fees pursuant to Cal. Gov't Code § 70616(a).

2.      The complaint in this action pleads causes of action for rescission and damages as a result of the violation by the defendants of the California Corporate Securities Act, the federal Securities Act of 1933, the California Civil Code, and the common law, arising from the sale or issuance by defendants of 37 certificates in 36 securitizations backed by residential mortgage loans. Schwab paid $1.38 billion for the certificates at issue in this action. Plaintiff alleges in these actions that defendants made numerous untrue statements to Schwab about the certificates and the credit quality of the mortgage loans that backed them, and omitted to state many material facts that were necessary in order to make their statements not misleading.

3.      This case is "complex" as set forth in Rule 3.400 of the California Rules of Court. Specifically:

(a) With twenty-seven individually named defendants in this action, who will likely be separately represented, this case will involve "[m]anagement of a large number of separately represented parties." Cal. Rules of Court Rule 3.400(b)(3).

(b) This case will likely involve "numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve," Cal. Rules of Court Rule 3.400(b)(1), in particular as the separately-named and individually-represented defendants will likely file individual motions with distinct arguments regarding the sale and issuance of mortgage-backed securities and relevant federal and California Securities laws.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-2-

**PLAINTIFF'S APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

1       (c) With this litigation involving the sale or issuance of a large number of individual

2       certificates in separate securitizations from different defendants, this case will

3       involve "[m]anagement of a large number of witnesses" as well as "a substantial

4       amount of documentary evidence." Cal. Rules of Court Rule 3.400(b)(2).

5       4.    For the reasons set forth above, Plaintiff respectfully requests that this case be

6   designated as complex and assigned for all purposes to the appropriate complex litigation

7   department. Plaintiff further requests that the Case Management Conference presently set for

8   December 17, 2010, in Department 212 be vacated and an initial case management conference

9   pursuant to Rule 3.750(a) be set for the earliest practical date.

10  Dated: August 3, 2010             GOODIN, MACBRIDE, SQUERI,
                        DAY & LAMPREY, LLP

11

12                          GRAIS & ELLSWORTH LLP

13

14                          By

                                Anne Hayes Hartman

15                          Attorneys for Plaintiff
                        Federal Home Loan Bank of San Francisco

16

17

18

19

20

21

22

23

24

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**PLAINTIFF'S APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ROBERT A. GOODIN, State Bar No. 061302
    rgoodin@goodinmacbride.com
FRANCINE T. RADFORD, State Bar No. 168269
    fradford@goodinmacbride.com
ANNE H. HARTMAN, State Bar No. 184556
    ahartman@goodinmacbride.com
505 Sansome Street, Suite 900
San Francisco, California  94111
Telephone:   (415) 392-7900
Facsimile:   (415) 398-4321

THE CHARLES SCHWAB CORPORATION
LOWELL HAKY, State Bar No. 178526
211 Main Street
San Francisco, California  94105
Telephone:   (415) 667-0622
Facsimile:   (415) 6671638

GRAIS & ELLSWORTH LLP
DAVID J. GRAIS (*pro hac application submitted*)
    dgrais@graisellsworth.com
KATHRYN C. ELLSWORTH (*pro hac application submitted*)
    kellsworth@graisellsworth.com
OWEN L. CYRULNIK (*pro hac application submitted*)
    ocyrulnik@graisellsworth.com
70 East 55th Street
New York, New York 10022
Telephone:   (212) 755-3550
Facsimile:   (212) 755-0052

Attorneys for Plaintiff
The Charles Schwab Corporation

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE CHARLES SCHWAB CORPORATION, | No. CGC-10-501610 |
| Plaintiff,<br><br>v.<br><br>BNP PARIBAS SECURITIES CORP.; et al<br><br>            Defendants. | **[PROPOSED] ORDER GRANTING PLAINTIFF'S APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**<br><br>Date of Filing:   **July 15, 2010**<br>Trial Date:   **Not yet set** |

CGC-10-501610

**ORDER APPROVING PLAINTIFF'S APPLICATION FOR COMPLEX LITIGATION DESIGNATION**

1             Upon the application of Plaintiff The Charles Schwab Corporation, and good cause

2 appearing, IT IS HEREBY ORDERED that this case is designated as complex and assigned for

3 all purposes to the Complex Litigation Department, Department _____. The case management

4 conference presently set for December 12, 2010, in Department 212, is hereby vacated and an

5 initial case management conference in Department _____ is set for _____,

6 2010, at _____.

7

8 Dated: _____

9

10                                    _____

11 3435/001/X120786.v1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP*
*ATTORNEYS AT LAW*
*SAN FRANCISCO*

**ORDER APPROVING PLAINTIFF'S APPLICATION FOR COMPLEX LITIGATION DESIGNATION**

# FILED
San Francisco County Superior Court

OCT 2 3 2007

GORDON PARK-LI, Clerk

BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| In re: | ) |
| | ) |
| COMPLEX LIGITATION | )   **AMENDED GENERAL ORDER RE:** |
| | )   **PROCEDURE FOR APPROVAL OF** |
| | )   **COMPLEX LITIGATION DESIGNATION** |
| | ) |
| | )   The Honorable Richard A. Kramer |
| | ) |
| | ) |
| | ) |

This Order shall apply to any case designated as a Complex Case on the Civil Case Cover Sheet (Judicial Council Form CM-010, Rule 3.220, Cal. Rules of Court) filed in San Francisco Superior Court.  As to all such cases:

1. The fee(s) required by California Government Code section 70616 shall be paid upon filing such designation.

2. No case shall be assigned to the Complex Litigation Department until an Application For Approval of Complex Litigation Designation has been made in accordance with this Order, and the Court has ordered the case so assigned.

1        3. An Application for Approval of Complex Designation should be made as early in the case

2  as is feasible and must set forth with specificity the reasons that the case should be assigned to the

3  Complex Litigation Department in accordance with the factors set forth in Rule 3.400 *et seq.*,

4  California Rules of Court.  A copy of such Application, together with a copy of the operative

5  Complaint and of the Civil Case Cover Sheet, shall be delivered to the clerk of Department 304

6  promptly upon filing.  Copies of the Application shall be served on all other parties who have been

7  served with the Complaint or have appeared in the case.

8        4. A Complex Case Designation which does not comply with this Order may be deemed

9  denied without further order.

10       5. Until such time as the Court issues an order assigning the case to the Complex Litigation

11  Department, it will remain in its otherwise assigned case management plan and shall be subject to all

12  applicable case management rules and procedures.  *See* Rule 3 – Civil Case Management, San

13  Francisco Superior Court Local Rules of Court.

14       6. Upon the denial of Complex Case Designation, either under paragraph 4 hereof or by

15  specific court order, and no sooner than 60 days after the date of filing the Civil Case Cover Sheet,

16  the Clerk of the Court shall, upon request, refund any fees paid pursuant to California Government

17  Code section 70616(a) or (b).  *See* Cal. Gov. Code § 70616(d).

18       7. This Order does not modify the provisions of Rule 3.403(b), California Rules of Court.

19  IT IS SO ORDERED.

20  Dated:  October 23, 2007

21

22

23                         The Honorable Richard A. Kramer

24

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Goodin, MacBride, Squeri Day & Lamprey, LLP
Robert A. Goodin; Francine T. Radford, SBN 168269
Anne Hayes Hartman, SBN 184556
505 Sansome Street, Suite 900
San Francisco, CA 94111
TELEPHONE NO.: (415)392-7900   FAX NO. *(Optional):* (415) 398-4321
E-MAIL ADDRESS *(Optional):* rgoodin@goodinmacbride.com
ATTORNEY FOR *(Name):* The Charles Schwab Corporation

FOR COURT USE ONLY

ENDORSED
Superior Court of California
County of San Francisco

JUL 1 5 2010

CLERK OF THE COURT
BY: _____ WESLEY RAMIREZ _____
                              Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Division

PLAINTIFF/PETITIONER: THE CHARLS SCHWAB CORPORATION

DEFENDANT/RESPONDENT: BNP PARIBAS SECURITIES CORP., et al

CASE NUMBER: CGC-10-501610

JUDICIAL OFFICER:

DEPT.:

## NOTICE OF RELATED CASE

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: The Charles Schwab Corporation v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al
   b. Case number: CGC-10-501151
   c. Court: [x] same as above
      [ ] other state or federal court *(name and address):*

   d. Department:
   e. Case type: [ ] limited civil   [x] unlimited civil   [ ] probate   [ ] family law   [ ] other *(specify):*

   f. Filing date: June 29, 2010
   g. Has this case been designated or determined as "complex?"   [x] Yes   [ ] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [x] involves the same parties and is based on the same or similar claims.
      [x] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [x] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [x] pending
      [ ] dismissed   [ ] with   [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
      [ ] other state or federal court *(name and address):*

   d. Department:

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

## NOTICE OF RELATED CASE

Legal
Solutions
Plus

Cal. Rules of Court, rule 3.300

CM-015

| PLAINTIFF/PETITIONER: THE CHARLS SCHWAB CORPORATION | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: BNP PARIBAS SECURITIES CORP., et al | |

2. *(continued)*
   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify)*:

   f. Filing date:

   g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☐ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         ☐ Additional explanation is attached in attachment 2h

   i. Status of case:
      ☐ pending
      ☐ dismissed  ☐ with  ☐ without prejudice
      ☐ disposed of by judgment

3. a. Title:
   b. Case number:
   c. Court: ☐ same as above
            ☐ other state or federal court *(name and address)*:

   d. Department:
   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify)*:

   f. Filing date:

   g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☐ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:
      ☐ pending
      ☐ dismissed  ☐ with  ☐ without prejudice
      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached:

Date: July 15, 2010

Robert A. Goodin
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)                    ► _____
                                                            (SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER: THE CHARLS SCHWAB CORPORATION | CASE NUMBER: |
| DEFENDANT/RESPONDENT: BNP PARIBAS SECURITIES CORP., et al | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):*
   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:
   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶

_____
(TYPE OR PRINT NAME OF DECLARANT)

_____
(SIGNATURE OF DECLARANT)

CM-015 [Rev. July 1, 2007]          **NOTICE OF RELATED CASE**          Page 3 of 3

CASE NUMBER: CGC-10-501610  THE CHARLES SCHWAB CORPORATION VS. BNP PARIB/

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

> **DATE:** DEC-17-2010
>
> **TIME:** 9:00AM
>
> **PLACE:** Department 212
> 400 McAllister Street
> San Francisco, CA  94102-3680

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

---

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)

---

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Goodin, MacBride, Squeri Day & Lamprey, LLP
Robert A. Goodin, SBN 061302, Francine T. Radford, SBN 168269
Anne Hayes Hartman, SBN 184556
505 Sansome Street, Suite 900
San Francisco, CA 94111
TELEPHONE NO.: (415)392-7900      FAX NO.: (415) 398-4321
ATTORNEY FOR (Name): The Charles Schwab Corporation

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Division

CASE NAME: Schwab v. BNP PARIBAS SECURITIES CORP.

**FOR COURT USE ONLY**

ENDORSED FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

JUL 15 2010

CLERK OF THE COURT
BY: PARAM NATT
Deputy Clerk

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited    [ ] Limited<br>(Amount          (Amount<br>demanded        demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CGC - 10 - 501610<br>JUDGE:<br>DEPT: |

Items 1-6 below must be completed (see instructions on page 2).

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[x] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties   d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve           in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action (specify): Five

5. This case [ ] is   [x] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: July 15, 2010

Robert A. Goodin
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

CM-010

## INSTRU∪ONS ON HOW TO COMPLETE THE CO⌐R SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a Complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, only parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach—Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case—Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late
      Claim
    Other Civil Petition

CM-010 [Rev. July 1, 2007]
          **CIVIL CASE COVER SHEET**

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

# There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 3.221(c))



**Superior Court of California
County of San Francisco**

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can save time.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR encourages participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR is flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

# Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1) Judicial Arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

### Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

# MEDIATION

### Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts.   Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties.  A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed.  If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation.  The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial.  Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110).  Both forms are attached to this packet.

### Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by BASF pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $250 per party administration fee, parties select a specific mediator from the list of approved mediation providers or BASF will help them select an appropriate mediator for the matter. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at **www.sfbar.org/mediation** or you may call BASF at 415-982-1600.

### Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

## Cost

Generally, the cost of Private Mediation ranges from $100 per hour to $800 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $250 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

# EARLY SETTLEMENT PROGRAM

## Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

## Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If the Court assigns a matter to the ESP, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO

400 McAllister Street, San Francisco, CA   94102-4514

|  |  |
|---|---|
| Plaintiff | Case No. _____ |
| v. | **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |
| Defendant | **DEPARTMENT   212** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐ Private Mediation             ☐    Mediation Services of BASF       ☐    Judicial Mediation
☐ Binding arbitration                                                                                            Judge _____
☐ Non-binding judicial arbitration                                                                       Judge _____
☐ BASF Early Settlement Program
☐ Other ADR process (describe) _____

Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____

_____


| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff   ☐  Defendant   ☐  Cross-defendant | | Dated: _____ |


| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff   ☐  Defendant   ☐  Cross-defendant | | Dated: _____ |


| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff   ☐  Defendant   ☐  Cross-defendant | | Dated: _____ |

☐  *Additional signature(s) attached*

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | *FOR COURT USE ONLY* |
|---|---|

TELEPHONE NO.:          FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** <br> **(Check one):** ☐ **UNLIMITED CASE** <br> (Amount demanded exceeds $25,000)    ☐ **LIMITED CASE** <br> (Amount demanded is $25,000 or less) | CASE NUMBER: |
|---|---|

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:          Time:          Dept.:          Div.:          Room:

Address of court *(if different from the address above)*:

☐ Notice of Intent to Appear by Telephone, by *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. Fax number:
f. E-mail address:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a. Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.

b. ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*

c. ☐ The case has gone to an ADR process *(indicate status):*

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.  The party or parties are willing to participate in *(check all that apply)*:

(1) ☐ Mediation

(2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

(3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

(4) ☐ Binding judicial arbitration

(5) ☐ Binding private arbitration

(6) ☐ Neutral case evaluation

(7) ☐ Other *(specify)*:

e.  ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

f.  ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

g.  ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption)*:

**11. Settlement conference**

☐ The party or parties are willing to participate in an early settlement conference *(specify when)*:

**12. Insurance**

a.  ☐ Insurance carrier, if any, for party filing this statement *(name)*:

b.  Reservation of rights:  ☐ Yes  ☐ No

c.  ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

☐ Bankruptcy  ☐ Other *(specify)*:

Status:

**14. Related cases, consolidation, and coordination**

a.  ☐ There are companion, underlying, or related cases.

(1) Name of case:

(2) Name of court:

(3) Case number:

(4) Status:

☐ Additional cases are described in Attachment 14a.

b.  ☐ A motion to  ☐ consolidate  ☐ coordinate   will be filed by *(name party)*:

**15. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**16. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**CASE MANAGEMENT STATEMENT**

<div style="text-align:right">**CM-110**</div>

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

    a. ☐ The party or parties have completed all discovery.

    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| <u>Party</u> | <u>Description</u> | <u>Date</u> |
|---|---|---|

    c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic litigation**

    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Total number of pages attached *(if any)*:** _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

| | |
|---|---|
| _____ | ► _____ |
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
| _____ | ► _____ |
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
| | ☐ Additional signatures are attached. |



# Superior Court of California
## County of San Francisco



HON. JAMES J. McBRIDE
PRESIDING JUDGE

### Judicial Mediation Program

JENIFFER B. ALCANTARA
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Gail Dekreon
The Honorable Ernest H. Goldsmith
The Honorable Curtis Karnow
The Honorable Charlene P. Kiesselbach
The Honorable Tomar Mason
The Honorable Anne-Christine Massullo
The Honorable Ronald Quidachay

The Honorable A. James Robertson, II
The Honorable Jeffrey S. Ross
The Honorable John K. Stewart
The Honorable Richard Ulmer
The Honorable Monica F. Wiley
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file the Stipulation to Alternative Dispute Resolution form indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated on the form but assignment to a particular judge is not guaranteed. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

03/2010 (rw)



## MEDIATION SERVICES

MEDIATION SERVICES

PROCEDURES, FORMS, MEDIATOR BIOGRAPHIES, AND PHOTOGRAPHS

# www.sfbar.org/mediation

QUESTIONS?
adr@sfbar.org or 415-982-1600

Business
Civil Rights
Commercial
Construction
Contracts
Disability
Discrimination
Education
Employment/Workplace
Environmental
Family
Fee Disputes
Financial
Gay/Lesbian/Bisexual/Transgender Issues
Government
Insurance
Intellectual Property
Intra-Organizational
Labor
Landlord/Tenant
Land Use
Malpractice:
Legal-Medical-Professional
Partnership Dissolutions
Personal Injury
Probate/Trust
Products Liability
Real Estate
Securities
Taxation
Uninsured Motorist
Women's Issues
And more...

## What is BASF's Mediation Service?

Mediation is a voluntary, private dispute resolution process in which a trained mediator assists the parties in reaching an outcome that is mutually agreeable.

Mediation Services was established by The Bar Association of San Francisco (BASF) with extensive input from experienced mediators, litigators and judges. This traditional mediation service is an approved alternative to court ordered Arbitration or Early Settlement.

## How Much Does the Service Cost?

Mediators generously provide one hour of preparation and two hours of session time free of charge as a service to BASF and the community. To qualify for the pro-bono hours, parties must file the Consent to Mediate form with BASF. Hourly fees beyond those three hours vary depending on the mediator selected. BASF charges a small administrative fee, which pays for the costs of running the program.

## Who Are the Mediators?

Experienced mediation professionals are available to assist in most areas of dispute, ranging from multi-party commercial matters to individuals in conflict. Each has been pre-approved pursuant to strict educational and experience requirements. In fact, our mediators average 15 years of mediation experience and 125 hours of formal mediation training.

## How Does it Work?



BASF's Mediation Services works quickly, matching a qualified mediator to a case within days. The assignment process is flexible; experienced BASF staff can suggest a mediator, or you can request three biographies to choose from, or request a particular mediator from our Web site.

## Who Can Use the Service?

The service can be utilized by anyone whether or not the dispute has been filed in a court. If a legal action is already underway, it can be used at any time during the litigation process and is not limited to San Francisco County litigants.

## More Information

Our Web site - www.sfbar.org/mediation - provides photographs, short biographies and hourly rates of our mediators. You can search by name or by area of law.

If you don't see the area you need in our 30+ panels, just contact us at adr@sfbar.org; it is very likely we can match your need with one of our panelists.

**WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ROBERT A. GOODIN, State Bar No. 061302
    rgoodin@goodinmacbride.com
FRANCINE T. RADFORD, State Bar No. 168269
    fradford@goodinmacbride.com
ANNE H. HARTMAN, State Bar No. 184556
    ahartman@goodinmacbride.com
505 Sansome Street, Suite 900
San Francisco, California  94111
Telephone:    (415) 392-7900
Facsimile:    (415) 398-4321

THE CHARLES SCHWAB CORPORATION
LOWELL HAKY, State Bar No. 178526
211 Main Street
San Francisco, California  94105
Telephone:    (415) 667-0622
Facsimile:    (415) 667-1638

GRAIS & ELLSWORTH LLP
DAVID J. GRAIS (*pro hac application to be submitted*)
KATHRYN C. ELLSWORTH (*pro hac app. to be submitted*)
OWEN L. CYRULNIK (*pro hac application to be submitted*)
LEANNE M. WILSON (*pro hac application to be submitted*)
70 East 55th Street
New York, New York  10022
Telephone:    (212) 755-0100
Facsimile:    (212) 755-0052

Attorneys for Plaintiff
The Charles Schwab Corporation

ENDORSED
FILED
Superior Court of California
County of San Francisco

AUG 02 2010

CLERK OF THE COURT
MICHAEL RAYRAY
BY: _____ Deputy Clerk

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE CHARLES SCHWAB CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>BNP PARIBAS SECURITIES CORP.;<br>CWMBS, INC.;<br>BANC OF AMERICA SECURITIES LLC;<br>BANC OF AMERICA MORTGAGE<br>SECURITIES, INC; | No. CGC-10-501610<br><br>**AMENDED COMPLAINT FOR RESCISSION AND DAMAGES FOR:**<br><br>**(1) VIOLATIONS OF §§ 25401 AND 25501 OF THE CALIFORNIA CORPORATE SECURITIES ACT;**<br><br>**(2) VIOLATIONS OF §§ 11 AND 15 OF** |

AMENDED COMPLAINT



| | |
|---|---|
| 1 | BANC OF AMERICA FUNDING CORPORATION; |
| 2 | CWALT, INC.; COUNTRYWIDE FINANCIAL |
| 3 | CORPORATION; CITIGROUP GLOBAL MARKETS, INC.; |
| 4 | CITIGROUP MORTGAGE LOAN TRUST, INC.; |
| 5 | RESIDENTIAL ACCREDIT LOANS, INC.; |
| 6 | FIRST HORIZON ASSET SECURITIES INC.; |
| 7 | CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE FIRST BOSTON |
| 8 | MORTGAGE SECURITIES CORP.; RESIDENTIAL ASSET MORTGAGE |
| 9 | PRODUCTS, INC.; |
| 10 | DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK N.A.; |
| 11 | GOLDMAN, SACHS & CO.; |
| 12 | GS MORTGAGE SECURITIES CORP.; RBS SECURITIES, INC. F/K/A |
| 13 | GREENWICH CAPITAL MARKETS, INC.; HSBC SECURITIES (USA) INC.; |
| 14 | WELLS FARGO ASSET SECURITIES CORPORATION; |
| 15 | WELLS FARGO BANK N.A.; |
| 16 | MORGAN STANLEY & CO. INC.; MORGAN STANLEY CAPITAL I INC.; |
| 17 | SEQUOIA RESIDENTIAL FUNDING, INC.; UBS SECURITIES, LLC; |
| 18 | MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; |
| 19 | AND, DOES 1-50, |
| 20 | |
| 21 | Defendants. |

THE SECURITIES ACT OF 1933;

(3) VIOLATIONS OF §§ 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933;

(4) VIOLATIONS OF §§ 1572 AND 1710 OF THE CALIFORNIA CIVIL CODE (NEGLIGENT MISREPRESENTATION); and

(5) RESCISSION OF CONTRACTS UNDER § 1689 ET SEQ. OF THE CALIFORNIA CIVIL CODE

Plaintiff, THE CHARLES SCHWAB CORPORATION complains of Defendants and for causes of action alleges as follows:

## NATURE OF THIS ACTION

1.      This is an action for rescission and damages as a result of the violation by the Defendants of the California Corporate Securities Act, the California Civil Code, the federal Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or

-2-
AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

issued to Charles Schwab Bank, N.A. (referred to in this Complaint as **Schwab**) 37 certificates in 36 securitization trusts backed by residential mortgage loans. Schwab paid $1.38 billion for those certificates. When they offered and then sold these certificates to Schwab, the Defendants made numerous statements to Schwab about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue as to material facts. Moreover, the Defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the loan-to-value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans departed from their own standards in doing so.

2.      Defendants made such untrue or misleading statements about at least the following numbers of the loans in each of the 36 securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 915 | 1,597 | 57.3% |
| 2 | 1,113 | 2,274 | 48.9% |
| 3 | 381 | 779 | 48.9% |
| 4 | 868 | 3,313 | 26.2% |
| 5 | 341 | 545 | 62.6% |
| 6 | 452 | 765 | 59.1% |
| 7 | 1,227 | 2,190 | 56% |
| 8 | 463 | 979 | 53.5% |
| 9 | 427 | 861 | 54.8% |
| 10 | 751 | 1,428 | 57.7% |
| 11 | 717 | 1,365 | 52.5% |
| 12 | 1,802 | 3,441 | 51.3% |
| 13 | 1,067 | 2,492 | 44.7% |
| 14 | 270 | 377 | 71.6% |
| 15 | 1,017 | 2,385 | 40.8% |
| 16 | 1,593 | 3,625 | 43.4% |
| 17[1] | 20 | 1,411 | 1.4% |

[1] Plaintiff was not able to perform a complete analysis of the loans in Securitizations 17 and 33 because the necessary data was not available. Plaintiff is informed and believes, and based thereon alleges,

-3-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 18 | 1,577 | 3,976 | 43.7% |
| 19 | 2,169 | 4,785 | 45.3% |
| 20 | 446 | 611 | 73% |
| 21 | 248 | 367 | 67.6% |
| 22 | 562 | 1,141 | 49.3% |
| 23 | 1,554 | 3,072 | 50.6% |
| 24 | 1,081 | 2,803 | 38.6% |
| 25 | 2,987 | 8,138 | 36.7% |
| 26 | 2,767 | 4,741 | 58.4% |
| 27 | 1,252 | 2,517 | 49.7% |
| 28 | 625 | 1,175 | 53.2% |
| 29 | 961 | 1,948 | 49.3% |
| 30 | 696 | 1,801 | 38.6% |
| 31 | 1,642 | 3,250 | 50.5% |
| 32 | 296 | 541 | 54.7% |
| 33[1] | 17 | 951 | 1.8% |
| 34 | 841 | 1,662 | 50.6% |
| 35 | 446 | 724 | 61.6% |
| 36 | 618 | 1,114 | 55.5% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[2]

3.     The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, Plaintiff is entitled to rescind the purchase of the certificates or to be paid damages for losses on the certificates.

4.     Twelve securities dealers sold these certificates to Schwab. The dealers are Defendants BNP Paribas (which sold to Schwab a certificate in one securitization trust, which is referred to in this Complaint as Securitization No. 1); Banc of America Securities LLC (six

---

that discovery will demonstrate that Defendants made untrue or misleading statements about a similar percentage of the loans in Securitizations 17 and 33 as Defendants made in the Securitizations for which complete data was available.

[2] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-4-

**AMENDED COMPLAINT**

1  securitizations, Securitizations Nos. 2 through 7); Citigroup Global Markets, Inc. (six

2  securitizations, Securitizations Nos. 10 through 15); Credit Suisse Securities (USA) LLC (one

3  securitization, Securitization No. 16); Credit Suisse First Boston Mortgage Securities Corp. (two

4  securitizations, Securitizations Nos. 17 and 18); Deutsche Bank Securities (one securitization,

5  Securitization No. 19); First Tennessee Bank, N.A. (two securitizations, Securitizations Nos. 20

6  and 21); Goldman, Sachs & Co. (two securitizations, Securitizations Nos. 22 and 23); Greenwich

7  Capital Markets, Inc. (two securitizations, Securitizations Nos. 24 and 25); HSBC Securities

8  (USA) Inc. (two securitizations, Securitizations Nos. 26 and 27); Morgan Stanley & Co Inc. (six

9  securitizations, Securitizations Nos. 28 through 33); and UBS Securities, LLC (three

10  securitizations, Securitizations Nos. 34 through 36). Bear, Stearns & Co. Inc. sold to Schwab two

11  certificates in two securitizations (Securitization Nos. 9 and 10). The other Defendants named in

12  this Complaint are liable to Plaintiff because they were the issuers of some of those certificates or

13  because they controlled some of those issuers.

**PARTIES**

15    5.    Plaintiff is a corporation organized under the laws of Delaware with its principal

16  place of business in San Francisco, California.

17    6.    Defendant BNP Paribas Securities Corp. (referred to as **BNP**) is a corporation

18  organized under the laws of Delaware. BNP sold Schwab one of the certificates.

19    7.    Defendant Banc of America Securities LLC (referred to as **Banc of America**) is a

20  limited liability company organized under the laws of Delaware. Banc of America sold Schwab

21  seven of the certificates.

22    8.    Defendant Banc of America Mortgage Securities, Inc. (referred to as **Banc of

23  America Mortgage Securities**) is a corporation organized under the laws of Delaware. Banc of

24  America Mortgage Securities was the issuer of four of the certificates that Banc of America sold

25  to Schwab.

26    9.    Defendant Banc of America Funding Corporation (referred to as **Banc of America

27  Funding**) is a corporation organized under the laws of Delaware. Banc of America Funding was

28  the issuer of two of the certificates that Banc of America sold to Schwab.

-5-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10.     Defendant Citigroup Global Markets, Inc. (referred to as **Citigroup Global**) is a corporation organized under the laws of New York. Citigroup Global sold Schwab six of the certificates.

11.     Defendant Citigroup Mortgage Loan Trust, Inc. (referred to as **Citigroup Mortgage**) is a corporation organized under the laws of Delaware. Citigroup Mortgage was the issuer of four of the certificates that Citigroup Global sold to Schwab.

12.     Defendant Residential Accredit Loans, Inc. (referred to as **Residential Accredit**) is a corporation organized under the laws of Delaware. Residential Accredit Loans, Inc. was the issuer of one of the certificates that Citigroup Global sold to Schwab.

13.     Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under the laws of Delaware. Credit Suisse sold Schwab three certificates.

14.     Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB Mortgage Securities was the issuer of one of the certificates that Credit Suisse sold to Schwab.

15.     Defendant Deutsche Bank Securities, Inc. (referred to as **Deutsche**) is a corporation organized under the laws of Delaware. Deutsche sold Schwab one of the certificates.

16.     Defendant First Tennessee Bank N.A. (referred to as **First Tennessee**) is a national banking association organized under the laws of the United States. First Tennessee sold Schwab two of the certificates.

17.     Defendant First Horizon Asset Securities Inc. (referred to as **First Horizon**) is a corporation organized under the laws of Delaware. First Horizon was the issuer of one of the certificates that Citigroup Global sold to Schwab and the two certificates that First Tennessee sold to Schwab.

18.     Defendant Goldman, Sachs & Co. (referred to as **Goldman Sachs**) is a limited partnership organized under the laws of New York. Goldman Sachs sold Schwab two of the certificates.

-6-

19.     Defendant GS Mortgage Securities Corp. (referred to as **GS Mortgage**) is a corporation organized under the laws of Delaware. GS Mortgage was the issuer of one of the certificates that Goldman Sachs sold to Schwab.

20.     Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets, Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of Delaware. Greenwich Capital sold Schwab two of the certificates.

21.     Defendant CWALT, Inc. (referred to as **CWALT**) is a corporation organized under the laws of Delaware. CWALT was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the certificates that Deutsche sold to Schwab, one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, two of the certificates that Greenwich Capital Markets sold to Schwab, and one of the certificates that Banc of America sold to Schwab.

22.     Defendant Countrywide Financial Corporation is a corporation organized under the laws of Delaware. Schwab is informed and believes, and based thereon alleges, that CWALT existed for no purpose other than to receive and deposit loans into the trusts. Countrywide Financial Corporation controls or controlled CWALT. Under Section 15 of the Securities Act Countrywide Financial Corporation therefore is liable to Schwab jointly and severally with, and to the same extent as, CWALT.

23.     Defendant HSBC Securities (USA) Inc. (referred to as **HSBC**) is a corporation organized under the laws of Delaware. HSBC sold Schwab two of the certificates.

24.     Defendant Morgan Stanley & Co. Inc. (referred to as **Morgan Stanley**) is a corporation organized under the laws of Delaware. Morgan Stanley sold Schwab six of the certificates.

25.     Defendant Morgan Stanley Capital I Inc. (referred to as **Morgan Stanley Capital**) is a corporation organized under the laws of Delaware. Morgan Stanley Capital was the issuer of three of the certificates that Morgan Stanley sold to Schwab.

26.     Defendant Wells Fargo Asset Securities Corporation (referred to as **Wells Fargo Asset**) is a corporation organized under the laws of Delaware. Wells Fargo Asset was the issuer

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-7-

1   of the two certificates that HSBC sold to Schwab and one of the certificates that Morgan Stanley

2   sold to Schwab.

3        27.    Defendant Wells Fargo Bank, N.A. (referred to as **Wells Fargo Bank**) is a

4   national banking association organized under the laws of the United States. Plaintiff is informed

5   and believes, and based thereon alleges, that Wells Fargo Asset exists for no purpose other than to

6   receive and deposit loans into the trusts. During the relevant time period, Wells Fargo Bank

7   controlled Wells Fargo Asset. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, Wells

8   Fargo Bank therefore is liable to Plaintiff jointly and severally with, and to the same extent as,

9   Wells Fargo Asset.

10       28.    Defendant Sequoia Residential Funding, Inc. (referred to as **Sequoia**) is a

11   corporation organized under the laws of Delaware. Sequoia was the issuer of one of the

12   certificates that Morgan Stanley sold to Schwab.

13       29.    Defendant Residential Asset Mortgage Products, Inc. (referred to as **Residential**

14   **Asset Mortgage**) is a corporation organized under the laws of Delaware. Residential Asset

15   Mortgage was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the

16   certificates that Goldman Sachs sold to Schwab, and one of the certificates that Morgan Stanley

17   sold to Schwab.

18       30.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company

19   organized under the laws of Delaware. UBS sold Schwab three of the certificates.

20       31.    Defendant CWMBS, Inc. (referred to as **CWMBS**) is a corporation organized

21   under the laws of Delaware. CWMBS was the issuer of the certificate that BNP sold to Schwab,

22   one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, and two of the certificates

23   that UBS sold to Schwab.

24       32.    Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)

25   is a corporation organized under the laws of Delaware. MAST was the issuer of one of the

26   certificates that UBS sold to Schwab.

27       33.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

28   Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-8-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   amend this Complaint to allege the true names and capacities of these Defendants when

2   ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is

3   responsible in some manner for the occurrences alleged herein and proximately caused Plaintiff's

4   damages.

<div align="center">**ASSIGNMENT OF CLAIMS**</div>

6       34.     Schwab is a national banking association organized under the laws of the United

7   States and a wholly-owned subsidiary of Plaintiff. Its investments are managed by Charles

8   Schwab Treasury, a division of Charles Schwab & Co., which is a wholly-owned subsidiary of

9   Plaintiff. Charles Schwab Treasury is the entity to which the Defendants directed their

10  solicitations to purchase all securities referred to in this Complaint. Charles Schwab Treasury

11  received those solicitations and executed the purchase of all securities referred to in this

12  Complaint.

13      35.     On June 29, 2010, Schwab assigned all of its right, title, and interest in the claims

14  made in this Complaint to Plaintiff. A copy of the assignment is attached as Exhibit A.

<div align="center">**JURISDICTION AND VENUE**</div>

16      36.     This action is an unlimited civil case within the meaning of California Code of

17  Civil Procedure Section 88, in that, *inter alia*, the amount in controversy (as defined in California

18  Code of Civil Procedure Section 85(a)) exceeds twenty-five thousand dollars ($25,000). This

19  Court has subject-matter jurisdiction of Plaintiff's causes of action for rescission under Sections

20  25401 and 25501 of the California Corporate Securities Act, damages for negligent

21  misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a)

22  of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over Plaintiff's

23  causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k,

24  77l(a)(2), and 77o.

25      37.     Under Section 22(a) of the Securities Act, "no case arising under this title and

26  brought in any State court of competent jurisdiction shall be removed to any court of the United

27  States." Because there is not complete diversity between the Plaintiff and the Defendants, the

28

<div align="center">-9-</div>

<div align="center">**AMENDED COMPLAINT**</div>

1   Federal courts have no jurisdiction of this action under 28 U.S.C. § 1332(a). This action is not

2   removable to Federal court.

3       38.     Defendants Banc of America, Citigroup Global, Credit Suisse, CWALT, CWMBS,

4   Deutsche, First Tennessee, Goldman Sachs, HSBC, Morgan Stanley, Greenwich Capital, Sequoia,

5   UBS, and Wells Fargo Bank are subject to personal jurisdiction in California because each of

6   them is registered to do business, and does business, in California. All of the Defendants are

7   subject to personal jurisdiction in California because they offered and sold, or controlled persons

8   that offered and sold, the certificates to Schwab "in California" within the meaning of Section

9   25008 of the California Corporate Securities Act.

10      39.     Venue is proper in this County because, among other reasons, the Defendants

11  offered and sold the certificates to Schwab in this County and because the violations of law

12  alleged in this Complaint, including the making of material untrue or misleading statements,

13  occurred in this County.

14  **SECURITIZATION OF MORTGAGE LOANS**

15      40.     The securities that the Defendants sold Schwab are so-called **residential**

16  **mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**.

17  Securitization begins with loans on which the borrowers are to make payments, usually monthly.

18  The entity that makes the loans is known as the **originator** of the loans. The process by which the

19  originator decides whether to make particular loans is known as the **underwriting** of loans. The

20  purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit

21  standing to repay them and only against sufficient collateral. In the loan underwriting process, the

22  originator applies its **underwriting standards**.

23      41.     In general, residential mortgage lenders may hold some of the mortgage loans they

24  originate in their own portfolio and may sell other mortgage loans they originate into

25  securitizations.

26      42.     In a securitization, a large number of loans, usually of a similar type, are grouped

27  into a **collateral pool**. The originator of those loans sells them (and, with them, the right to

28  receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The

-10-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP.
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors

2  such as Schwab. Each certificate entitles its holder to an agreed part of the cash flow from the

3  loans in the collateral pool.

4      43.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part

5  of the overall monthly cash flow from the loans in the collateral pool.

6      44.    In a more complex securitization, the cash flow is divided into different parts,

7  usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into

8  different **classes**, each with different rights. Each class of certificates is entitled to the cash flow

9  in the tranche corresponding to that class.

10      45.    One way in which the cash flow is divided — and the rights of different classes of

11  certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The

12  most **senior** class of certificates usually is entitled to be paid in full before the next most senior

13  class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool

14  are allocated first to the most **subordinate** class of certificates, then to the class above that, and so

15  on. The interest rate on each class of certificates is usually proportional to the amount of risk that

16  that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of

17  interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as

18  the **waterfall**.

19      46.    The risk of a particular class of certificate is a function of both the riskiness of the

20  loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying

21  loans are quite risky, the senior classes of certificates may bear so little of that risk that they may

22  be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest

23  quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky

24  loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a

25  senior class of $50 million and a subordinate class of $50 million. Even though the underlying

26  loans are quite risky, the senior class of certificates would be paid in full as long as the $100

27  million of loans produced payments of at least $50 million plus interest, that is, unless the loss

28  rate on those loans exceeded 50%, fully 10 times the historical average.

-11-

**AMENDED COMPLAINT**

47.     All of the certificates referred to in this Complaint were senior certificates that were rated triple-A when Schwab purchased them.

<center>*</center>

48.     Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

49.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

<center>*</center>

50.     **Securities dealers**, like 12 of the Defendants, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

51.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

<center>-12-</center>

<center>**AMENDED COMPLAINT**</center>

1  also includes notes from the person who underwrote the loan about whether and how the loan

2  complied with the originator's underwriting standards, including documentation of any

3  "compensating factors" that justified any departure from those standards.

4      52.    Potential investors in certificates are not given access to loan files. Instead, the

5  securities dealers that underwrite the sale of the certificates in a securitization are responsible for

6  gathering, verifying, and presenting to potential investors the information about the credit quality

7  of the loans that will be deposited into the trust. They do so by using information about the loans,

8  which has been compiled into a database known as a **loan tape**. The securities dealers use the

9  loan tape to compile numerous statistics about the loans, which are presented to potential

10  investors in a **prospectus supplement**, a disclosure document that the dealers are required to file

11  with the Securities and Exchange Commission.

12      53.    As alleged in detail below, the information that the Defendants presented to

13  Schwab about the credit quality of the loans in the collateral pools of the trusts contained many

14  statements that were material to the credit quality of those loans, but were untrue or misleading.

15  <div align="center">**TOLLING OF THE STATUTE OF LIMITATIONS**</div>

16      54.    Plaintiff is a putative member of the proposed classes in *Luther v. Countrywide*

17  *Financial Corporation*, Superior Court for the State of California County of Los Angeles No. BC

18  380698, filed on November 11, 2007; and *In re Wells Fargo Mortgage-Backed Certificates*

19  *Litigation*, United States District Court for the Northern District of California, No. 09-cv-01376-

20  SI, filed on March 27, 2009; the pendency of which has tolled the running of the statute of

21  limitations on the causes of action alleged in this Complaint.

22  <div align="center">**THE SALES OF THE CERTIFICATES**</div>

23      55.    The Defendants sold to Schwab 37 certificates in Securitizations Nos. 1 through

24  36. Details of each trust and each certificate are stated in Item 55 of Schedules 1 through 36 of

25  this Complaint. The Schedules correspond to Securitizations Nos. 1 through 36. Plaintiff

26  incorporates into this paragraph 55, and alleges as though fully set forth in this paragraph, the

27  contents of Item 55 of the schedules.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

<div align="center">-13-</div>
<div align="center">**AMENDED COMPLAINT**</div>

56.     Defendants knew that Charles Schwab Treasury was responsible for locating, analyzing, and making investments for Schwab.

57.     Representatives of Defendants sent communications and solicitations to Charles Schwab Treasury in San Francisco for the purpose of inducing Charles Schwab Treasury to purchase the bonds for Schwab.

58.     The sale of these certificates occurred in California because representatives of the Defendants directed communications about the certificates and solicitations to purchase the bonds to Charles Schwab Treasury there, and because Charles Schwab Treasury received those communications and solicitations there.

## DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

59.     In connection with their offers and sales of the certificates to Schwab, each of the dealer Defendants sent numerous documents to Charles Schwab Treasury at its office in San Francisco. For each certificate, these documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, each dealer made statements of material fact about the certificate that it offered and sold to Schwab. A true copy of the prospectus supplement for each securitization is available from the Securities and Exchange Commission's website.[3]

60.     Many of the statements of material fact that each dealer made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**I.      Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**A.      LTVs**

**1.      The materiality of LTVs**

61.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

---

[3] A URL for each prospectus supplement is included in Item 55 of each schedule.

-14-

**AMENDED COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000

2   has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of

3   the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in

4   the collateral pool of a securitization are therefore one of the most crucial measures of the risk of

5   certificates sold in that securitization. LTV is a primary determinant of the likelihood of default.

6   The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less

7   likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby

8   give the owner an incentive to stop making mortgage payments and abandon the property, a so-

9   called strategic default. LTV is also a primary determinant of the severity of losses for those loans

10   that do default. The lower the LTV, the lower the severity of losses on those loans that do default.

11   Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the

12   proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

13          62.     Beyond these fundamental effects on the likelihood and severity of default, LTVs

14   also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage

15   loans before maturity and when they do so) and therefore the expected lives of the loans and the

16   associated certificates. Prepayment patterns affect many aspects of certificates that are material to

17   the investors that purchase them, including the life of the certificate and the timing and amount of

18   cash that the investor will receive during that life.

19          63.     In addition, rating agencies use LTVs to determine the proper structuring and

20   credit enhancement necessary for securities, such as the certificates that Schwab purchased, to

21   receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a

22   securitization are incorrect, the ratings of certificates sold in that securitization will also be

23   incorrect.

24          64.     An accurate denominator (that is, the value of the property) is essential to an

25   accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk

26   of a loan. To return to the example above, if the property whose actual value is $500,000 is

27   valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to

28   54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the

-15-

**AMENDED COMPLAINT**

LTV based on the incorrect appraised value understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an error in value of any given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

65.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

### 2.     Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

66.     In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 66 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 66, and alleges as though fully set forth in this paragraph, the contents of Item 66 of the schedules.

67.     The mortgage loans in the collateral pools of these securitizations were divided into groups. Payments on the certificates that Schwab purchased were to be made primarily from the cash flows from the loans in the particular groups that were designated to support Schwab's certificates. Because of the structure of the securitizations, however, in most cases the credit quality of the loans in the other groups in the securitizations also was material to the risk of the certificates that Schwab purchased.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-16-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

68.     The Defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the Defendants intended that these statements be understood as statements of fact. Charles Schwab Treasury did understand the statements about the LTVs as statements of fact. Plaintiff, Charles Schwab Treasury, and Schwab had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the Defendants made about those LTVs.

<div align="center">

**3.      These statements were untrue because the stated LTVs of many of those mortgage loans were lower than their actual LTVs.**

</div>

69.     The stated LTVs of many of the mortgage loans in each securitization were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus supplements were also, therefore, untrue and misleading.

<div align="center">

**a.      Use of an automated valuation model demonstrates that the Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

</div>

70.     Using a comprehensive, industry-standard automated valuation model (AVM), it is possible to determine the true market value of a certain property as of a selected date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

---

[4] References in this Complaint and the schedules to the denominator in the LTVs are to the appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

<div align="center">

-17-

**AMENDED COMPLAINT**

</div>

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

71.     On many of the properties that secured the mortgage loans, the model reported that LTVs were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

72.     To take an example, in Securitization No. 1, there were 1,597 mortgage loans in the collateral pool. There was sufficient information for the model to determine the value of the properties that secured 930 of those loans. On 626 of those 930 properties, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $106,814,153. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of true market value on only 69 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominator was $11,194,470. Thus, the number of properties on which the value was overstated exceeded by more than nine times the number on which the value was understated, and the aggregate amount overstated was more than nine times the aggregate amount understated.

73.     On one of the loans in Securitization No. 1, the amount of the loan was $585,000 and the stated value of the property was $1,220,000, resulting in a stated LTV of 48%. The model, however, determined that the true value of the property was $794,000, resulting in a true LTV of 73.6%. Thus, the stated value was higher than the true value by 53.7%, and the stated LTV was lower than the true LTV by 34.7%. Both of these were huge discrepancies that were material to the credit quality of the loan.

-18-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

74. The overstated values of 626 properties made virtually every statement by the Defendants about the LTVs of the mortgage loans untrue or misleading. For example, the Defendants stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 196 of the 930 properties valued by the model had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans was 73.84%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 90.5%. These differences were material for the reasons stated above.

75. The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans | 1,597 |
| Number of properties on which there was enough information for the model to determine a true market value | 930 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 626 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $106,814,153 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 69 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,194,470 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 196 |
| Weighted-average LTV, as stated by Defendants (group 4) | 73.84% |
| Weighted-average LTV, as determined by the model (group 4) | 90.5% |

76. The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 76 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 76, and alleges as though fully set forth in this paragraph, the contents of Item 76 of the schedules.

               **b.    Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

77. Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the

-19-

**AMENDED COMPLAINT**

only basis for determining the value of the property because there is no sale price in a refinancing. A substantial number of those properties have since been sold. In nearly all the pools, those properties were sold for much less than the value ascribed to them in the LTV data reported in the prospectus supplements and other documents that the Defendants sent to Charles Schwab Treasury. The differences cannot be explained by the declines in house prices in the areas in which those properties were located. Analysis of indices that track home prices in various geographic areas shows that the differences between the values ascribed to these properties and the prices at which the properties were sold are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding sale). Thus, the large differences show that the values ascribed to those properties, and to all properties in the collateral pools, in the LTV data reported in the prospectus supplements and other documents that the Defendants sent to Charles Schwab Treasury were too high, that the resulting LTVs were too low, and thus that the statements in the prospectus supplements and other documents sent to Charles Schwab Treasury about the LTVs were untrue or misleading.

78.     To take an example of Securitization No. 1, of the 1,597 mortgage loans in the collateral pool, 812 were taken out to refinance, rather than to purchase, properties. For those 812 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 812 properties, 59 were subsequently sold for a total of approximately $30,927,350. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Charles Schwab Treasury was $48,435,000. Thus, those properties were sold for 63.9% of the value ascribed to them, a difference of 36.1%. This difference is significantly greater than would have been predicted by the declines in house prices in the areas in which those properties were located.

79.     The results of this analysis for the securitizations are stated in Item 79 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 79, and alleges as though fully set forth in this paragraph, the contents of Item 79 of the schedules.

-20-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**4.    These statements were misleading because the Defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

80.    As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

81.    The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

82.    According to land records, many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to liens in addition to the lien of the

-21-

**AMENDED COMPLAINT**

mortgage in the pool at the time of the closing of these securitizations.[5] In twenty-four of the securitizations, the Defendants failed to disclose any of these additional liens in the prospectus supplements and other documents they sent to Charles Schwab Treasury. These additional liens reduced the equity of the owners of the properties subject to them, and thereby increased the risk that those owners would default in payment of the mortgage loan in the pool.

83.   To take an example, of the 2,274 properties that secured the mortgage loans in Securitization No. 2, at least 669 were subject to undisclosed liens in addition to the lien of the mortgage in the pool. The undisclosed additional liens on these properties reduced the owners' equity in those properties by a weighted average of 91.5% and by an aggregate amount of $32,261,150.

84.   On one of the loans, the original balance of the mortgage loan was $532,000, the represented value of the property was $760,000, the owner's ostensible equity was $228,000, and the reported LTV was 70%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $200,000. Thus, the owner's true equity was only $28,000, 87.7% less than the equity implied by the disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed additional liens were precisely equal to the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

85.   Similar numbers of additional undisclosed liens were found in each securitization in which the Defendants did not disclose the existence of additional liens. Details of the undisclosed additional liens in each securitization are stated in Item 85 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in this paragraph, the contents of Item 85 of the schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the schedules.

---

[5] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

-22-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

86.   Because the Defendants did not disclose the existence or the amounts of these additional liens, all statements that they made about the LTVs of the mortgage loans were misleading.

**B.   Appraisals**

87.   As discussed above in paragraph 64, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

88.   In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

89.   This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the Defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

-23-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.    **These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

90.    The Defendants omitted to state that brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values,

- the withholding of business if the appraisers refused to guarantee a predetermined value,

- the withholding of business if the appraisers refused to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

91.    The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 77 through 79 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 70 through 76, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 9.1 | 9.5 |
| 2 | 2.0 | 2.8 |
| 3 | 6.2 | 5.8 |
| 4 | 2.1 | 2.2 |
| 5 | 2.9 | 4.2 |

**AMENDED COMPLAINT**

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 6 | 2.5 | 2.7 |
| 7 | 2.8 | 3.4 |
| 8 | 4.3 | 6.0 |
| 9 | 5.8 | 6.8 |
| 10 | 3.8 | 5.5 |
| 11 | 3.3 | 2.3 |
| 12 | 3.0 | 3.5 |
| 13 | 1.9 | 2.1 |
| 14 | 4.1 | 5.3 |
| 15 | 2.1 | 2.9 |
| 16 | 3.1 | 3.9 |
| 17 | N/A | N/A |
| 18 | 1.7 | 1.4 |
| 19 | 3.6 | 3.6 |
| 20 | 9.0 | 15.3 |
| 21 | 4.6 | 4.5 |
| 22 | 4.8 | 5.1 |
| 23 | 2.6 | 3.1 |
| 24 | 1.7 | 1.4 |
| 25 | 1.8 | 1.5 |
| 26 | 6.0 | 7.7 |
| 27 | 3.3 | 4.2 |
| 28 | 3.4 | 3.8 |
| 29 | 4.1 | 5.3 |
| 30 | 2.9 | 4.1 |
| 31 | 3.1 | 3.0 |
| 32 | 1.7 | 3.5 |
| 33 | N/A | N/A |
| 34 | 3.8 | 4.4 |
| 35 | 3.0 | 4.0 |
| 36 | 3.1 | 6.7 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

92.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-25-

AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**2.      The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

93.      Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

94.      USPAP includes the following provisions:

(a)      Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

(b)      Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

(c)      Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.      the reporting of a predetermined result (*e.g.*, opinion of value);

2.      a direction in assignment results that favors the cause of the client;

3.      the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

95.      The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

-26-

1    ____ ”; “If this property will not appraise for at least _____, stop and call us immediately”; etc.

2    About such conditions, Advisory Opinion 19 states:

3              Certain types of conditions are unacceptable in any assignment
               because performing an assignment under such conditions violates
4              USPAP. Specifically, an assignment condition is unacceptable
               when it:
5
6              •  precludes an appraiser's impartiality. Because such a
                  condition destroys the objectivity and independence
7                 required for the development and communication of
                  credible results;
8
               •  limits the scope of work to such a degree that the
9                 assignment results are not credible, given the intended use
                  of the assignment; or
10
               •  limits the content of a report in a way that results in the
11                report being misleading.

12        96.      In the prospectus supplements and other documents they sent to Charles Schwab

13   Treasury, the Defendants made statements that the appraisals of properties that secured the

14   mortgage loans in the collateral pools were made in compliance with USPAP or with the

15   appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP.

16   Details of each such statement are stated in Item 96 of the schedules of this Complaint. Plaintiff

17   incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the

18   contents of Item 96 of the schedules.

19        97.      Plaintiff is informed and believes, and based thereon alleges, that a material

20   number of mortgage loans in the collateral pools had appraisals conducted that deviated from

21   USPAP.

22        98.      Each of these statements referred to in paragraph 96 was untrue because the

23   appraisals of a material number of the properties referred to in each such statement did not

24   conform to USPAP.

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-27-

**AMENDED COMPLAINT**

*

1

2      99.     By each of the untrue and misleading statements referred to in paragraphs 66 and

3  96 above, the Defendants materially understated the risk of the certificates that they offered and

4  sold to Schwab.

5  **II.    Untrue or Misleading Statements About the Occupancy Status of the Properties**
   **That Secured the Mortgage Loans in the Collateral Pools**
6

7          **A.    The materiality of occupancy status**

8      100.    Residential real estate is usually divided into primary residences, second homes,

9  and investment properties. Mortgages on primary residences are less likely to default than

10 mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also

11 influences prepayment patterns.

12     101.    Occupancy status (that is, whether the property that secures a mortgage is to be the

13 primary residence of the borrower, a second home, or an investment property) is an important

14 measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a

15 securitization that are not secured by mortgages on primary residences is an important measure of

16 the risk of certificates sold in that securitization. Other things being equal, the higher the

17 percentage of loans not secured by primary residences, the greater the risk of the certificates. A

18 reasonable investor considers occupancy status important to the decision whether to purchase a

19 certificate in a securitization of mortgage loans.

20         **B.    Untrue or misleading statements about the occupancy status of the properties**
           **that secured the mortgage loans in the collateral pools of these securitizations**
21

22     102.    In the prospectus supplements and other documents they sent to Charles Schwab

23 Treasury, the Defendants made statements about the number of properties in the collateral pool of

24 each securitization that were the primary homes of their owners. To return to the example of

25 Securitization No. 1, the Defendants stated that, of the 1,597 mortgage loans in the collateral

26 pool, 1,498 were secured by primary residences and 99 were not. Details of each such statement

27 in each securitization are stated in Item 102 of the schedules of this Complaint. Plaintiff

28

-28-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    incorporates into this paragraph 102, and alleges as though fully set forth in this paragraph, the

2    contents of Item 102 of the schedules.

3        103.    These statements were untrue or misleading because (i) the stated number of

4    mortgage loans secured by primary residences was higher than the actual number of loans in that

5    category; (ii) the stated number of mortgage loans not secured by primary residences was lower

6    than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

7    occupancy status of a significant number of the properties that secured the mortgage loans in the

8    collateral pools was misstated because of fraud.

9        **C.    Basis of the allegations above that these statements about the occupancy
         status of the properties that secured the mortgage loans in the collateral pools**

10       **were untrue or misleading**

11       104.    Because they are less risky than other mortgage loans, mortgage loans on primary

12   residences usually have more favorable terms, including lower interest rates and more lenient

13   underwriting standards, than mortgage loans on second homes and investment properties.

14   Applicants for loans on second homes and investment properties therefore have an incentive to

15   state that the property will be their primary residence even when it will not. Plaintiff is informed

16   and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans

17   did so.

18       105.    A significant number of the properties in the collateral pool of each securitization

19   that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and

20   believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

21   loan files of many more of the mortgage loans in the collateral pool.

22       106.    With respect to some of the properties that were stated to be primary residences,

23   the borrower instructed local tax authorities to send the bills for the taxes on the property to the

24   borrower at an address other than the property itself. This is strong evidence that the mortgaged

25   property was not the borrower's primary residence.

26       107.    In some states and counties, owners of a property are able to designate whether

27   that property is his or her "homestead," which may reduce the taxes on that property or exempt

28   the property from assets available to satisfy the owner's creditors, or both. An owner may

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-29-

**AMENDED COMPLAINT**

designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

108.    With respect to some of the properties that were stated to be primary residences, the borrower owned three or more properties. Thus it was reasonably likely that the borrower did not live in the property that was stated to be owner-occupied.

109.    When a borrower who lives in a mortgaged property falls behind in his or her payments, it is normally many months before foreclosure ensues, during which time the borrower tries to become current in his or her payments or to modify the mortgage so as not to lose his or her home. During this time, the borrower becomes progressively more delinquent (30 days past due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight from being current to either foreclosure or ownership by the lender, it is usually because the borrower did not live in the property and so made no effort to remain in it, but instead abandoned the property to the lender soon after he or she became unable to make the payments. In many of the securitizations, there were mortgage loans in the collateral pools that were secured by properties that were stated to be primary residences and that went straight from current to foreclosure or ownership by the lender. It is more likely than not that the properties that secured these mortgage loans were actually not primary residences.

110.    When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the

-30-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    addresses in the borrowers' credit files to the addresses of the mortgage properties six months

2    after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by

3    properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the

4    address of the mortgaged property but did receive their bills at an address or addresses that were

5    different from the address of the mortgaged properties. It is very likely that each of these

6    borrowers did not occupy the mortgaged property.

7    　　　　111.    In Securitization No. 1, 112 owners of properties that were stated to be primary

8    residences instructed local tax authorities to send the bills for the taxes on that property to them at

9    a different address; 283 owners of properties that were stated to be primary residences could

10   have, but did not, designate that property as their homestead; 27 owners of properties that were

11   stated to be primary residences owned three or more properties, and 183 owners of properties that

12   were stated to be primary residences did not receive any of their bills there 6 months after the

13   mortgage was originated. Eliminating duplicates, 499 properties that were stated to be primary

14   residences actually were not, for one or more of these reasons. Thus, of the 1,498 properties that

15   were stated to be primary residences, 499 actually were not, and the number of properties that

16   were not primary residences was not 99, as Defendants stated, but at least 598, a material

17   difference. The numbers of such loans in the collateral pool of each securitization are stated in

18   Item 111 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 111, and

19   alleges as though fully set forth in this paragraph, the contents of Item 111 of the schedules.

20   　　　　　　　　　　　　　　　　　　　　*

21   　　　　112.    By each of the untrue and misleading statements referred to in paragraph 102, the

22   Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

23   **III.    Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

24

25   　　　　**A.    The materiality of underwriting standards and the extent of an originator's departures from them**

26   　　　　113.    Originators of mortgage loans have written standards by which they underwrite

27   applications for loans. An important purpose of underwriting is to ensure that the originator

28   makes mortgage loans only in compliance with those standards and that its underwriting decisions

-31-

AMENDED COMPLAINT

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator departs from its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and the extent to which each originator departs from its standards, important to the decision whether to purchase a certificate in that securitization.

**B.      Untrue or misleading statements about the underwriting standards of originators of the mortgage loans in the collateral pools and about the extent to which those originators departed from their standards**

**1.      The untrue or misleading statements**

114.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 114 of the schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 114, and alleges as though fully set forth in this paragraph, the contents of Item 114 of the schedules.

115.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the Defendants omitted to state that: (a) the originators were departing extensively from those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not

-32-

**AMENDED COMPLAINT**

1    repay; and (e) the originators were failing frequently to follow quality-assurance practices

2    necessary to detect and prevent fraud intended to circumvent their underwriting standards.

### 2.   Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading

#### a.   The deterioration in undisclosed credit characteristics of mortgage loans made by these originators

7    116.   Plaintiff is informed and believes, and based thereon alleges, before and during the

8    time of these securitizations, many originators of mortgage loans relaxed their actual lending

9    practices for loans they sold into securitizations, even though their stated underwriting standards

10   may have remained unchanged. As a result of this relaxation, securitized mortgage loans made

11   between 2004 and the dates of these securitizations have experienced high rates of delinquency

12   and default.

13   117.   Based on an extensive empirical study of mortgage loans made and sold into

14   securitizations during this period, economists at the University of Michigan and elsewhere found

15   that the high rates of delinquency and default were caused not so much by any deterioration in

16   credit characteristics of the loans that were expressly embodied in underwriting standards and

17   disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed

18   to investors.

19   118.   What these economists found about recent securitized mortgage loans in general

20   was true in particular of loans originated by the entities that originated the loans in the collateral

21   pools of these securitizations, as the following figures demonstrate. Taking the originator

22   Countrywide Home Loans Inc. as an example, Figure 1 shows the rising incidence of early

23   payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that

24   were originated and sold into securitizations by Countrywide Home Loans Inc. and that became

25   60 or more days delinquent within six months after they were made. An EPD is strong evidence

26   that the originator departed from its underwriting standards in making the loan, often by failing to

27   detect fraud in the application. Underwriting standards are intended to ensure that loans are made

28   only to borrowers who can and will make their mortgage payments. Because an EPD occurs so

-33-

soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Countrywide Home Loans Inc. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.



**Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination**

119. Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO





Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

120.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
|---------|------------|
| B | Bank of America N.A. |
| C | Countrywide Home Loans Inc. |
| D | EMC Mortgage Corporation |
| E | GMAC Mortgage Corporation |
| F | Morgan Stanley |
| G | PHH Mortgage Corporation |
| H | SunTrust Mortgage Inc. |
| I | Wells Fargo Bank N.A. |

Plaintiff incorporates into this paragraph 120, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

-35-

**AMENDED COMPLAINT**

b.   **The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

121.   As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced very high rates of EPDs. This high rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 121 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 121, and alleges as though fully set forth in this paragraph, the contents of Item 121 of the schedules.

122.   A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. This high rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 122 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 122, and alleges as though fully set forth in this paragraph, the contents of Item 122 of the schedules.

123.   A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure, some as high as 57% of the loans as of March 31, 2010. This high rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on March 31, 2010, are stated in Item 123 of the schedules of this Complaint. Plaintiff incorporates into this

-36-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    paragraph 123, and alleges as though fully set forth in this paragraph, the contents of Item 123 of

2    the schedules.

3                                            *

4         124.    By each of the untrue and misleading statements referred to in paragraph 114

5    above, the Defendants materially understated the risk of the certificates that they offered and sold

6    to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that

7    discovery will yield additional evidence that the originators departed extensively from their

8    underwriting guidelines when making the mortgage loans in the collateral pools of these

9    securitizations.

10   **IV.    The Large Number of Mortgage Loans in the Collateral Pools About Which the
         Defendants Made Material Untrue or Misleading Statements Made Their Statements
11       About the Ratings of Schwab's Certificates Untrue and Misleading.**

12        125.    In the prospectus supplements and other documents they sent to Charles Schwab

13   Treasury, the Defendants made statements about the rating of each certificate by Moody's

14   Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or

15   more of those agencies rated each such certificate triple-A or above. Details of each such

16   statement are stated in Item 125 of the schedules of this Complaint. Plaintiff incorporates into this

17   paragraph 125, and alleges as though fully set forth in this paragraph, the contents of Item 125 of

18   the schedules.

19        126.    The ratings were important to the decision of any reasonable investor whether to

20   purchase the certificates. Many investors, including Schwab, have investment policies that require

21   a certain minimum rating for all investments. The policy of Schwab was to purchase only

22   certificates that were rated triple-A.

23        127.    These statements by the Defendants about the ratings of the certificates they sold

24   to Schwab were misleading because the Defendants omitted to state that the ratings did not take

25   into account all the material untrue or misleading statements about specific mortgage loans in the

26   collateral pool. These include:

27        (a)    loans in which the LTVs were materially understated;

28

-37-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(b)     loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)     loans that suffered EPDs, strong evidence that the originators may have made undisclosed departures from the underwriting standards in making those loans; and

(d)     loans in which the properties were stated to be owner-occupied, but were not.

128.     In Securitization No. 1, there were 626 loans whose LTVs were materially understated and 499 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 915 loans (or 57.3% of the loans in the collateral pool) about which Defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 128 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 128, and alleges as though fully set forth in this paragraph, the contents of Item 128 of the schedules.

129.     Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

130.     By these untrue and misleading statements, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

## FIRST CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
### (California Corporations Code §§ 25401, 25501)

131.     This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
| --- | --- |
| BNP | Securitization No. 1 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7 |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | Securitizations Nos. 19 |

-38-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| First Tennessee | Securitizations Nos. 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | Securitizations Nos. 34, 35, 36 |

132.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 130.

133.    In doing the acts alleged in the sale to Schwab of the certificates in the securitizations referred to above, the Defendants named above violated Sections 25401 and 25501 of the California Corporations Code by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    This action is brought within two years after the discovery of the untrue and misleading statements in the prospectus supplements and other documents that the Defendants sent to Charles Schwab Treasury, and within five years of Schwab's purchase of these certificates, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, neither Plaintiff, Charles Schwab Treasury, nor Schwab could reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other documents.

135.    Under California Corporations Code §§ 25401 and 25501, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date on which it recovers the purchase price, minus the amount of income received on the certificate. Pursuant to § 25501, and in anticipation of the remedies thereunder, Plaintiff hereby offers to tender each certificate.

-39-

AMENDED COMPLAINT

### SECOND CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS
### IN REGISTRATION STATEMENTS
#### (Section 11 of the Securities Act of 1933)

136.   This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitization:* |
| ---: | --- |
| Banc of America | Securitization No. 3 |
| CWALT | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Credit Suisse | Securitization No. 18 |
| Deutsche | Securitization No. 19 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitization No. 28 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |

137.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 135.

138.   In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in connection with the sale to Schwab of the certificates in the securitizations referred to above.

139.   The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 55 of the schedules.

140.   Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in those securitizations. UBS acted as underwriter of the certificate listed above.

141.   This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab

-40-

**AMENDED COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   did not and could not reasonably have discovered earlier the untrue and misleading statements in

2   the prospectus supplements.

3       142.    The registration statements, as amended by the prospectus supplements, contained

4   untrue statements of material fact and omitted to state material facts necessary in order to make

5   the statements, in the light of the circumstances under which they were made, not misleading.

6   These untrue and misleading statements included all of the untrue and misleading statements

7   described in paragraphs 59 through 130.

8       143.    Plaintiff expressly excludes from this cause of action any allegation that could be

9   construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

10   on claims of strict liability or negligence under the Securities Act of 1933.

11       144.    Schwab did not know when it purchased these certificates that the statements in

12   the registration statements, as amended by the prospectus supplements, were untrue or

13   misleading.

14       145.    Schwab has suffered a loss on each of these certificates.

15       146.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

16   <div align="center">**THIRD CAUSE OF ACTION**</div>

17   <div align="center">**UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES**</div>
<div align="center">**(Section 12(a)(2) of the Securities Act of 1933)**</div>

18       147.    This cause of action is alleged against the following Defendants:

19

20

21

| *Against Defendant:* | *In connection with Securitization:* |
|---|---|
| Banc of America | Securitization No. 3 |
| CWALT | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Credit Suisse | Securitization No. 18 |
| Deutsche | Securitization No. 19 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitization No. 28 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |

22

23

24

25

26

27

28

<div align="center">-41-</div>
<div align="center">AMENDED COMPLAINT</div>

148.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 146.

149.   In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

150.   This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury.

151.   Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in that securitization. In connection with the offer and sale of these certificates to Schwab, the issuer also made all of the statements of material fact about these certificates that were in the prospectus supplements and other written offering materials and oral communications that that the dealers sent to Charles Schwab Treasury.

152.   Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

153.   The Defendants named above solicited Schwab to purchase these certificates, and sold the certificates to Schwab, by means of the prospectus supplements and other written offering materials and oral communications.

154.   The prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury contained untrue statements of

-42-

**AMENDED COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   material fact and omitted to state material facts necessary in order to make the statements, in the

2   light of the circumstances under which they were made, not misleading.

3       155.    Schwab did not know when it purchased these certificates that the statements in

4   the prospectus supplements and other written offering materials and oral communications that the

5   dealers sent to Charles Schwab Treasury were untrue or misleading.

6       156.    Schwab has suffered a loss on each of these certificates.

7       157.    Plaintiff is entitled to recover the consideration paid for each of these certificates,

8   plus interest at the legal rate from the date of purchase to the date on which it recovers the

9   purchase price, minus the amount of income received on each certificate. Pursuant to Section

10  12(a)(2), and in anticipation of the remedies thereunder, Plaintiff hereby offers to tender each

11  certificate.

### FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
### (Section 15 of the Securities Act of 1933)

158.    This cause of action is alleged against the following Defendant:

| Against Defendants: | In connection with Securitizations: |
|---|---|
| Countrywide Financial Corporation | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Wells Fargo Bank | Securitizations Nos. 26, 27, 28 |

19

20      159.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

21  through 157.

22      160.    The Defendants named above is liable because, in doing the acts alleged, persons

23  they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to

24  Schwab of the certificates in the securitizations referred to above.

25      161.    Countrywide Financial Corporation by or through stock ownership, agency, or

26  otherwise, controlled CWALT within the meaning of Section 15 of the Securities Act of 1933.

27      162.    Wells Fargo Bank by or through stock ownership, agency, or otherwise, controlled

28  Wells Fargo Asset within the meaning of Section 15 of the Securities Act of 1933.

-43-

**AMENDED COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

163. In doing the acts alleged, each controlled person named in paragraphs 162 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 157.

164. The Defendants named above are therefore jointly and severally liable with and to the same extent as the person they controlled.

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
**(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)**

165. This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
| --- | --- |
| BNP | Securitization No. 1 |
| CWMBS | Securitizations Nos. 1, 8, 35, 36 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Banc of America Mortgage Securities | Securitizations Nos. 2, 5, 6 |
| CWALT | Securitizations Nos. 3, 9,18, 19, 24, 25 |
| Banc of America Funding | Securitizations Nos. 4, 7 |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Citigroup Mortgage | Securitizations Nos. 10, 12, 13, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| CSFB Mortgage Securities | Securitization No. 16 |
| Residential Asset Mortgage | Securitizations Nos. 17, 22, 33 |
| Residential Accredit | Securitization No. 11 |
| Deutsche Bank | Securitization No. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| First Horizon | Securitizations Nos. 14, 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| GS Mortgage | Securitizations Nos. 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| Morgan Stanley Capital | Securitizations Nos. 29, 30, 31 |
| Sequoia | Securitization No. 32 |
| MAST | Securitization No. 34 |
| UBS | Securitizations Nos. 34, 35, 36 |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-44-

AMENDED COMPLAINT

166.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 164.

167.    As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

168.    In making the representations referred to above, the Defendants intended to induce Schwab to rely on those representations in making its decision to purchase these certificates in these securitizations.

169.    When the Defendants made these representations, they had no reasonable ground for believing them to be true. Plaintiff is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants inspected those files, they would have learned that the information they gave Charles Schwab Treasury contained untrue or misleading statements. In addition, Plaintiff is informed and believes, and based thereon alleges, that Defendants hired one or more "due-diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied with the representations and warranties made about those loans, and these contractors reported to the Defendants that a material number of the loans in the collateral pools were different from the descriptions of those loans in the prospectus supplements. Thus, Plaintiff is informed and believes, and based thereon alleges, that the Defendants had access to information that either did make the Defendants aware, or should have made them aware had they heeded that information, that the representations they made to Charles Schwab Treasury contained material untrue or misleading statements about the mortgage loans in the collateral pools.

170.    When it purchased these certificates, Schwab did not know about the untrue and misleading statements alleged herein.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-45-

AMENDED COMPLAINT

171.   Schwab reasonably and justifiably relied on the representations described above in analyzing and deciding to purchase these certificates. Had the Defendants not made these false and misleading representations, Schwab would not have purchased these certificates.

172.   As a direct and proximate result of the negligent misrepresentations by the Defendants, Schwab was damaged in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION

### RESCISSION OF CONTRACT
### (California Civil Code §§ 1689 and 1710, and Common Law)

173.   This cause of action is alleged against the following Defendants:

| *Against Defendants:* | *In connection with Securitization:* |
|---|---|
| BNP | Securitization No. 1 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | Securitizations Nos. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | Securitizations Nos. 34, 35, 36 |

174.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 172.

175.   Schwab purchased each certificate pursuant to a contract in writing between Schwab and the dealer from which it purchased that certificate. Each contract stated the consideration that Schwab paid each dealer for each certificate.

176.   In making each contract to purchase the certificates, Schwab relied on the truth of the statements that the Defendants named above made in the prospectus supplements and other offering materials. Because those statements were untrue or misleading, Schwab was mistaken about its basic assumptions underlying its purchase of each certificate, and this mistake had a material adverse effect on the agreed-upon exchange represented by Schwab's purchase of each

-46-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    certificate. Because the Defendants named above were responsible to provide accurate

2    information in the prospectus supplements, Schwab did not assume, nor does it bear, the risk of

3    the fundamental mistake underlying its decision to purchase these certificates.

4         177.    The Defendants named above obtained the consent of Schwab to the contracts to

5    purchase the certificates by means of their assertion, as facts, of that which was not true, when

6    those Defendants had no reasonable ground for believing those assertions to be true.

7         178.    Pursuant to California Civil Code. § 1689 *et seq.*, Plaintiff is entitled to rescind,

8    and does hereby demand the rescission of, each contract for the sale and purchase of these

9    certificates. Plaintiff offers to restore all benefits that Schwab has received under those contracts

10   and is entitled to recover all consideration paid under them.

## PRAYER FOR RELIEF

12       WHEREFORE, Plaintiff respectfully demands judgment as follows:

13       A.    On the first cause of action, the consideration paid for each certificate with interest

14   thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

15   certificate;

16       B.    On the second cause of action, damages in an amount to be determined at trial;

17       C.    On the third cause of action, the consideration paid for each certificate with

18   interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

19   certificate;

20       D.    On the fourth cause of action, the consideration paid for each certificate with

21   interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

22   certificate;

23       E.    On the fifth cause of action, damages in an amount to be determined at trial;

24       F.    On the sixth cause of action, the consideration paid for each certificate with

25   interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

26   certificate;

27       G.    All together with the costs of this action, the reasonable fees of Plaintiff's

28   attorneys in this action, and such other and further relief as the Court may deem just.

-47-

**AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: August 2, 2010

GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY, LLP

By _____
     Robert A. Goodin

LOWELL HAKY

GRAIS & ELLSWORTH LLP

Attorneys for Plaintiff
The Charles Schwab Corporation

**AMENDED COMPLAINT**

Exhibit A to the Amended Complaint

Naureen Hassan
Chief Operating Officer
Charles Schwab Bank, N.A.
211 Main Street
San Francisco, CA 94104

Dear Naureen:

This letter agreement (Agreement) sets forth our understanding regarding an assignment of claims, as described below.

In consideration of the mutual agreements and understandings set forth herein and such other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

1. Charles Schwab Bank, N.A. (Schwab Bank) assigns to The Charles Schwab Corporation (Corporation) all of its right, title, and interest in any and all claims (Claims) that it has or may have against any and all persons under any applicable law (including, but not limited to, federal and state securities laws and common law) against the issuer or seller to Schwab Bank (or any person that controlled any such issuer or seller) of any of the securities identified in Exhibit A.

2. Schwab Bank also hereby appoints the Corporation as its true and lawful attorney-in-fact for the purpose of executing the following powers:

    a. To enter into any discussions or other activities on behalf of Schwab Bank in connection with attempting to recover damages for losses suffered on the securities identified on Exhibit A, including, without limitation, selecting and retaining legal counsel, and filing and prosecuting court proceedings in the interests of Schwab Bank. Schwab Bank agrees to be bound by final determinations in court proceedings prosecuted by the Corporation n the interests of Schwab Bank

    b. To sign, on behalf of Schwab Bank, settlement agreements, releases, or other documents relating to the settlement of legal claims or causes of action to recover damages for losses suffered on the securities identified on Exhibit A. Schwab Bank hereby agrees to be bound by any settlement, compromise, or release reached by the Corporation on their behalf and that any document executed in connection with any such settlement, compromise, or release by the Corporation on behalf of Schwab Bank shall be binding on Schwab Bank.

    c.  Schwab Bank specifically acknowledges and confirms that no person or entity who shall pay to the Corporation (or its assignee) amounts relating in any way Schwab Bank's legal claims based on losses suffered on the securities identified on Exhibit A shall be liable to Schwab Bank to extent of any amounts so paid, unless the person or entity making such payment has actual knowledge that the authority granted to the Corporation by this Agreement has been properly revoked. This Agreement (which is coupled with an interest) may not be revoked without the written consent of the attorney-in-fact.

2.    The Corporation agrees to pay to Schwab Bank 97% of any amounts it recovers in pursuing such Claims, whether by settlement or award. The remaining 3% of any amounts recovered shall be retained by the Corporation in further consideration of its prosecution of the Claims as assignee and attorney-in-fact.

3.    Schwab Bank agrees to provide the Corporation with its full cooperation in the prosecution of the Claims, including with respect to the furnishing of books and records, personnel and witnesses and the execution of necessary documents.

4.    Governing Law: Unless preempted by federal law, this Agreement will be governed by and construed in accordance with the laws of the State of California, without regard to California conflict of law provisions.

5.    Dispute Resolution: It is the intent of the parties that all disputes arising under this Agreement be resolved expeditiously, amicably, and at the level within each party's organization that is most knowledgeable about the disputed issue. In the event of a dispute, the parties will discuss the matter in good faith and escalate the issue, as appropriate, within their respective organizations. Except with regard to actions for equitable relief, the parties will attempt to resolve all disputes informally for a period of ten (10) days or such other period as they may mutually agree on in writing before instituting any legal proceedings. Each party agrees that any and all disputes or claims relating to this Agreement that the parties are unable to resolve according to the foregoing process will be submitted for resolution exclusively through binding arbitration.

6.    Waiver/Severability: Any waiver, in whole or in part of any provision of this Agreement will not affect be considered to be a waiver of any other provision. If any term of this Agreement is found to be unenforceable or invalid for any reason, all other terms will remain in full force and effect.

7.    Authority: Each party represents and warrants that it has taken all requisite action to approve the execution, delivery and performance of this Agreement and that this Agreement constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms.

8.    Entire Agreement: This Agreement, as to its subject matter, exclusively and completely states the rights, duties and obligations of the parties and supersedes

all prior and contemporaneous representations, letters, proposals, discussions and understandings by or between the parties.

9.   This Agreement shall not be amended except by a writing executed by each of the parties hereto.

10.  This letter agreement may be executed by facsimile, electronic signature or other electronic medium and in counterparts, each of which when taken together shall constitute an original of this letter agreement, fully enforceable and binding on the parties.

If this letter agreement correctly sets forth our understanding, please acknowledge by signing below and returning a signed copy to my attention.

Very truly yours,

The Charles Schwab Corporation

By: _____

Acknowledged and agreed:

CHARLES SCHWAB BANK, N.A.

By: _____
        (Signature)

Name:   _NAUREEN HASSAN_

Title:   _CHIEF OPERATING OFFICER_

Date:   _June 29, 2010_

**EXHIBIT B TO THE COMPLAINT**



Figure 1: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B TO THE AMENDED COMPLAINT**

**EXHIBIT C TO THE COMPLAINT**





**EXHIBIT C TO THE AMENDED COMPLAINT**

**EXHIBIT D TO THE COMPLAINT**



Figure 1: Percent of Loans Originated by EMC Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by EMC Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D TO THE AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT E TO THE COMPLAINT

**Figure 1: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination**

**Figure 2: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV**





**EXHIBIT F TO THE COMPLAINT**





GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**EXHIBIT F TO THE AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT G TO THE COMPLAINT



Figure 1: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**EXHIBIT G TO THE AMENDED COMPLAINT**

1

# EXHIBIT H TO THE COMPLAINT

2

3



Figure 1: Percent of Loans Originated by SunTrust Mortgage Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

13

14



Figure 2: Percent of Loans Originated by SunTrust Mortgage Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4
5
6
7
8
9
10
11
12
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H TO THE AMENDED COMPLAINT

# EXHIBIT I TO THE COMPLAINT



Figure 1: Percent of Loans Originated by Wells Fargo Bank N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Wells Fargo Bank N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3435/001/X120690.v1

**EXHIBIT I TO THE AMENDED COMPLAINT**

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
2  ROBERT A. GOODIN, State Bar No. 061302
       rgoodin@goodinmacbride.com
3  FRANCINE T. RADFORD, State Bar No. 168269
       fradford@goodinmacbride.com
4  ANNE H. HARTMAN, State Bar No. 184556
       ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California 94111
6  Telephone:    (415) 392-7900
7  Facsimile:    (415) 398-4321

8  THE CHARLES SCHWAB CORPORATION
   LOWELL HAKY, State Bar No. 178526
9  211 Main Street
   San Francisco, California 94105
10 Telephone:    (415) 667-0622
11 Facsimile:    (415) 667-1638

12 GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (*pro hac application to be submitted*)
13 KATHRYN C. ELLSWORTH (*pro hac app. to be submitted*)
   OWEN L. CYRULNIK (*pro hac application to be submitted*)
14 LEANNE M. WILSON (*pro hac application to be submitted*)
15 70 East 55th Street
   New York, New York 10022
16 Telephone:    (212) 755-0100
   Facsimile:    (212) 755-0052
17

18 Attorneys for Plaintiff
   The Charles Schwab Corporation
19

20        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

21        IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

22

23 THE CHARLES SCHWAB CORPORATION,        No. CGC-10-501610

24                 Plaintiff,

25 v.                                      **VOLUME 2 OF SCHEDULES OF
                                           AMENDED COMPLAINT
26 BNP PARIBAS SECURITIES CORP.;          (SCHEDULES 20 – 36)**
   CWMBS, INC.;
27 BANC OF AMERICA SECURITIES LLC;
28 BANC OF AMERICA MORTGAGE

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

AUG 02 2010

CLERK OF THE COURT
BY: _____ MICHAEL RAYRAY
                    Deputy Clerk

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



SECURITIES, INC;
BANC OF AMERICA FUNDING
CORPORATION;
CWALT, INC.;
COUNTRYWIDE FINANCIAL
CORPORATION;
CITIGROUP GLOBAL MARKETS, INC.;
CITIGROUP MORTGAGE LOAN TRUST,
INC.;
RESIDENTIAL ACCREDIT LOANS, INC.;
FIRST HORIZON ASSET SECURITIES
INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP.;
RESIDENTIAL ASSET MORTGAGE
PRODUCTS, INC.;
DEUTSCHE BANK SECURITIES INC.;
FIRST TENNESSEE BANK N.A.;
GOLDMAN, SACHS & CO.;
GS MORTGAGE SECURITIES CORP.;
RBS SECURITIES, INC. F/K/A
GREENWICH CAPITAL MARKETS, INC.;
HSBC SECURITIES (USA) INC.;
WELLS FARGO ASSET SECURITIES
CORPORATION;
WELLS FARGO BANK N.A.;
MORGAN STANLEY & CO. INC.;
MORGAN STANLEY CAPITAL I INC.;
SEQUOIA RESIDENTIAL FUNDING, INC.;
UBS SECURITIES, LLC;
MORTGAGE ASSET SECURITIZATION
TRANSACTIONS, INC.;
AND,
DOES 1-50,

Defendants.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### SCHEDULE 20 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants First Tennessee and First Horizon.

**Item 55.**        **Details of trust and certificate(s).**

(a)        **Dealer that sold the certificate(s) to Schwab:** First Tennessee.

(b)        **Description of the trust:** First Horizon Mortgage Pass-Through Trust, Mortgage Pass-Through Certificates, Series 2007-AR2 was a securitization in June 2007 of 611 mortgage loans, in three pools. The mortgage loans in the collateral pool of this securitization were originated by First Horizon Home Loans. FHASI 2007-AR2 Pros. Sup. S-6.

(c)        **Description of the certificate(s) that Schwab purchased:** First Tennessee offered and sold to Schwab a senior certificate in this securitization, in class I-A-1, for which Schwab paid $50,000,000 plus accrued interest on May 18, 2007.

(d)        **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Fitch: AAA.

(e)        **Current ratings of the certificate(s):** Standard & Poor's: CC; Fitch: CC.

(f)        **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1400130/000093041307005654/c49118_424b5.htm

**Item 66.**        **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, First Tennessee and First Horizon made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        The original LTVs of the mortgage loans in Pool I ranged from 16.95% to 90%, with a weighted average of 70.54%. FHASI 2007-AR2 Pros. Sup. S-8.

(b)        The original LTVs of the mortgage loans in Pool II ranged from 25% to 84.93%, with a weighted-average of 70.24%. FHASI 2007-AR2 Pros. Sup. S-8.

(c)        The original LTVs of the mortgage loans in Pool III ranged from 40.36% to 90%, with a weighted average of 71.44%. FHASI 2007-AR2 Pros. Sup. S-9.

1

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (d)    "No mortgage loan has a loan-to-value ratio at origination of more than 90%."

2    FHASI 2007-AR2 Pros. Sup. S-29.

3    (e)    In Annex I through Annex IV of the prospectus supplement, First Tennessee and

4    First Horizon presented tables of statistics about the mortgage loans in the collateral pool. FHASI

5    2007-AR2 Pros. Sup. I-1 through IV-3. Each table focused on a certain characteristic of the loans

6    (for example, current principal balance) and divided the loans into categories based on that

7    characteristic (for example, loans with current principal balances of less than $250,001, $400,001

8    to $450,000, $450,001 to $500,000, etc.). Each table then presented various data about the loans

9    in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Mortgage

10    Loans in Pool I," divided the loans in Pool I into eight categories of original LTV (for example,

11    50% and below, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading

12    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

13    the percent of aggregate principal balance outstanding in each of these categories. FHASI 2007-

14    AR2 Pros. Sup. I-1.

15    (f)    "The weighted average original loan-to-value ratio of the mortgage loans in Pool I

16    is expected to be approximately 70.54%." FHASI 2007-AR2 Pros. Sup. I-1.

17    (g)    In Annex II, First Tennessee and First Horizon presented a table entitled "Original

18    Loan-to-Value Ratios for the Mortgage Loans in Pool II." This table divided the loans in Pool II

19    into eight categories of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to

20    60%, etc.). The table made untrue and misleading statements about the number of mortgage

21    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

22    outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. II-1.

23    (h)    "The weighted average original loan-to-value ratio of the mortgage loans in Pool II

24    is expected to be approximately 70.24%." FHASI 2007-AR2 Pros. Sup. II-1.

25    (i)    In Annex III, First Tennessee and First Horizon presented a table entitled "Original

26    Loan-to-Value Ratios for the Mortgage Loans in Pool II." This table divided the loans in Pool III

27    into seven categories of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to

28    60%, etc.). The table made untrue and misleading statements about the number of mortgage

-2-

1  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

2  outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. III-1.

3       (j)    "The weighted average original loan-to-value ratio of the mortgage loans in Pool

4  III is expected to be approximately 71.44%." FHASI 2007-AR2 Pros. Sup. III-1.

5       (k)    In Annex IV, First Tennessee and First Horizon presented a table entitled

6  "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided all of the loans in the

7  collateral pool into nine categories of original LTV (for example, 50% and below, 50.01% to

8  55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number

9  of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

10  principal balance outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. IV-1.

11       (l)    "The weighted average original loan-to-value ratio of the mortgage loans is

12  expected to be approximately 70.54%." FHASI 2007-AR2 Pros. Sup. IV-1.

13  **Item 76.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 611 |
| Number of properties on which there was enough information for the model to determine a true market value | 371 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 244 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $51,937,170 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 27 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,390,937 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 61 |
| Weighted-average LTV, as stated by Defendants (Pool I) | 70.54% |
| Weighted-average LTV, as determined by the model (Pool I) | 89.2% |

25  **Item 79.**    **Evidence from subsequent sales of refinanced properties:**

26      Of the 611 mortgage loans in the collateral pool, 302 were taken out to refinance, rather

27  than to purchase, properties. For those 302 loans, the value (denominator) in the LTV was an

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

appraised value rather than a sale price. Of those 302 properties, 27 were subsequently sold for a total of approximately $22,363,791. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $28,292,000. Thus, those properties were sold for 79.0% of the value ascribed to them, a difference of 21.0%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 85.    Undisclosed additional liens:**

    (a)    Minimum number of properties with additional liens: 279

    (b)    Total reduction in equity from additional liens: $38,755,229

    (c)    Weighted-average reduction in equity from additional liens: 53.7%

**Item 96.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, First Tennessee and First Horizon made the following statement about the appraisals of the properties that secured the mortgage loans originated by FTN Financial Capital Markets: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHASI 2007-AR2 Pros. Sup. S-32.

**Item 102.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, First Tennessee and First Horizon made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)    In Annex I of the prospectus supplement, described in Item 66, First Tennessee and First Horizon presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided the mortgage loans in Pool I into the categories "Primary Residence," "Investor Property," and "Second Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

-4-

1  aggregate principal balance outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup.

2  I-2.

3      (b)     In the "Occupancy Types for the Mortgage Loans in Pool I" table, First Tennessee

4  and First Horizon stated that 94.1% of the mortgage loans in Pool I were secured by a "Primary

5  Residence," 1.56% by an "Investor Property," and 4.33% by a "Second Residence." FHASI

6  2007-AR2 Pros. Sup. I-2.

7      (c)     In Annex II, First Tennessee and First Horizon presented a table entitled

8  "Occupancy Types for the Mortgage Loans in Pool II." This table divided the mortgage loans in

9  Pool II into the categories "Primary Residence," "Investor Property," and "Second Residence."

10  The table made untrue and misleading statements about the number of mortgage loans, the

11  aggregate principal balance outstanding, and the percent of aggregate principal balance

12  outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. II-1.

13      (d)     In the "Occupancy Types for the Mortgage Loans in Pool II" table, First

14  Tennessee and First Horizon stated that 92.96% of the mortgage loans in Pool II were secured by

15  a "Primary Residence," 1.56% by an "Investor Property," and 5.47% by a "Second Residence."

16  FHASI 2007-AR2 Pros. Sup. II-1.

17      (e)     In Annex III , First Tennessee and First Horizon presented a table entitled

18  "Occupancy Types for the Mortgage Loans in Pool III." This table divided the mortgage loans in

19  Pool III into the categories "Primary Residence," "Investor Property," and "Second Residence."

20  The table made untrue and misleading statements about the number of mortgage loans, the

21  aggregate principal balance outstanding, and the percent of aggregate principal balance

22  outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. III-1.

23      (f)     In the "Occupancy Types for the Mortgage Loans in Pool III" table, First

24  Tennessee and First Horizon stated that 95.02% of the mortgage loans in Pool III were secured by

25  a "Primary Residence," 2.8% by an "Investor Property," and 2.17% by a "Second Residence."

26  FHASI 2007-AR2 Pros. Sup. III-1.

27      (g)     In Annex IV, First Tennessee and First Horizon presented a table entitled

28  "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

collateral pool into the categories "Primary Residence," "Investor Property," and "Second Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. FHASI 2007-AR2 Pros. Sup. IV-2.

(h)     In the "Occupancy Types for the Mortgage Loans" table, First Tennessee and First Horizon stated that 93.85% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 1.69% by an "Investor Property," and 4.46% by a "Second Residence." FHASI 2007-AR2 Pros. Sup. IV-2.

**Item 110.    Details of properties that were stated to be owner-occupied, but were not:**

    **(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 47**

    **(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 105**

    **(c)    Number of loans on which the owner of the property owned three or more properties: 17**

    **(d)    Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 57**

    **(e)    Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 185**

**Item 113.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-30 through S-32 of the prospectus supplement, First Tennessee and First Horizon made statements about the underwriting guidelines of First Horizon Home Loans. All of those statements are incorporated herein by reference.

One of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHASI 2007-AR2 Pros. Sup. S-31.

Another one of these statements was that: "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." FHASI 2007-AR2 Pros. Sup. S-31.

-6-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Another one of these statements was that: "First Horizon also applies criteria to determine

2    the borrower's capacity to repay." FHASI 2007-AR2 Pros. Sup. S-32.

3    **Item 121.**    **90+ days delinquencies:**

4        **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 86**

5        **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 14.1%**

6    **Item 122.**    **30+ days delinquencies in this securitization:**

7        **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31,**
         **2010: 92**

8

9        **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31,**
         **2010: 15.1%**

10   **Item 124.**    **Statements about the ratings of the certificate(s) that Schwab purchased:**

11    On page S-5, S-12 and S-69 of the prospectus supplement, First Tennessee and First

12   Horizon made statements about the ratings assigned to the certificates issued in this securitization.

13   First Tennessee and First Horizon stated that Schwab's certificate was rated AAA by Fitch

14   Ratings and AAA by Standard & Poor's Rating Services. These were the highest ratings available

15   from these two rating agencies.

16    First Tennessee and First Horizon also stated that: "The issuance of the offered certificates

17   is conditioned on the certificates receiving the ratings from Fitch and S&P indicated under the

18   heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement."

19   FHASI 2007-AR2 Pros. Sup. S-12. The requirement for class I-A-1 certificates was for AAA

20   from Standard & Poor's and AAA from Fitch.

21   **Item 127.**    **Summary of loans about which the Defendants made untrue or misleading**
         **statements:**

22

23       **(a)**    **Number of loans whose LTVs were materially understated: 244**

24       **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by**
         **undisclosed additional liens: 279**

25       **(c)**    **Number of loans in which the properties were stated to be owner-occupied**
         **but were not: 185**

26

27       **(d)**    **Eliminating duplicates, number of loans about which the Defendants made**
         **untrue or misleading statements: 446**

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-7-

SCHEDULE 20 TO THE AMENDED COMPLAINT



GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(e)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 73%

-8-

SCHEDULE 20 TO THE AMENDED COMPLAINT

**SCHEDULE 21 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants First Tennessee and First Horizon.

**Item 55.        Details of trust and certificate(s).**

(a)        **Dealer that sold the certificate(s) to Schwab:** First Tennessee.

(b)        **Description of the trust:** First Horizon Mortgage Pass-Through Trust, Mortgage Pass-Through Certificates, Series 2005-7 was a securitization in October 2005 of 367 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated or acquired by First Horizon Home Loan Corporation. FHASI 2005-7 Pros. Sup. S-6.

(c)        **Description of the certificate(s) that Schwab purchased:** First Tennessee offered and sold to Schwab a senior certificate in this securitization, in class A-9, for which Schwab paid $30,000,000 plus accrued interest on October 28, 2005.

(d)        **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Fitch: AAA.

(e)        **Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: A.

(f)        **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1081915/000095011705004074/a40687.htm

**Item 66.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, First Tennessee and First Horizon made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        "No mortgage loan has a loan-to-value ratio at origination of more than 95%." FHASI 2005-7 Pros. Sup. S-18.

(b)        In Annex I of the prospectus supplement, First Tennessee and First Horizon presented tables of statistics about the mortgage loans in the collateral pool. FHASI 2005-7 Pros. Sup. I-1 to I-2. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,001 to $450,000, $450,001 to $500,000, $500,001

-1-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP.
ATTORNEYS AT LAW
SAN FRANCISCO

1  to $550,000, etc.). Each table then presented various data about the loans in each category. One of

2  the tables, entitled "Original Loan-to-Value Ratios for the Mortgage Loans," divided all of the

3  loans in the collateral pool into nine categories of original LTV (for example, 50% and below,

4  50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about

5  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

6  aggregate principal balance outstanding in each of these categories. FHASI 2005-7 Pros. Sup. I-1.

7      (c)    "The weighted average original loan-to-value ratio of the mortgage loans is

8  expected to be approximately 70.16%." FHASI 2005-7 Pros. Sup. I-1.

9  **Item 76.**    **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 367 |
| Number of properties on which there was enough information for the model to determine a true market value | 199 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 114 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $18,125,516 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 25 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,999,434 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 20 |
| Weighted-average LTV, as stated by Defendants | 70.16% |
| Weighted-average LTV, as determined by the model | 81.9% |

**Item 85.**    **Undisclosed additional liens:**

    **(a)**    **Minimum number of properties with additional liens: 134**

    **(b)**    **Total reduction in equity from additional liens: $15,698,830**

    **(c)**    **Weighted-average reduction in equity from additional liens: 50.6%**

**Item 102.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, First Tennessee and First Horizon made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     (a)    In Appendix I of the prospectus supplement, described in Item 66, First Tennessee

2   and First Horizon presented a table entitled "Occupancy Types for the Mortgage Loans." This

3   table divided all of the mortgage loans in the collateral pool into the categories "Primary

4   Residence," "Investor Property," and "Secondary Residence." The table made untrue and

5   misleading statements about the number of mortgage loans, the aggregate principal balance

6   outstanding, and the percent of aggregate principal balance outstanding in each of these

7   categories. FHASI 2005-7 Pros. Sup. I-2.

8     (b)    In the "Occupancy Types for the Mortgage Loans" table, First Tennessee and First

9   Horizon stated that 94.16% of the mortgage loans in the collateral pool were secured by a

10  "Primary Residence," 0.44% by an "Investor Property," and 5.4% by a "Secondary Residence."

11  FHASI 2005-7 Pros. Sup. I-2.

**Item 110.**    **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 28**

    **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 52**

    **(c)**    **Number of loans on which the owner of the property owned three or more properties: 3**

    **(d)**    **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 22**

    **(e)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 90**

**Item 113.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 26 through 28 of the prospectus, First Tennessee and First Horizon made

statements about the underwriting guidelines of First Horizon Home Loan Corporation. All of

those statements are incorporated herein by reference.

One of these statements was that: "First Horizon's underwriting standards, as well as any

other underwriting standards that may be applicable to any first lien mortgage loans, generally

include a set of specific criteria pursuant to which the underwriting evaluation is made. However,

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the application of those underwriting standards does not imply that each specific criterion was

2   satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance

3   with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan

4   substantially complies with the underwriting standards. For example, a mortgage loan may be

5   considered to comply with a set of underwriting standards, even if one or more specific criteria

6   included in the underwriting standards were not satisfied, if other factors compensated for the

7   criteria that were not satisfied or if the mortgage loan is considered to be in substantial

8   compliance with the underwriting standards." FHASI 2005-7 Pros. 26.

9        Another one of these statements was that: "First Horizon's underwriting standards are

10  intended to evaluate the prospective mortgagor's credit standing and repayment ability . . . ."

11  FHASI 2005-7 Pros. Sup. 27.

12       Another one of these statements was that: "Underwriting standards are applied by or on

13  behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value

14  and adequacy of the related Property as collateral." FHASI 2005-7 Pros. Sup. 27.

15  **Item 121.**     **90+ days delinquencies:**

16       **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies: 357**

17       **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies: 15.7%**

18  **Item 122.**     **30+ days delinquencies in this securitization:**

19       **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31,**
20       **2010: 31**

21       **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on March 31,**
     **2010: 8.4%**

22  **Item 124.**     **Statements about the ratings of the certificate(s) that Schwab purchased:**

23       On pages S-5, S-9, and S-52 to S-53 of the prospectus supplement, First Tennessee and

24  First Horizon made statements about the ratings assigned to the certificates issued in this

25  securitization. First Tennessee and First Horizon stated that Schwab's certificate was rated AAA

26  by Standard & Poor's and AAA by Fitch. These were the highest ratings available from these two

27  rating agencies.

28

First Tennessee and First Horizon also stated that: "The classes of senior certificates will not be offered unless they are assigned the rating 'AAA' by Fitch and S&P." FHASI 2005-7 Pros. Sup. S-9.

First Tennessee and First Horizon also stated that: "It is a condition to the issuance of the senior certificates that they be rated 'AAA' by Fitch and S&P." FHASI 2005-7 Pros. Sup. S-52 to S-53.

**Item 127.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)   **Number of loans whose LTVs were materially understated: 114**

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 134**

(c)   **Number of loans in which the properties were stated to be owner-occupied but were not: 90**

(d)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 248**

(e)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 67.6%**

SCHEDULE 21 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SCHEDULE 22 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Goldman Sachs and Residential Asset Mortgage.

**Item 55.**    **Details of trust and certificate(s).**

    **(a)**    **Dealer that sold the certificate(s) to Schwab:** Goldman Sachs.

    **(b)**    **Description of the trust:** GMACM Mortgage Loan Trust, GMACM Mortgage Pass-Through Certificates, Series 2006-AR1 was a securitization in February 2006 of 1,141 mortgage loans, in three groups. The mortgage loans in the collateral pool of this securitization were originated by GMAC Mortgage Corporation, GMAC Bank (an affiliate of GMAC Mortgage Corporation), and various undisclosed originators. GMAC Mortgage Corporation originated or acquired approximately 61.02% of the mortgage loans in the collateral pool. GMAC Bank originated or acquired approximately 38.98%. GMACM 2006-AR1 Pros. Sup. S-5 and S-25.

    **(c)**    **Description of the certificate(s) that Schwab purchased:** Goldman Sachs offered and sold to Schwab a senior certificate in this securitization, in class 1-A-1, for which Schwab paid $30,000,000 plus accrued interest on February 10, 2006.

    **(d)**    **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

    **(e)**    **Current ratings of the certificate(s):** Standard & Poor's: B-; Moody's: Caa3.

    **(f)**    **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1351072/000119312506040068/d424b5.htm

**Item 66.**    **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Goldman Sachs and Residential Asset Mortgage made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

    **(a)**    In Annex I of the prospectus supplement ("Mortgage Loan Statistical Information"), Goldman Sachs and Residential Asset Mortgage presented tables of statistics about the mortgage loans in the collateral pool. GMACM 2006-AR1 Pros. Sup. I-1 to I-29. Each

-1-

table focused on a certain characteristic of the loans (for example, outstanding principal balance) and divided the loans into categories based on that characteristic (for example, loans with outstanding principal balances of less than $250,000, $250,000 to $299,999, $300,000 to $349,999, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios of the Mortgage Loans," divided all of the loans in the collateral pool into nine categories of original LTV (for example, 55% or less, 55.01% to 60%, 60.01% to 65%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-3.

(b) "The weighted average original loan-to-value ratio of the mortgage loans as of the cut-off date is approximately 72.11%." GMACM 2006-AR1 Pros. Sup. I-3.

(c) In Annex I, Goldman Sachs and Residential Asset Mortgage presented a table entitled "Original Loan-to-Value Ratios of the Group 1 Mortgage Loans." This table divided the loans in group 1 into eight categories of original LTV (for example, 55% or less, 55.01% to 60%, 60.01% to 65%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-11.

(d) "The weighted average original loan-to-value ratio of the group 1 mortgage loans as of the cut-off date is approximately 73.39%." GMACM 2006-AR1 Pros. Sup. I-11.

(e) In Annex I, Goldman Sachs and Residential Asset Mortgage presented a table entitled "Original Loan-to-Value Ratios of the Group 2 Mortgage Loans." This table divided the loans in group 2 into nine categories of original LTV (for example, 55% or less, 55.01% to 60%, 60.01% to 65%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-18.

(f) "The weighted average original loan-to-value ratio of the Group 2 mortgage loans as of the cut-off date is approximately 71.46%." GMACM 2006-AR1 Pros. Sup. I-18.

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (g)   In Annex, Goldman Sachs and Residential Asset Mortgage presented a table

2   entitled "Original Loan-to-Value Ratios of the Group 3 Mortgage Loans." This table divided the

3   loans in group 3 into seven categories of original LTV (for example, 55% or less, 55.01% to 60%,

4   60.01% to 65%, etc.). The table made untrue and misleading statements about the number of

5   mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid

6   principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-25.

7   (h)   "The weighted average original loan-to-value ratio of the Group 3 mortgage loans

8   as of the cut-off date is approximately 70.26%." GMACM 2006-AR1 Pros. Sup. I-25.

9   **Item 76.   Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,141 |
| Number of properties on which there was enough information for the model to determine a true market value | 637 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 348 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $40,131,157 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 73 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,866,051 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 54 |
| Weighted-average LTV, as stated by Defendants | 72.11% |
| Weighted-average LTV, as determined by the model | 82.5% |

20   **Item 79.   Evidence from subsequent sales of refinanced properties:**

21   Of the 1,141 mortgage loans in the collateral pool, 605 were taken out to refinance, rather

22   than to purchase, properties. For those 605 loans, the value (denominator) in the LTV was an

23   appraised value rather than a sale price. Of those 605 properties, 61 were subsequently sold for a

24   total of approximately $30,917,233. The total value ascribed to those same properties in the LTV

25   data reported in the prospectus supplements and other documents sent to Schwab was

26   $39,524,700. Thus, those properties were sold for 78.2% of the value ascribed to them, a

27   difference of 21.8%. This difference cannot be accounted for by declines in house prices in the

28   areas in which those properties were located.

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 85.**     **Undisclosed additional liens:**

  (a)     Minimum number of properties with additional liens: 98

  (b)     Total reduction in equity from additional liens: $9,877,047

  (c)     Weighted-average reduction in equity from additional liens: 49.7%

**Item 102.**     'Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, Goldman Sachs and Residential Asset Mortgage made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

  (a)     In Annex I of the prospectus supplement, described in Item 66, Goldman Sachs and Residential Asset Mortgage presented a table entitled "Occupancy Status of the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-4.

  (b)     In the "Occupancy Status of the Mortgage Loans" table, Goldman Sachs and Residential Asset Mortgage stated that 92.88% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 1.85% by an "Investment Property," and 5.28% by a "Second Home." GMACM 2006-AR1 Pros. Sup. I-4.

  (c)     In Annex I, Goldman Sachs and Residential Asset Mortgage presented a table entitled "Occupancy Status of the Group 1 Mortgage Loans." This table divided the mortgage loans in group 1 into the categories "Primary Residence," "Investment Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in each of these categories. GMACM 2006-AR1 Pros. Sup. I-12.

  (d)     In the "Occupancy Status of the Group 1 Mortgage Loans" table, Goldman Sachs and Residential Asset Mortgage stated that 92.03% of the mortgage loans in group 1 were secured

-4-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   by a "Primary Residence," 2.17% by an "Investment Property," and 5.8% by a "Second Home."

2   GMACM 2006-AR1 Pros. Sup. I-12.

3        (e)     In Annex I, Goldman Sachs and Residential Asset Mortgage presented a table

4   entitled "Occupancy Status of the Group 2 Mortgage Loans." This table divided the mortgage

5   loans in group 2 into the categories "Primary Residence," "Investment Property," and "Second

6   Home." The table made untrue and misleading statements about the number of mortgage loans,

7   the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in

8   each of these categories. GMACM 2006-AR1 Pros. Sup. I-19.

9        (f)     In the "Occupancy Status of the Group 2 Mortgage Loans" table, Goldman Sachs

10  and Residential Asset Mortgage stated that 94.31% of the mortgage loans in group 2 were secured

11  by a "Primary Residence," 1.5% by an "Investment Property," and 4.19% by a "Second Home."

12  GMACM 2006-AR1 Pros. Sup. I-19.

13       (g)     In Annex I, Goldman Sachs and Residential Asset Mortgage presented a table

14  entitled "Occupancy Status of the Group 3 Mortgage Loans." This table divided the mortgage

15  loans in group 3 into the categories "Primary Residence," "Investment Property," and "Second

16  Home." The table made untrue and misleading statements about the number of mortgage loans,

17  the aggregate unpaid principal balance, and the percent of aggregate unpaid principal balance in

18  each of these categories. GMACM 2006-AR1 Pros. Sup. I-26.

19       (h)     In the "Occupancy Status of the Group 3 Mortgage Loans" table, Goldman Sachs

20  and Residential Asset Mortgage stated that 93.06% of the mortgage loans in group 3 were secured

21  by a "Primary Residence," 1.56% by an "Investment Property," and 5.38% by a "Second Home."

22  GMACM 2006-AR1 Pros. Sup. I-26.

23  **Item 110.    Details of properties that were stated to be owner-occupied, but were not:**

24       (a)    **Number of loans on which the owner of the property instructed tax
              authorities to send property tax bills to him or her at a different address: 80**

25

26       (b)    **Number of loans on which the owner of the property could have, but did not,
              designate the property as his or her homestead: 113**

27       (c)    **Number of loans on which the owner of the property owned three or more
              properties: 11**

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULE 22 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (d)   **Number of loans on which the owner of the property did not receive bills at
2         the address of the mortgaged property but did receive bills at a different
         address: 60**

3   (e)   **Eliminating duplicates, number of loans about which one or more of
         statements (a) through (d) is true: 226**

4   **Item 113.   Untrue or misleading statements about the underwriting standards of the
5                originators of the mortgage loans:**

6       On pages S-37 through S-40 of the prospectus supplement, Goldman Sachs and

7   Residential Asset Mortgage made statements about the underwriting guidelines of GMAC

8   Mortgage Corporation. All of those statements are incorporated herein by reference.

9       One of these statements was that: "[GMAC Mortgage Corporation]'s underwriting

10  standards include a set of specific criteria pursuant to which the underwriting evaluation is made.

11  However, the application of [GMAC Mortgage Corporation]'s underwriting standards does not

12  imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be

13  considered to be originated in accordance with a given set of underwriting standards if, based on

14  an overall qualitative evaluation, the loan is in substantial compliance with those underwriting

15  standards. For example, a mortgage loan may be considered to comply with a set of underwriting

16  standards, even if one or more specific criteria included in those underwriting standards were not

17  satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage

18  loan is considered to be in substantial compliance with the underwriting standards." GMACM

19  2006-AR1 Pros. Sup. S-40.

20      Another one of these statements was that: "Once all applicable employment, credit, asset

21  and property information is received, a determination is made as to whether the prospective

22  borrower has sufficient monthly income available to meet the borrower's monthly obligations on

23  the proposed mortgage loan and other expenses related to the home (such as property taxes and

24  hazard insurance) and other financial obligations and monthly living expenses." GMACM 2006-

25  AR1 Pros. Sup. S-39.

26  **Item 120.   Early payment defaults:**

27  (a)   **Number of the mortgage loans that suffered EPDs: 36**

28  (b)   **Percent of the mortgage loans that suffered EPDs: 3.2%**

-6-

**Item 121.** 90+ days delinquencies:

    **(a)** Number of the mortgage loans that suffered 90+ days delinquencies: 218

    **(b)** Percent of the mortgage loans that suffered 90+ days delinquencies: 19.1%

**Item 122.** 30+ days delinquencies in this securitization:

    **(a)** Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 200

    **(b)** Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 17.5%

**Item 124.** Statements about the ratings of the certificate(s) that Schwab purchased:

On page S-7, S-15, and S-90 of the prospectus supplement, Goldman Sachs and Residential Asset Mortgage made statements about the ratings assigned to the certificates issued in this securitization. Goldman Sachs and Residential Asset Mortgage stated that Schwab's certificate was rated AAA by Standard & Poor's Rating Services and Aaa by Moody's Investor Services. These were the highest ratings available from these two rating agencies.

Goldman Sachs and Residential Asset Mortgage also stated that: "When issued, the offered certificates will receive ratings which are not lower than those listed for each class of certificates in the table on page S-7 of this prospectus supplement." GMACM 2006-AR1 Pros. Sup. S-15. The requirement for class 1-A-1 certificates was for AAA from Standard & Poor's and Aaa from Moody's.

Goldman Sachs and Residential Asset Mortgage also stated that: "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-7 of this prospectus supplement by Standard & Poor's Ratings Services . . . and Moody's Investors Service . . . ." GMACM 2006-AR1 Pros. Sup. S-90. The requirement for class 1-A-1 certificates was for AAA from Standard & Poor's and Aaa from Moody's.

**Item 127.** Summary of loans about which the Defendants made untrue or misleading statements:

    **(a)** Number of loans whose LTVs were materially understated: 348

    **(b)** Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 98

    **(c)** Number of loans that suffered EPDs: 36

-7-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 226**

(e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 562**

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 49.3%**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-8-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SCHEDULE 23 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Goldman Sachs and GS Mortgage.

**Item 55.    Details of trust and certificate(s).**

(a)    **Dealer that sold the certificate(s) to Schwab**: Goldman Sachs.

(b)    **Description of the trust**: GSR Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR7 was a securitization in October 2005 of 3,072 mortgage loans, in six groups. The mortgage loans in the collateral pool of this securitization were originated by Bank of America, N.A., Countrywide Home Loans, Inc., National City Mortgage Co., Residential Funding Corporation, SunTrust Mortgage, Inc. and Wells Fargo Bank, N.A. Bank of America originated 25.68% of the loans in Group 5,  and 29.11% of loans in Group 6, and 15.13% of the loans in the aggregate. Countrywide Servicing originated 38.48% of the loans in Group 1, 68.59% of the loans in Group 4, 28.73% of the loans in Group 5, 7.06% of the loans in Group 6 and 13.65% of the loans in the aggregate. National City originated 61.52% of the loans in Group 1, 47.06% of the loans in Group 3, 31.41% of the loans in Group 4, 13.25% of the loans in Group 5, 6.25% of the loans in Group 6, and 13.52% of the loans in the aggregate. Residential Funding originated 1.95% of the loans in Group 5, 4.6% of the loans in Group 6, and 2.21% of the loans in the aggregate. SunTrust originated 52.94% of the loans in Group 3, 1.04% of the loans in Group 5, 2.62% of the loans in Group 6, and 4.53% of the loans in the aggregate. Wells Fargo originated 100% of the loans in Group 2, 29.36% of the loans in Group 5, 50.36% of the loans in Group 6, and 50.97% of the loans in the aggregate. GSR 2005-AR7 Pros. Sup. S-7.

(c)    **Description of the certificate(s) that Schwab purchased**: Goldman Sachs offered and sold to Schwab a senior certificate in this securitization, in class 3-A-1, for which Schwab paid $30,000,000 plus accrued interest on October 13, 2005.

(d)    **Ratings of the certificate(s) when Schwab purchased them**: Standard & Poor's: AAA; Fitch: AAA.

(e)    **Current ratings of the certificate(s)**: Standard & Poor's: CCC; Fitch: CCC.

-1-

SCHEDULE 23 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (f)    **URL of prospectus supplement for this securitization:**

2    http://www.sec.gov/Archives/edgar/data/807641/000093041305007382/c39669_424b5.txt

3    **Item 66.    Untrue or misleading statements about the LTVs of the mortgage loans:**

4          In the prospectus supplement, Goldman Sachs and GS Mortgage made the following

5    statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

6          (a)    "As of the Cut-Off Date, approximately 97.935% of the Mortgage Loans in Loan

7    Group 1 had current loan-to-value ratios of less than or equal to 80%, while approximately

8    2.065% of the Mortgage Loans in Loan Group 1 had current loan-to-value ratios greater than

9    80%." GSR 2005-AR7 Pros. Sup. S-34.

10          (b)    "As of the Cut-Off Date, approximately 99.905% of the Mortgage Loans in Loan

11    Group 2 had current loan-to-value ratios of less than or equal to 80%, while approximately

12    0.095% of the Mortgage Loans in Loan Group 2 had current loan-to-value ratios greater than

13    80%." GSR 2005-AR7 Pros. Sup. S-34.

14          (c)    "As of the Cut-Off Date, approximately 98.873% of the Mortgage Loans in Loan

15    Group 3 had current loan-to-value ratios of less than or equal to 80%, while approximately

16    1.127% of the Mortgage Loans in Loan Group 3 had current loan-to-value ratios greater than

17    80%." GSR 2005-AR7 Pros. Sup. S-34.

18          (d)    "As of the Cut-Off Date, approximately 98.818% of the Mortgage Loans in Loan

19    Group 4 had current loan-to-value ratios of less than or equal to 80%, while approximately

20    1.182% of the Mortgage Loans in Loan Group 4 had current loan-to-value ratios greater than

21    80%." GSR 2005-AR7 Pros. Sup. S-35.

22          (e)    "As of the Cut-Off Date, approximately 99.668% of the Mortgage Loans in Loan

23    Group 5 had current loan-to-value ratios of less than or equal to 80%, while approximately

24    0.332% of the Mortgage Loans in Loan Group 5 had current loan-to-value ratios greater than

25    80%." GSR 2005-AR7 Pros. Sup. S-35.

26          (f)    "As of the Cut-Off Date, approximately 99.743% of the Mortgage Loans in Loan

27    Group 6 had current loan-to-value ratios of less than or equal to 80%, while approximately

28

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   0.257% of the Mortgage Loans in Loan Group 6 had current loan-to-value ratios greater than

2   80%." GSR 2005-AR7 Pros. Sup. S-35.

3       (g)    The weighted-average current LTV of the mortgage loans in Loan Group 1 was

4   74.63%. GSR 2005-AR7 Pros. Sup. S-36.

5       (h)    The weighted-average current LTV of the mortgage loans in Loan Group 2 was

6   65.16%. GSR 2005-AR7 Pros. Sup. S-36.

7       (i)    The weighted-average current LTV of the mortgage loans in Loan Group 3 was

8   72.64%. GSR 2005-AR7 Pros. Sup. S-36.

9       (j)    The weighted-average current LTV of the mortgage loans in Loan Group 4 was

10  73.49%. GSR 2005-AR7 Pros. Sup. S-36.

11      (k)    The weighted-average current LTV of the mortgage loans in Loan Group 5 was

12  71.9%. GSR 2005-AR7 Pros. Sup. S-36.

13      (l)    The weighted-average current LTV of the mortgage loans in the Track 1 Loan

14  Group (Loan Groups 1 through 5) was 69.38%. GSR 2005-AR7 Pros. Sup. S-36.

15      (m)    The weighted-average current LTV of the mortgage loans in Group 6 (Track 2

16  Loan Group) was 67.53%. GSR 2005-AR7 Pros. Sup. S-36.

17      (n)    "The loan-to-value ratio of each Mortgage Loan was less than 125% at either the

18  time of its origination or refinancing, as applicable . . . ." GSR 2005-AR7 Pros. Sup. S-42.

19      (o)    In Appendix B of the prospectus supplement, Goldman Sachs and GS Mortgage

20  presented tables of statistics about the mortgage loans in the collateral pool. GSR 2005-AR7 Pros.

21  Sup. S-B-1 to S-B-59. Each table focused on a certain characteristic of the loans (for example,

22  current principal balance) and divided the loans into categories based on that characteristic (for

23  example, loans with current principal balances of below or equal to $50,000, $50,000.01 to

24  $200,000, $200,000.01 to $350,000, etc.). Each table then presented various data about the loans

25  in each category. One of the tables, entitled "Original Loan-to-Value Ratios of the Track 1

26  Loans," divided the mortgage loans in Track 1 into eight categories of original LTV (for example,

27  below or equal to 50%, 50.001% to 60%, 60.001% to 70%, etc.). The table made untrue and

28  misleading statements about the number of mortgage loans, the aggregate scheduled principal

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of

2    these categories. GSR 2005-AR7 Pros. Sup. S-B-2.

3        (p)    "At origination, the weighted average loan-to-value ratio of all the Track 1 Loans

4    was approximately 69.678%." GSR 2005-AR7 Pros. Sup. S-B-2.

5        (q)    In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

6    "Current Loan-to-Value Ratios of the Track 1 Loans." This table divided the mortgage loans in

7    Track 1 into seven categories of current LTV (for example, below or equal to 50%, 50.001% to

8    60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

9    of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

10   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

11   Pros. Sup. S-B-3.

12       (r)    "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

13   Track 1 Loans was approximately 69.378%." GSR 2005-AR7 Pros. Sup. S-B-3.

14       (s)    In Appendix B, Goldman Sachs and GS MORTGAGE presented a table entitled

15   "Original Loan-to-Value Ratios of the Group 1 Loans." This table divided the mortgage loans in

16   Group 1 into seven categories of original LTV (for example, below or equal to 50%, 50.001% to

17   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

18   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

19   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

20   Pros. Sup. S-B-12.

21       (t)    "At origination, the weighted average loan-to-value ratio of all the Group 1 Loans

22   was approximately 74.824%." GSR 2005-AR7 Pros. Sup. S-B-12.

23       (u)    In Appendix B, Goldman Sachs and GS MORTGAGE presented a table entitled

24   "Current Loan-to-Value Ratios of the Group 1 Loans." This table divided the mortgage loans in

25   Group 1 into seven categories of current LTV (for example, below or equal to 50%, 50.001% to

26   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

27   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

28

-4-

SCHEDULE 23 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

2    Pros. Sup. S-B-12.

3         (v)    "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

4    Group 1 Loans was approximately 74.628%." GSR 2005-AR7 Pros. Sup. S-B-12.

5         (w)    In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

6    "Original Loan-to-Value Ratios of the Group 2 Loans." This table divided the mortgage loans in

7    Group 2 into seven categories of original LTV (for example, below or equal to 50%, 50.001% to

8    60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

9    of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

10   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

11   Pros. Sup. S-B-20.

12        (x)    "At origination, the weighted average loan-to-value ratio of all the Group 2 Loans

13   was approximately 65.594%." GSR 2005-AR7 Pros. Sup. S-B-20.

14        (y)    In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

15   "Current Loan-to-Value Ratios of the Group 2 Loans." This table divided the mortgage loans in

16   Group 2 into six categories of current LTV (for example, below or equal to 50%, 50.001% to

17   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

18   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

19   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

20   Pros. Sup. S-B-20.

21        (z)    "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

22   Group 2 Loans was approximately 65.156%." GSR 2005-AR7 Pros. Sup. S-B-20.

23        (aa)   In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

24   "Original Loan-to-Value Ratios of the Group 3 Loans." This table divided the mortgage loans in

25   Group 3 into seven categories of original LTV (for example, below or equal to 50%, 50.001% to

26   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

27   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

28

1    percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

2    Pros. Sup. S-B-28.

3        (bb)   "At origination, the weighted average loan-to-value ratio of all the Group 3 Loans

4    was approximately 72.996%." GSR 2005-AR7 Pros. Sup. S-B-28.

5        (cc)   In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

6    "Current Loan-to-Value Ratios of the Group 3 Loans." This table divided the mortgage loans in

7    Group 3 into seven categories of current LTV (for example, below or equal to 50%, 50.001% to

8    60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

9    of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

10   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

11   Pros. Sup. S-B-28.

12       (dd)   "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

13   Group 3 Loans was approximately 72.639%." GSR 2005-AR7 Pros. Sup. S-B-28.

14       (ee)   In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

15   "Original Loan-to-Value Ratios of the Group 4 Loans." This table divided the mortgage loans in

16   Group 4 into seven categories of original LTV (for example, below or equal to 50%, 50.001% to

17   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

18   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

19   percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

20   Pros. Sup. S-B-36.

21       (ff)   "At origination, the weighted average loan-to-value ratio of all the Group 4 Loans

22   was approximately 73.635%." GSR 2005-AR7 Pros. Sup. S-B-36.

23       (gg)   In Appendix B, Goldman Sachs and GS MORTGAGE presented a table entitled

24   "Current Loan-to-Value Ratios of the Group 4 Loans." This table divided the mortgage loans in

25   Group 4 into seven categories of current LTV (for example, below or equal to 50%, 50.001% to

26   60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

27   of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

2    Pros. Sup. S-B-36.

3        (hh)    "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

4    Group 4 Loans was approximately 73.487%." GSR 2005-AR7 Pros. Sup. S-B-36.

5        (ii)    In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

6    "Original Loan-to-Value Ratios of the Group 5 Loans." This table divided the mortgage loans in

7    Group 5 into seven categories of original LTV (for example, below or equal to 50%, 50.001% to

8    60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

9    of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

10    percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

11    Pros. Sup. S-B-44.

12        (jj)    "At origination, the weighted average loan-to-value ratio of all the Group 5 Loans

13    was approximately 71.955%." GSR 2005-AR7 Pros. Sup. S-B-44.

14        (kk)    In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

15    "Current Loan-to-Value Ratios of the Group 5 Loans." This table divided the mortgage loans in

16    Group 5 into six categories of current LTV (for example, below or equal to 50%, 50.001% to

17    60%, 60.001% to 70%, etc.). The table made untrue and misleading statements about the number

18    of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the

19    percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7

20    Pros. Sup. S-B-44.

21        (ll)    "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

22    Group 5 Loans was approximately 71.895%." GSR 2005-AR7 Pros. Sup. S-B-44.

23        (mm)   In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

24    "Original Loan-to-Value Ratios of the Track 2 Loans (Group 6 Loans)." This table divided the

25    mortgage loans in Group 6 into eight categories of original LTV (for example, below or equal to

26    50%, 50.001% to 60%, 60.001% to 70%, etc.). The table made untrue and misleading statements

27    about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off

28

-7-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  date, and the percent of aggregate scheduled principal balance in each of these categories. GSR

2  2005-AR7 Pros. Sup. S-B-52.

3      (nn)   "At origination, the weighted average loan-to-value ratio of all the Track 2 Loans

4  (Group 6 Loans) was approximately 67.791%." GSR 2005-AR7 Pros. Sup. S-B-52.

5      (oo)   In Appendix B, Goldman Sachs and GS Mortgage presented a table entitled

6  "Current Loan-to-Value Ratios of the Track 2 Loans (Group 6 Loans)." This table divided the

7  mortgage loans in Group 6 into seven categories of current LTV (for example, below or equal to

8  50%, 50.001% to 60%, 60.001% to 70%, etc.). The table made untrue and misleading statements

9  about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off

10  date, and the percent of aggregate scheduled principal balance in each of these categories. GSR

11  2005-AR7 Pros. Sup. S-B-52.

12     (pp)   "As of the Cut-Off Date, the weighted average loan-to-value ratio of all of the

13  Track 2 Loans (Group 6 Loans) was approximately 67.525%." GSR 2005-AR7 Pros. Sup. S-B-

14  52.

15  **Item 76.**      **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,072 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,047 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 999 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $158,658,790 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 385 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $51,388,989 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 146 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 72.64% |
| Weighted-average LTV, as determined by the model (Group 3) | 84.07% |

26  **Item 96.**      **Untrue or misleading statements about compliance with USPAP:**

27      In the prospectus supplement, Goldman Sachs and GS Mortgage made the following

28  statement about the appraisals of the properties that secured the mortgage loans: "[T]he appraisal

-8-

1   and the appraiser both satisfy the applicable requirements of Fannie Mae or Freddie Mac, as

2   applicable[.]" GSR 2005-AR7 Pros. Sup. S-43.

3   **Item 102.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

4

5       In the prospectus supplement, Goldman Sachs and GS Mortgage made the following

6   statements about the occupancy status of the properties that secured the mortgage loans in the

7   collateral pool of this securitization.

8       (a)    In Schedule B of the prospectus supplement, described in Item 66, Goldman Sachs

9   and GS Mortgage presented a table entitled "Occupancy Status of the Track 1 Loans." This table

10   divided the Track 1 mortgage loans into the categories "Primary Residence," "Investment," and

11   "Second Home." The table made untrue and misleading statements about the number of mortgage

12   loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of

13   aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-

14   B-5.

15       (b)    In the "Occupancy Status of the Track 1 Loans" table, Goldman Sachs and GS

16   MORTGAGE stated that 92.15% of the Track 1 mortgage loans were secured by a "Primary

17   Residence," 0.05% by an "Investment" property, and 7.81% by a "Second Home." GSR 2005-

18   AR7 Pros. Sup. S-B-5.

19       (c)    In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled

20   "Occupancy Status of the Group 1 Loans." This table divided the Group 1 mortgage loans into the

21   categories "Primary Residence" and "Second Home." The table made untrue and misleading

22   statements about the number of mortgage loans, the aggregate scheduled principal balance as of

23   the cut-off date, and the percent of aggregate scheduled principal balance in each of these

24   categories. GSR 2005-AR7 Pros. Sup. S-B-14.

25       (d)    In the "Occupancy Status of the Group 1 Loans" table, Goldman Sachs and GS

26   MORTGAGE stated that 91.22% of the Group 1 mortgage loans were secured by a "Primary

27   Residence" and 8.78% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-14.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULE 23 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(e)     In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled "Occupancy Status of the Group 2 Loans." This table divided the Group 2 mortgage loans into the categories "Primary Residence" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-B-22.

(f)     In the "Occupancy Status of the Group 2 Loans" table, Goldman Sachs and GS Mortgage stated that 90.3% of the Group 2 mortgage loans were secured by a "Primary Residence" and 9.7% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-22.

(g)     In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled "Occupancy Status of the Group 3 Loans." This table divided the Group 3 mortgage loans into the categories "Primary Residence," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-B-30.

(h)     In the "Occupancy Status of the Group 3 Loans" table, Goldman Sachs and GS Mortgage stated that 93.11% of the Group 3 mortgage loans were secured by a "Primary Residence," 0.42% by an "Investment" property, and 6.47% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-30.

(i)     In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled "Occupancy Status of the Group 4 Loans." This table divided the Group 4 mortgage loans into the categories "Primary Residence" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-B-38.

(j)     In the "Occupancy Status of the Group 4 Loans" table, Goldman Sachs and GS Mortgage stated that 92.87% of the Group 4 mortgage loans were secured by a "Primary Residence," and 7.13% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-38.

-10-

SCHEDULE 23 TO THE AMENDED COMPLAINT

(k)   In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled "Occupancy Status of the Group 5 Loans." This table divided the Group 5 mortgage loans into the categories "Primary Residence" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-B-46.

(l)   In the "Occupancy Status of the Group 5 Loans" table, Goldman Sachs and GS Mortgage stated that 97.21% of the Group 5 mortgage loans were secured by a "Primary Residence" and 2.79% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-46.

(m)   In Schedule B, Goldman Sachs and GS Mortgage presented a table entitled "Occupancy Status of the Track 2 Loans (Group 6 Loans)." This table divided the Group 6 mortgage loans into the categories "Primary Residence," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate scheduled principal balance as of the cut-off date, and the percent of aggregate scheduled principal balance in each of these categories. GSR 2005-AR7 Pros. Sup. S-B-54.

(n)   In the "Occupancy Status of the Track 2 Loans (Group 6 Loans)" table, Goldman Sachs and GS Mortgage stated that 93.28% of the Group 6 mortgage loans were secured by a "Primary Residence," 0.06% by an "Investment" property, and 6.67% by a "Second Home." GSR 2005-AR7 Pros. Sup. S-B-54.

**Item 110.   Details of properties that were stated to be owner-occupied, but were not:**

(a)   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 214**

(b)   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 518**

(c)   **Number of loans on which the owner of the property owned three or more properties: 46**

(d)   **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 230**

(e)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 828**

-11-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 113.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On page S-42 of the prospectus supplement and pages 26 through 27 of the prospectus, Goldman Sachs and GS Mortgage made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool. All of those statements are incorporated herein by reference.

One of these statements was that: "The Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time of origination with exceptions thereto exercised in a reasonable manner." GSR 2005-AR7 Pros. Sup. S-42.

Another one of these statements was that: "The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral." GSR 2005-AR7 Pros. 26.

**Item 121.**   **90+ days delinquencies:**

    (a)   **Number of the mortgage loans that suffered 90+ days delinquencies: 275**

    (b)   **Percent of the mortgage loans that suffered 90+ days delinquencies: 9.0%**

**Item 122.**   **30+ days delinquencies in this securitization:**

    (a)   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 281**

    (b)   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 9.1%**

**Item 124.**   **Statements about the ratings of the certificate(s) that Schwab purchased:**

On pages S-1, S-16, S-44 and S-103 of the prospectus supplement, Goldman Sachs and GS Mortgage made statements about the ratings assigned to the certificates issued in this securitization. Goldman Sachs and GS Mortgage stated that Schwab's certificate was rated AAA by Standard & Poor's Rating Services and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Goldman Sachs and GS Mortgage also stated that: "In order to be issued, the offered certificates must have the rating or ratings indicated under 'Certificate Ratings' in this prospectus

-12-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  supplement." GSR 2005-AR7 Pros. Sup. S-16. The requirement for class 3-A-1 certificates was

2  for AAA from Standard & Poor's and AAA from Fitch. GSR 2005-AR7 Pros. Sup. S-16.

3       Goldman Sachs and GS Mortgage also stated that: "The Offered Certificates . . . will not

4  be issued unless they receive the rating or ratings from Standard & Poor's Ratings

5  Services . . . and Fitch Ratings . . . indicated under 'Certificate Ratings' in this prospectus

6  supplement." GSR 2005-AR7 Pros. Sup. S-44. The requirement for class 3-A-1 certificates was

7  for AAA from Standard & Poor's and AAA from Fitch.

8       Goldman Sachs and GS Mortgage also stated that: "It is a condition to the issuance of the

9  Offered Certificates that they receive [AAA] ratings from Fitch and S&P . . . ." GSR 2005-AR7

10  Pros. Sup. S-103.

11  **Item 127.**     **Summary of loans about which the Defendants made untrue or misleading
12  statements:**

13      **(a)**     **Number of loans whose LTVs were materially understated: 999**

14      **(b)**     **Number of loans in which the properties were stated to be owner-occupied
   but were not: 828**

15      **(c)**     **Eliminating duplicates, number of loans about which the Defendants made
16  untrue or misleading statements: 1,554**

17      **(d)**     **Eliminating duplicates, percent of loans about which the Defendants made
   untrue or misleading statements: 50.6%**

18

19

20

21

22

23

24

25

26

27

28

-13-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SCHEDULE 24 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Greenwich Capital and CWALT.

**Item 55.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to Schwab:** Greenwich Capital.

(b)      **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-26CB was a securitization in May 2005 of 2,092 mortgage loans,[1] in one group. The mortgage loans in the collateral pool of this securitization were originated by Countrywide Home Loans, Inc., and one or more other sellers affiliated with Countrywide Financial Corporation. CWALT 2005-26CB Pros. Sup. S-3 and S-14.

(c)      **Description of the certificate(s) that Schwab purchased:** Greenwich Capital offered and sold to Schwab a senior certificate in this securitization, in class A-7, for which Schwab paid $30,000,000 plus accrued interest on May 18, 2005.

(d)      **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's: B; Moody's: Caa1.

(f)      **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1269518/000095012905005803/v09356b5e424b5.txt

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on April, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

---

[1] CWALT 2005-26CB was a prefunded securitization. On the closing date of the securitization there were 2,092 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 711 mortgage loans.

-1-

SCHEDULE 24 TO THE AMENDED COMPLAINT

**Item 66.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Greenwich Capital and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-26CB Pros. Sup. S-15.

(b)      In the section of the prospectus supplement entitled "The Mortgage Pool," Greenwich Capital and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from three to 40. Thus, in "The Mortgage Pool" section, Greenwich Capital and CWALT made hundreds of statements about the original LTVs of the loans in the collateral pool. CWALT 2005-26CB Pros. Sup. S-17 to S-23.

(c)      "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans is approximately 74.86%." CWALT 2005-26CB S-20.

**Item 76.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,803 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,332 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 570 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $21,970,014 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 332 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,568,997 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 94 |

-2-

SCHEDULE 24 TO THE AMENDED COMPLAINT

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Weighted-average LTV, as stated by Defendants | 74.86% |
|---|---|
| Weighted-average LTV, as determined by the model | 80.1% |

**Item 85.**   **Undisclosed additional liens:**

    **(a)**   **Minimum number of properties with additional liens: 152**

    **(b)**   **Total reduction in equity from additional liens: $7,601,311**

    **(c)**   **Weighted-average reduction in equity from additional liens: 74.4%**

**Item 96.**   **Untrue or misleading statements about compliance with USPAP:**

    In the prospectus supplement, Greenwich Capital and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-26CB Pros. Sup. S-28.

**Item 102.**   **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

    In the prospectus supplement, Greenwich Capital and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)   In "The Mortgage Pool" section, described in Item 66, Greenwich Capital and CWALT presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table made untrue or misleading statements about the number of mortgage loans, the aggregate principal balance, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-26CB Pros. Sup. S-22.

    (b)   In the "Occupancy Types" table, Greenwich Capital and CWALT stated that 87.43% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 10.36% by an "Investment Property," and 2.21% by a "Secondary Residence." CWALT 2005-26CB Pros. Sup. S-22.

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 110.**   **Details of properties that were stated to be owner-occupied, but were not:**

(a)   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 170**

(b)   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 260**

(c)   **Number of loans on which the owner of the property owned three or more properties: 16**

(d)   **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 181**

(e)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 543**

**Item 113.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-31 of the prospectus supplement, Greenwich Capital and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-26CB Pros. Sup. S-27.

Another one of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.." CWALT 2005-26CB Pros. Sup. S-27.

**Item 121.**   **90+ days delinquencies:**

(a)   **Number of the mortgage loans that suffered 90+ days delinquencies: 278**

(b)   **Percent of the mortgage loans that suffered 90+ days delinquencies: 13.3%**

**Item 122.**   **30+ days delinquencies in this securitization:**

(a)   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 300**

(b)   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 14.3%**

-4-

SCHEDULE 24 TO THE AMENDED COMPLAINT

**Item 124.**     **Statements about the ratings of the certificate(s) that Schwab purchased:**

On pages S-3 and S-74 of the prospectus supplement, Greenwich Capital and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Greenwich Capital and CWALT stated that Schwab's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Greenwich Capital and CWALT also stated that: "The classes of certificates . . . will not be offered unless they are assigned the following ratings by Standard and Poor's Ratings Services . . . and Moody's Investors Service, Inc. . . . ." The requirement for class A-7 certificates was for AAA from Standard & Poor's and Aaa from Moody's. CWALT 2005-26CB Pros. Sup. S-3.

Greenwich Capital and CWALT also stated that: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." CWALT 2005-26CB Pros. Sup. S-74.

**Item 127.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

  (a)   **Number of loans whose LTVs were materially understated: 570**

  (b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 152**

  (c)   **Number of loans in which the properties were stated to be owner-occupied but were not: 543**

  (d)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,081**

  (e)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 38.6%**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SCHEDULE 25 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Greenwich Capital and CWALT.

**Item 55.**   **Details of trust and certificate(s).**

    **(a)**   **Dealer that sold the certificate(s) to Schwab:** Greenwich Capital.

    **(b)**   **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-3CB was a securitization in January 2005 of 6,053 mortgage loans,[2] in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. and one or more other sellers affiliated with Countrywide Financial Corporation. CWALT 2005-3CB Pros. Sup. S-4 and S-14.

    **(c)**   **Description of the certificate(s) that Schwab purchased:** Greenwich Capital offered and sold to Schwab a senior certificate in this securitization, in class 1-A-5, for which Schwab paid $25,000,000 plus accrued interest on January 26, 2005.

    **(d)**   **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

    **(e)**   **Current ratings of the certificate(s):** Standard & Poor's: BBB-; Moody's: Caa1.

    **(f)**   **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1269518/000095012905000648/v04624b5e424b5.txt

    **(g)**   **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on September 23, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

---

    [2] CWALT 2005-3CB was a prefunded securitization. On the closing date of the securitization there were 6,053 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 2,085 mortgage loans.

-1-

SCHEDULE 25 TO THE AMENDED COMPLAINT

**Item 66.**         **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Greenwich Capital and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-3CB Pros. Sup. S-15.

(b)      In "The Mortgage Pool" section of the prospectus supplement, Greenwich Capital and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-3CB Pros. Sup. S-14 to S-32. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from three to 97. Thus, in "The Mortgage Pool" section, Greenwich Capital and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT 2005-3CB Pros. Sup. S-17 to S-26.

(c)      "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 1 is approximately 72.79%." CWALT 2005-3CB Pros. Sup. S-22.

(d)      In "The Mortgage Pool" section, Greenwich Capital and CWALT presented similar tables of statistics about the mortgage loans in loan group 2. In these tables, Greenwich Capital and CWALT similarly made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT 2005-3CB Pros. Sup. S-27 to S-32.

(e)      "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 2 is approximately 66.89%." CWALT 2005-3CB Pros. Sup. S-29.

SCHEDULE 25 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 76.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 8,138 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,620 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,565 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $69,443,851 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 882 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $45,982,088 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 255 |
| Weighted-average LTV, as stated by Defendants (group 1) | 72.79% |
| Weighted-average LTV, as determined by the model (group 1) | 77.89% |

**Item 85.      Undisclosed additional liens:**

   (a)     Minimum number of properties with additional liens: 485

   (b)     Total reduction in equity from additional liens: $23,556,312

   (c)     Weighted-average reduction in equity from additional liens: 67.7%

**Item 96.      Untrue or misleading statements about compliance with USPAP:**

   In the prospectus supplement, Greenwich Capital and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-3CB Pros. Sup. S-37.

**Item 102.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

   In the prospectus supplement, Greenwich Capital and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

   (a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 66, Greenwich Capital and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Property," and "Secondary Residence." This table made untrue or misleading statements about

2   the number of mortgage loans, the aggregate scheduled principal balance, and the percent of

3   aggregate scheduled principal balance outstanding in each of these categories. CWALT 2005-

4   3CB Pros. Sup. S-25.

5       (b)     In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

6   85.48% of the mortgage loans in loan group 1 were secured by a "Primary Residence," 12.07%

7   by an "Investment Property," and 2.44% by a "Secondary Residence." CWALT 2005-3CB Pros.

8   Sup. S-25.

9       (c)     In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

10  another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2

11  into the categories "Primary Residence," "Investment Property," and "Secondary Residence."

12  This table made untrue or misleading statements about the number of mortgage loans, the

13  aggregate scheduled principal balance, and the percent of aggregate scheduled principal balance

14  outstanding in each of these categories. CWALT 2005-3CB Pros. Sup. S-32.

15      (d)     In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

16  77.44% of the mortgage loans in loan group 2 were secured by a "Primary Residence," 19.21%

17  by an "Investment Property," and 3.35% by a "Secondary Residence." CWALT 2005-3CB Pros.

18  Sup. S-32.

19  **Item 110.**     **Details of properties that were stated to be owner-occupied, but were not:**

20      (a)     **Number of loans on which the owner of the property instructed tax
            authorities to send property tax bills to him or her at a different address: 501**

21

22      (b)     **Number of loans on which the owner of the property could have, but did not,
            designate the property as his or her homestead: 715**

23      (c)     **Number of loans on which the owner of the property owned three or more
            properties: 36**

24

25      (d)     **Number of loans on which the owner of the property did not receive bills at
            the address of the mortgaged property but did receive bills at a different
            address: 542**

26

27      (e)     **Eliminating duplicates, number of loans about which one or more of
            statements (a) through (d) is true: 1,483**

28

-4-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   **Item 113.     Untrue or misleading statements about the underwriting standards of the**
     **originators of the mortgage loans:**

2

3        On pages S-36 through S-41 of the prospectus supplement, Greenwich Capital and

4   CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc.

5   All of those statements are incorporated herein by reference.

6        One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting

7   guidelines may be made if compensating factors are demonstrated by a prospective borrower."

8   CWALT 2005-3CB Pros. Sup. S-37.

9        Another one of these statements was that: "Countrywide Home Loans' underwriting

10   standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective

11   borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

12   property as collateral." CWALT 2005-3CB Pros. Sup. S-37.

13   **Item 120.     Early payment defaults:**

14        **(a)     Number of the mortgage loans that suffered EPDs:** 15

15        **(b)     Percent of the mortgage loans that suffered EPDs:** 0.2%

16   **Item 121.     90+ days delinquencies:**

17        **(a)     Number of the mortgage loans that suffered 90+ days delinquencies:** 713

18        **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:** 11.8%

19   **Item 122.     30+ days delinquencies in this securitization:**

20        **(a)     Number of the mortgage loans that were 30+ days delinquent on March 31,**
          **2010:** 719

21

22        **(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31,**
          **2010:** 11.9%

23   **Item 124.     Statements about the ratings of the certificate(s) that Schwab purchased:**

24        On page S-3 of the prospectus supplement, Greenwich Capital and CWALT made

25   statements about the ratings assigned to the certificates issued in this securitization. Greenwich

26   Capital and CWALT stated that Schwab's certificate was rated Aaa by Moody's Investors

27   Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings

28   available from these two rating agencies.

1    Greenwich Capital and CWALT also stated that: "The classes of certificates listed below

2    will not be offered unless they are assigned the following ratings by Standard & Poor's . . . and by

3    Moody's Investors Service, Inc. . . . ." The requirement for class 1-A-5 certificates was for Aaa

4    from Moody's and AAA from Standard & Poor's. CWALT 2005-3CB Pros. Sup. S-3.

5    Greenwich Capital and CWALT also stated that: "It is a condition to the issuance of the

6    senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's

7    Investors Service, Inc. . . . ." CWALT 2005-3CB Pros. Sup. S-82.

**Item 127.    Summary of loans about which the Defendants made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated: 1,565**

(b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 485**

(c)    **Number of loans that suffered EPDs: 15**

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 1,483**

(e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,987**

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 36.7%**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 26 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants HSBC and Wells Fargo.

**Item 55.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to Schwab:** HSBC.

(b)      **Description of the trust:** Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-Through Certificates, Series 2007-8 was a securitization in June 2007 of 4,741 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Wells Fargo Bank and various undisclosed originators. WFMBS 2007-8 Pros. Sup. S-9 and S-59.

(c)      **Description of the certificate(s) that Schwab purchased:** HSBC offered and sold to Schwab a senior certificate in this securitization, in class I-A-1, for which Schwab paid $50,000,000 plus accrued interest on May 17, 2007.

(d)      **Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's: AAA; Moody's: Aaa; Fitch: AAA.

(e)      **Current ratings of the certificate(s):** Standard & Poor's: CCC; Moody's: B3; Fitch: CCC.

(f)      **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1011663/000119312507145159/d424b5.htm

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by Wells Fargo Asset with the SEC on form S-3 on October 11, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

-1-

**Item 66.**          **Untrue or misleading statements about the LTVs of the mortgage loans:**

In Appendix A of the prospectus supplement, HSBC and Wells Fargo Asset made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(e)          The original LTVs of the mortgage loans in the collateral pool ranged from 15.46% to 100% with a weighted average of 72.43%. WFMBS 2007-8 Pros. Sup. A-1.

(f)          The weighted-average original LTV of all of the mortgage loans in the collateral pool with original principal balances greater than $600,000 was 70.69%. WFMBS 2007-8 Pros. Sup. A-1.

(g)          The maximum original LTV of all the mortgage loans in the collateral pool with original principal balances greater than $600,000 was 100%. WFMBS 2007-8 Pros. Sup. A-1.

(h)          The original LTVs of the All Group I Mortgage Loans ranged from 15.46% to 100% with a weighted average of 72.61%. WFMBS 2007-8 Pros. Sup. A-3.

(i)          The original LTVs of the Group I Premium Mortgage Loans ranged from 21.59% to 100% with a weighted average of 73.39%. WFMBS 2007-8 Pros. Sup. A-3.

(j)          The original LTVs of the Group I Discount Mortgage Loans ranged from 15.46% to 100% with a weighted average of 72.09%. WFMBS 2007-8 Pros. Sup. A-3.

(k)          The weighted-average original LTV of the All Group I Mortgage Loans with original principal balances greater than $600,000 was 71.03%. WFMBS 2007-8 Pros. Sup. A-3.

(l)          The weighted-average original LTV of the Group I Premium Mortgage Loans with original principal balances greater than $600,000 was 71.34%. WFMBS 2007-8 Pros. Sup. A-3.

(m)          The weighted-average original LTV of the Group I Discount Mortgage Loans with original principal balances greater than $600,000 was 70.85%. WFMBS 2007-8 Pros. Sup. A-3.

(n)          The maximum original LTV of the All Group I Mortgage Loans with original principal balances greater than $600,000 was 100%. WFMBS 2007-8 Pros. Sup. A-3.

(o)          The maximum original LTV of the Group I Premium Mortgage Loans with original principal balances greater than $600,000 was 94.81%. WFMBS 2007-8 Pros. Sup. A-3.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(p)     The maximum original LTV of the Group I Discount Mortgage Loans with original principal balances greater than $600,000 was 100%. WFMBS 2007-8 Pros. Sup. A-3.

(q)     The original LTVs of the all Group II Mortgage Loans ranged from 22.92% to 100% with a weighted average of 72.15%. WFMBS 2007-8 Pros. Sup. A-5.

(r)     The original LTVs of the Group II Premium Mortgage Loans ranged from 25.39% to 100% with a weighted average of 72.82%. WFMBS 2007-8 Pros. Sup. A-5.

(s)     The original LTVs of the Group II Discount Mortgage Loans ranged from 22.92% to 95.00% with a weighted average of 71.48%. WFMBS 2007-8 Pros. Sup. A-5.

(t)     The weighted-average original LTV of the Group II Mortgage Loans with original principal balances greater than $600,000 was 70.15%. WFMBS 2007-8 Pros. Sup. A-5.

(u)     The weighted-average original LTV of the Group II Premium Mortgage Loans with original principal balances greater than $600,000 was 70.29%. WFMBS 2007-8 Pros. Sup. A-5.

(v)     The weighted-average original LTV of the Group II Discount Mortgage Loans with original principal balances greater than $600,000 was 70.03%. WFMBS 2007-8 Pros. Sup. A-5.

(w)     The maximum original LTV of the Group II Mortgage Loans with original principal balances greater than $600,000 was 90%. WFMBS 2007-8 Pros. Sup. A-5.

(x)     The maximum original LTV of the Group II Premium Mortgage Loans with original principal balances greater than $600,000 was 88.86%. WFMBS 2007-8 Pros. Sup. A-5.

(y)     The maximum original LTV of the Group II Discount Mortgage Loans with original principal balances greater than $600,000 was 90%. WFMBS 2007-8 Pros. Sup. A-5.

(z)     In Appendix A of the prospectus supplement, HSBC and Wells Fargo Asset presented tables of statistics about the mortgage loans in the collateral pool. WFMBS 2006-AR7 Pros. Sup. A-1 to A-18. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of less than or equal to $50,000, $50,001 to $100,000, $100,001 to $150,000, etc.). Each table then presented various data about the loans in

-3-

each category. One of the tables, entitled "Original Loan-to-Value Ratios" divided all of the loans in the collateral pool into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-8.

(aa)    In Appendix A, HSBC and Wells Fargo Asset presented another table entitled "Original Loan-to-Value Ratios." This table divided the loans in group I into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-12.

(bb)    In Appendix A, HSBC and Wells Fargo Asset presented another table entitled "Original Loan-to-Value Ratios." This table divided the loans in group II into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-16.

(cc)    "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%." WFMBS 2007-8 Pros. 35.

**Item 76.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 4,741 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,065 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,912 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $302,554,730 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 321 |

SCHEDULE 26 TO THE AMENDED COMPLAINT

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| Aggregate amount by which the true market values of those properties exceed their stated values | $39,161,751 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 428 |
| Weighted-average LTV, as stated by Defendants | 72.43% |
| Weighted-average LTV, as determined by the model | 86.40% |

**Item 79.     Evidence from subsequent sales of refinanced properties:**

Of the 4,741 mortgage loans in the collateral pool, 2,153 were taken out to refinance, rather than to purchase, properties. For those 2,153 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 2,153 properties, 178 were subsequently sold for a total of approximately $96,782,888. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $135,063,733. Thus, those properties were sold for 71.7% of the value ascribed to them, a difference of 28.3%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 102.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, HSBC and Wells Fargo Asset made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In Appendix A of the prospectus supplement, described in Item 66, HSBC and Wells Fargo Asset presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Second Home." This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-9.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(b)     In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 93.78% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 0.21% by an "Investment Property," and 6.01% by a "Second Home." WFMBS 2007-8 Pros. Sup. A-9.

(c)     In Appendix A, HSBC and Wells Fargo Asset presented another table entitled "Occupancy Types." This table divided the mortgage loans in group I into the categories "Primary Residence," "Investment Property," and "Second Home." This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-13.

(d)     In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 94.23% of the mortgage loans in group I were secured by a "Primary Residence," 0.18% by an "Investment Property," and 5.59% by a "Second Home." WFMBS 2007-8 Pros. Sup. A-13.

(e)     In Appendix A, HSBC and Wells Fargo Asset presented another table entitled "Occupancy Types." This table divided the mortgage loans in group II into the categories "Primary Residence," "Investment Property," and "Second Home." This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2007-8 Pros. Sup. A-17.

(f)     In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 93.1% of the mortgage loans in group II were secured by a "Primary Residence," 0.25% by an "Investment Property," and 6.65% by a "Second Home." WFMBS 2007-8 Pros. Sup. A-17.

**Item 110.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 342**

(b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 771**

(c)     **Number of loans on which the owner of the property owned three or more properties: 86**

-6-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(d)    **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 529**

(e)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 1,437**

**Item 113.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 33 through 37 of the prospectus, HSBC and Wells Fargo Asset made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool. All of those statements are incorporated herein by reference.

One of these statements was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan . . . ." WFMBS 2007-8 Pros. 33.

Another one of these statements was that: "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines . . . ." WFMBS 2007-8 Pros. 35.

Another one of these statements was that: "This [underwriter discretion] initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines." WFMBS 2007-8 Pros. 37.

**Item 120.**    **Early payment defaults:**

(a)    **Number of the mortgage loans that suffered EPDs: 6**

(b)    **Percent of the mortgage loans that suffered EPDs: 0.1%**

**Item 121.**    **90+ days delinquencies:**

(a)    **Number of the mortgage loans that suffered 90+ days delinquencies: 562**

(b)    **Percent of the mortgage loans that suffered 90+ days delinquencies: 11.9%**

**Item 122.**    **30+ days delinquencies in this securitization:**

(a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 532**

-7-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(b)  **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 11.2%

**Item 124.**     **Statements about the ratings of the certificate(s) that Schwab purchased:**

On page S-6 of the prospectus supplement, HSBC and Wells Fargo Asset made statements about the ratings assigned to the certificates issued in this securitization. HSBC and Wells Fargo Asset stated that Schwab's certificate was rated Aaa by Moody's Investors Service, Inc., AAA by Fitch Ratings, and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these three rating agencies.

HSBC and Wells Fargo Asset also stated that: "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table on page S-6." The ratings for class I-A-1 certificates was Aaa from Moody's and AAA from Fitch and AAA from Standard & Poor's. WFMBS 2007-8 Pros. Sup. S-10.

HSBC and Wells Fargo Asset also stated that: "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning on page S-6 from Fitch . . . Moody's . . . and Standard & Poor's . . . ." The ratings for class I-A-1 certificates was Aaa from Moody's and AAA from Fitch and AAA from Standard & Poor's. WFMBS 2007-8 Pros. Sup. S-77.

**Item 127.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)  **Number of loans whose LTVs were materially understated:** 1,912

(b)  **Number of loans that suffered EPDs:** 6

(c)  **Number of loans in which the properties were stated to be owner-occupied but were not:** 1,437

(d)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 2,767

(e)  **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 58.4%

**SCHEDULE 27 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants HSBC and Wells Fargo Asset.

**Item 55.**     **Details of trust and certificate(s).**

  **(a)**     **Dealer that sold the certificate(s) to Schwab:** HSBC.

  **(b)**     **Description of the trust:** Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-Through Certificates, Series 2006-AR7 was a securitization in April 2006 of 2,517 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Wells Fargo Bank. WFMBS 2006-AR7 Pros. Sup. S-40.

  **(c)**     **Description of the certificate(s) that Schwab purchased:** HSBC offered and sold to Schwab a senior certificate in this securitization, in class II-A-1, for which Schwab paid $50,000,000 plus accrued interest on April 12, 2006.

  **(d)**     **Ratings of the certificate(s) when Schwab purchased them:** Moody's: Aaa; Fitch: AAA.

  **(e)**     **Current ratings of the certificate(s):** Moody's: Caa2; Fitch: CCC.

  **(f)**     **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1011663/000119312506085826/d424b5.htm

  **(g)**     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by Wells Fargo Asset with the SEC on form S-3 on March 17, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 66.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

In Appendix A of the prospectus supplement, HSBC and WFASC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

-1-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (a)    The original LTVs of the Aggregate Mortgage Loans in the collateral pool ranged

2    from 7.45% to 100% with a weighted average of 73.82%. WFMBS 2006-AR7 Pros. Sup. A-1.

3    (b)    The original LTVs of the Group I Mortgage Loans ranged from 7.45% to 100%

4    with a weighted average of 76.32%. WFMBS 2006-AR7 Pros. Sup. A-1.

5    (c)    The original LTVs of the Group II Mortgage Loans ranged from 14.48% to 100%

6    with a weighted average of 72.59%. WFMBS 2006-AR7 Pros. Sup. A-1.

7    (d)    The weighted-average original LTV of the aggregate Mortgage Loans with

8    original principal balances greater than $600,000 was 68.59%. WFMBS 2006-AR7 Pros. Sup. A-

9    1.

10    (e)    The weighted-average original LTV of the Group I Mortgage Loans with original

11    principal balances greater than $600,000 was 73.13%. WFMBS 2006-AR7 Pros. Sup. A-1.

12    (f)    The weighted-average original LTV of the Group II Mortgage Loans with original

13    principal balances greater than $600,000 was 68.57%. WFMBS 2006-AR7 Pros. Sup. A-1.

14    (g)    The maximum original LTV of the aggregate Mortgage Loans with original

15    principal balances greater than $600,000 was 100%. WFMBS 2006-AR7 Pros. Sup. A-1.

16    (h)    The maximum original LTV of the Group I Mortgage Loans with original

17    principal balances greater than $600,000 was 80%. WFMBS 2006-AR7 Pros. Sup. A-1.

18    (i)    The maximum original LTV of the Group II Mortgage Loans with original

19    principal balances greater than $600,000 was 100%. WFMBS 2006-AR7 Pros. Sup. A-1.

20    (j)    In Appendix A of the prospectus supplement ("Aggregate Mortgage Loan Data"),

21    HSBC and WFASC presented tables of statistics about the mortgage loans in the collateral pool.

22    WFMBS 2006-AR7 Pros. Sup. A-3 to A-14. Each table focused on a certain characteristic of the

23    loans (for example, original principal balance) and divided the loans into categories based on that

24    characteristic (for example, loans with original principal balances of less than or equal to $50,000,

25    $50,001 to $100,000, $100,001 to $150,000, etc.). Each table then presented various data about

26    the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios," divided

27    all of the loans in the collateral pool into 11 categories of original LTV (for example, 50% or less,

28    50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the

2   total aggregate unpaid principal balance represented of the total principal balance in each of these

3   categories. WFMBS 2006-AR7 Pros. Sup. A-4.

4        (k)    In Appendix A of the prospectus supplement ("Group I Mortgage Loan Data"),

5   HSBC and WFASC presented another table entitled "Original Loan-to-Value Ratios." This table

6   divided the loans in Group I into 11 categories of original LTV (for example, 50% or less,

7   50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about

8   the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the

9   total aggregate unpaid principal balance represented of the total principal balance in each of these

10   categories. WFMBS 2006-AR7 Pros. Sup. A-8.

11        (l)    In Appendix A of the prospectus supplement ("Group II Mortgage Loan Data"),

12   HSBC and WFASC presented another table entitled "Original Loan-to-Value Ratios." This table

13   divided the loans in Group II into 11 categories of original LTV (for example, 50% or less,

14   50.01% to 55%, 55.01% to 60%, etc.). This table made untrue and misleading statements about

15   the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the

16   total aggregate unpaid principal balance represented of the total principal balance in each of these

17   categories. WFMBS 2006-AR7 Pros. Sup. A-12.

18   **Item 76.**    **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,517 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,652 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 811 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $76,145,842 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 244 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,199,244 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 122 |
| Weighted-average LTV, as stated by Defendants | 73.82% |
| Weighted-average LTV, as determined by the model | 84.0% |

-3-

**Item 79.**      **Evidence from subsequent sales of refinanced properties:**

Of the 2,517 mortgage loans in the collateral pool, 683 were taken out to refinance, rather than to purchase, properties. For those 683 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 683 properties, 116 were subsequently sold for a total of approximately $74,508,736. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $88,981,800. Thus, those properties were sold for 83.7% of the value ascribed to them, a difference of 16.3%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 102.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, HSBC and Wells Fargo Asset made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Appendix A of the prospectus supplement, described in Item 66, HSBC and Wells Fargo Asset presented a table entitled "Occupancy Types." This table divided the Aggregate Mortgage Loans into the categories "Primary Residence," "Investment Property," and "Second Home." This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage that the total aggregate unpaid principal balance represented of the total principal balance in each of these categories. WFMBS 2006-AR7 Pros. Sup. A-5.

(b)      In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 83.99% of the Aggregate Mortgage Loans were secured by a "Primary Residence," 6.39% by an "Investment Property," and 9.62% by a "Second Home." WFMBS 2006-AR7 Pros. Sup. A-4.

(c)      In Appendix A, HSBC and Wells Fargo Asset presented another table entitled "Occupancy Types." This table divided the mortgage loans in Group I into the categories "Primary Residence," "Investment Property," and "Second Home." This table made untrue and misleading statements about the number of mortgage loans, the aggregate unpaid principal

-4-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    balance, and the percentage that the total aggregate unpaid principal balance represented of the

2    total principal balance in each of these categories. WFMBS 2006-AR7 Pros. Sup. A-9.

3       (d)    In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 80.5%

4    of the mortgage loans in Group I were secured by a "Primary Residence," 9.27% by an

5    "Investment Property," and 10.24% by a "Second Home." WFMBS 2006-AR7 Pros. Sup. A-9.

6       (e)    In Appendix A, HSBC and Wells Fargo Asset presented another table entitled

7    "Occupancy Types." This table divided the mortgage loans in Group II into the categories

8    "Primary Residence," "Investment Property," and "Second Home." This table made untrue and

9    misleading statements about the number of mortgage loans, the aggregate unpaid principal

10    balance, and the percentage that the total aggregate unpaid principal balance represented of the

11    total principal balance in each of these categories. WFMBS 2006-AR7 Pros. Sup. A-13.

12       (f)    In the "Occupancy Types" table, HSBC and Wells Fargo Asset stated that 85.71%

13    of the mortgage loans in Group II were secured by a "Primary Residence," 4.97% by an

14    "Investment Property," and 9.31% by a "Second Home." WFMBS 2006-AR7 Pros. Sup. A-13.

15    **Item 110.    Details of properties that were stated to be owner-occupied, but were not:**

16       **(a)    Number of loans on which the owner of the property instructed tax
17            authorities to send property tax bills to him or her at a different address: 178**

18       **(b)    Number of loans on which the owner of the property could have, but did not,
            designate the property as his or her homestead: 318**

19       **(c)    Number of loans on which the owner of the property owned three or more
20            properties: 13**

21       **(d)    Number of loans on which the owner of the property did not receive bills at
            the address of the mortgaged property but did receive bills at a different
22            address: 189**

23       **(e)    Eliminating duplicates, number of loans about which one or more of
            statements (a) through (d) is true: 576**

24    **Item 113.    Untrue or misleading statements about the underwriting standards of the
25            originators of the mortgage loans:**

26       On pages 32 through 37 of the prospectus, HSBC and WFASC made statements about the

27    underwriting guidelines of the originators of the mortgage loans in the collateral pool. All of

28    those statements are incorporated herein by reference.

SCHEDULE 27 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

One of these statements was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan . . . ." WFMBS 2006-AR7 Pros. 32.

Another one of these statements was that: "Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines . . . ." WFMBS 2006-AR7 Pros. 34.

Another one of these statements was that: "During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies. This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines." WFMBS 2006-AR7 Pros. 36-37.

**Item 121.     90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 492

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 19.5%

**Item 122.     30+ days delinquencies in this securitization:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 476

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 18.9%

**Item 124.     Statements about the ratings of the certificate(s) that Schwab purchased:**

On page S-6 of the prospectus supplement, HSBC and Wells Fargo Asset made statements about the ratings assigned to the certificates issued in this securitization. HSBC and Wells Fargo Asset stated that Schwab's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA Fitch Ratings. These were the highest ratings available from these two rating agencies.

HSBC and Wells Fargo Asset also stated that: "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table on page S-6." The

-6-

1   ratings for class II-A-1 certificates was Aaa from Moody's and AAA from Fitch. WFMBS 2006-

2   AR7 Pros. Sup. S-8.

3        HSBC and Wells Fargo Asset also stated that: "It is a condition to the issuance of the

4   Offered Certificates that each such class will have received at least the rating set forth in the table

5   on page S-6 from Fitch . . . and Moody's . . . ." The ratings for class II-A-1 certificates was Aaa

6   from Moody's and AAA from Fitch. WFMBS 2006-AR7 Pros. Sup. S-55.

7   **Item 127.    Summary of loans about which the Defendants made untrue or misleading
                   statements:**

8

9        (a)    **Number of loans whose LTVs were materially understated: 811**

10       (b)    **Number of loans in which the properties were stated to be owner-occupied
                but were not: 576**

11

12       (c)    **Eliminating duplicates, number of loans about which the Defendants made
                untrue or misleading statements: 1,183**

13       (d)    **Eliminating duplicates, percent of loans about which the Defendants made
                untrue or misleading statements: 47%**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-7-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### SCHEDULE 28 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Morgan Stanley and Wells Fargo Asset.

**Item 55.     Details of trust and certificate(s).**

    **(a)     Dealer that sold the certificate(s) to Schwab**: Morgan Stanley.

    **(b)     Description of the trust**: Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-Through Certificates, Series 2006-AR3 was a securitization in February 2006 of 1,175 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated by Wells Fargo Bank, N.A. WFMBS 2006-AR3 Pros. Sup. S-37.

    **(c)     Description of the certificate(s) that Schwab purchased**: Morgan Stanley offered and sold to Schwab a senior certificate in this securitization, in class A-1, for which Schwab paid $30,000,000 plus accrued interest on March 13, 2006.

    **(d)     Ratings of the certificate(s) when Schwab purchased them**: Standard & Poor's: AAA; Fitch: AAA.

    **(e)     Current ratings of the certificate(s)**: Standard & Poor's: BB; Fitch: CCC.

    **(f)     URL of prospectus supplement for this securitization**: http://www.sec.gov/Archives/edgar/data/1351942/000119312506039402/d424b5.htm

    **(g)     Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by Wells Fargo Asset with the SEC on form S-3 on March 17, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 66.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Wells Fargo Asset made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

-1-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1      (a)     The original LTV of the mortgage loans in the collateral pool as of the cut-off

2  date ranged from 18.97% to 100% with a weighted average of 70.85%. WFMBS 2006-AR3 Pros.

3  Sup. A-1.

4      (b)     The weighted average original LTV of the mortgage loans with original principal

5  balances greater than $600,000 was 68.94%. WFMBS 2006-AR3 Pros. Sup. A-1.

6      (c)     The maximum original LTV of the mortgage loans with original principal balances

7  greater than $600,000 was 90%. WFMBS 2006-AR3 Pros. Sup. A-1.

8      (d)     In Appendix A of the prospectus supplement ("Selected Mortgage Loans Data"),

9  Morgan Stanley and Wells Fargo Asset presented tables of statistics about the mortgage loans in

10  the collateral pool. WFMBS 2006-AR3 Pros. Sup. A-1 to A-6. Each table focused on a certain

11  characteristic of the loans (for example, original principal balance) and divided the loans into

12  categories based on that characteristic (for example, loans with original principal balances of Less

13  than or equal to $50,000, $50,001 to $100,000, $100,001 to $150,000, etc.). Each table then

14  presented various data about the loans in each category. One of the tables, entitled "Original

15  Loan-to-Value Ratios" divided all of the loans in the collateral pool into 11 categories of original

16  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

17  misleading statements about the number of mortgage loans, the aggregate unpaid principal

18  balance outstanding, and the percent of aggregate unpaid principal balance outstanding in each of

19  these categories. WFMBS 2006-AR3 Pros. Sup. A-4.

20      (e)     The total weighted average original LTV for all borrowers in the collateral pool

21  was 70.85%. WFMBS 2006-AR3 Pros. Sup. A-6.

22  **Item 76.**     **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,175 |
| Number of properties on which there was enough information for the model to determine a true market value | 875 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 423 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $54,421,119 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 123 |

-2-

| | |
|---|---|
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,244,521 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 44 |
| Weighted-average LTV, as stated by Defendants | 70.85% |
| Weighted-average LTV, as determined by the model | 79.4% |

**Item 102.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Wells Fargo Asset made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Appendix A of the prospectus supplement, described in Item 66, Morgan Stanley and Wells Fargo Asset presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. WFMBS 2006-AR3 Pros. Sup. A-5.

(b)      In the "Occupancy Types" table, Morgan Stanley and Wells Fargo Asset stated that 94.22% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 2.62% by an "Investment Property," and 3.17% by a "Second Home." WFMBS 2006-AR3 Pros. Sup. A-5.

**Item 110.     Details of properties that were stated to be owner-occupied, but were not:**

    (a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 76**

    (b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 209**

    (c)     **Number of loans on which the owner of the property owned three or more properties: 13**

    (d)     **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 96**

-3-

(e)  **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 322

**Item 113.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On page S-39 of the prospectus supplement and pages 32 through 37 of the prospectus, Morgan Stanley and Wells Fargo Asset made statements about the underwriting guidelines of Wells Fargo Bank, N.A. All of those statements are incorporated herein by reference.

One of these statements was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan . . . ." WFMBS 2006-AR3 Pros. 32.

Another one of these statements was that: "This [underwriter discretion] initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines." WFMBS 2006-AR3 Pros. 37.

**Item 121.  90+ days delinquencies:**

(a)  **Number of the mortgage loans that suffered 90+ days delinquencies:** 155

(b)  **Percent of the mortgage loans that suffered 90+ days delinquencies:** 13.2%

**Item 122.  30+ days delinquencies in this securitization:**

(a)  **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 136

(b)  **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 11.6%

**Item 124.  Statements about the ratings of the certificate(s) that Schwab purchased:**

On pages S-5, S-7, and S-51 of the prospectus supplement, Morgan Stanley and Wells Fargo Asset made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and WFMBS stated that Schwab's certificate was rated AAA by Standard & Poor's Rating Services and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

-4-

SCHEDULE 28 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Morgan Stanley and WFMBS also stated that: "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table on page S-5." The requirement for class A-1 certificates was for AAA from Standard & Poor's and from Fitch. WFMBS 2006-AR3 Pros. Sup. S-7.

Morgan Stanley and WFMBS also stated that: "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table on page S-5 from Fitch Ratings . . . and Standard & Poor's . . . ." The requirement for class A-1 certificates was for AAA from Standard & Poor's and from Fitch. WFMBS 2006-AR3 Pros. Sup. S-51.

**Item 127.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated: 423**

    **(b)**    **Number of loans in which the properties were stated to be owner-occupied but were not: 322**

    **(c)**    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 625**

    **(d)**    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 53.2%**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    **SCHEDULE 29 TO THE AMENDED COMPLAINT**

2        To the extent that this Schedule is incorporated by reference into allegations in the

3    amended complaint, those allegations are made against Defendants Morgan Stanley and Morgan

4    Stanley Capital.

5    **Item 55.        Details of trust and certificate(s).**

6        **(a)        Dealer that sold the certificate(s) to Schwab:** Morgan Stanley.

7        **(b)        Description of the trust:** Morgan Stanley Mortgage Loan Trust, Mortgage Pass-

8    Through Certificates, Series 2006-3AR was a securitization in February 2006 of 1,948 mortgage

9    loans, in three groups. The mortgage loans in the collateral pool of this securitization were

10   originated or acquired by Morgan Stanley Mortgage Capital Inc., Morgan Stanley Credit Corp.

11   (f/k/a Morgan Stanley Dean Witter Credit Corporation), Wachovia Mortgage Corporation, Wells

12   Fargo Bank, National Association, and various undisclosed originators. Morgan Stanley

13   Mortgage Capital Inc. originated 56.34% of the loans in Loan Group 1 of this securitization,

14   68.29% of the loans in Loan Group 2, and 82.28% of the loans in Loan Group 3. Morgan Stanley

15   Credit Corp. originated 5.31% of the loans in Loan Group 1 of this securitization, 16.44% of the

16   loans in Loan Group 2, and 12.49% of the loans in Loan Group 3. Wachovia Mortgage

17   Corporation originated 14.77% of the loans in Loan Group 1 of this securitization, 3.6% of the

18   loans in Loan Group 2, and 0.14% of the loans in Loan Group 3. Wells Fargo Bank N.A.

19   originated 10.29% of the loans in Loan Group 1 of this securitization. MSM 2006-3AR Pros. Sup.

20   S-30.

21       **(c)        Description of the certificate(s) that Schwab purchased:** Morgan Stanley

22   offered and sold to Schwab a senior certificate in this securitization, in class 1-A-1, for which

23   Schwab paid $50,000,000 plus accrued interest on February 17, 2006.

24       **(d)        Ratings of the certificate(s) when Schwab purchased them:** Standard & Poor's:

25   AAA; Moody's: Aaa.

26       **(e)        Current ratings of the certificate(s):** Standard & Poor's: CCC; Moody's: Caa1.

27       **(f)        URL of prospectus supplement for this securitization:**

28   http://www.sec.gov/Archives/edgar/data/762153/000095013606001498/file001.htm

-1-

SCHEDULE 29 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 66.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The weighted-average original LTV of the mortgage loans in Loan Group 1 was 72.08%. MSM 2006-3AR Pros. Sup. S-7.

(b) The weighted-average original effective LTV of the mortgage loans in Loan Group 1 was 71.8%. MSM 2006-3AR Pros. Sup. S-7.

(c) The weighted-average original LTV of the mortgage loans in Loan Group 2 was 74.46%. MSM 2006-3AR Pros. Sup. S-7.

(d) The weighted-average original effective LTV of the mortgage loans in Loan Group 2 was 73.62%. MSM 2006-3AR Pros. Sup. S-7.

(e) The weighted-average original LTV of the mortgage loans in Loan Group 3 was 72.73%. MSM 2006-3AR Pros. Sup. S-8.

(f) The weighted-average original effective LTV of the mortgage loans in Loan Group 3 was 72.37%. MSM 2006-3AR Pros. Sup. S-8.

(g) "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than approximately 100%." MSM 2006-3AR Pros. Sup. S-33.

(h) In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans," Morgan Stanley and Morgan Stanley Capital presented tables of statistics about the mortgage loans in the collateral pool. MSM 2006-3AR S-35 to S-53. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $100,000, $100,000.01 to $200,000, $200,000.01 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Subject LTV." There were 19 such tables in the "Tabular Characteristics of the Mortgage Loans" section for the loans in Loan Group 1. In each table, the number of categories into which the loans were divided ranged from three to 21. Thus, in the

-2-

"Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the original subject LTVs of the loans in Loan Group 1. MSM 2006-3AR Pros. Sup. S-35 to S-40.

(i)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 1 by Aggregate Cut-off Date Loan Balance is approximately 72.08%." MSM 2006-3AR Pros. Sup. S-36.

(j)    "The weighted average original [effective] Loan-to-Value Ratio of the Mortgage Loans in Loan Group 1 by Aggregate Cut-off Date Loan Balance is approximately 71.80%." MSM 2006-3AR Pros. Sup. S-36.

(k)    In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented similar tables of statistics about the mortgage loans in Aggregate Loan Group II. In these tables, Morgan Stanley and Morgan Stanley Capital similarly made hundreds of statements about the original LTVs of the loans in Aggregate Loan Group II. MSM 2006-3AR Pros. Sup. S-41 to S-45.

(l)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Aggregate Loan Group II by Aggregate Cut-off Date Loan Balance is approximately 73.55%." MSM 2006-3AR Pros. Sup. S-42.

(m)    "The weighted average original [effective] Loan-to-Value Ratio of the Mortgage Loans in Aggregate Loan Group II by Aggregate Cut-off Date Loan Balance is approximately 72.97%." MSM 2006-3AR Pros. Sup. S-42.

(n)    In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, Morgan Stanley and Morgan Stanley Capital similarly made hundreds of statements about the original LTVs of the loans in Loan Group 2. MSM 2006-3AR Pros. Sup. S-46 to S-49.

(o)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 2 by Aggregate Cut-off Date Loan Balance is approximately 74.46%." MSM 2006-3AR Pros. Sup. S-47.

-3-

SCHEDULE 29 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1      (p)     "The weighted average original [effective] Loan-to-Value Ratio of the Mortgage

2   Loans in Loan Group 2 by Aggregate Cut-off Date Loan Balance is approximately 73.62%."

3   MSM 2006-3AR Pros. Sup. S-47.

4      (q)     In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley

5   and Morgan Stanley Capital presented similar tables of statistics about the mortgage loans in

6   Loan Group 3. In these tables, Morgan Stanley and Morgan Stanley Capital similarly made

7   hundreds of statements about the original LTVs of the loans in Loan Group 3. MSM 2006-3AR

8   Pros. Sup. S-50 to S-53.

9      (r)     "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in

10   Loan Group 3 by Aggregate Cut-off Date Loan Balance is approximately 72.73%." MSM 2006-

11   3AR Pros. Sup. S-50.

12      (s)     "The weighted average original [effective] Loan-to-Value Ratio of the Mortgage

13   Loans in Loan Group 3 by Aggregate Cut-off Date Loan Balance is approximately 72.37%."

14   MSM 2006-3AR Pros. Sup. S-51.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 76.      Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,948 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,194 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 663 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $75,971,368 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 161 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,307,687 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 126 |
| Weighted-average LTV, as stated by Defendants (Group 1) | 72.08% |
| Weighted-average LTV, as determined by the model (Group 1) | 84.01% |

**Item 79.      Evidence from subsequent sales of refinanced properties:**

Of the 1,948 mortgage loans in the collateral pool, 863 were taken out to refinance, rather than to purchase, properties. For those 863 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 863 properties, 174 were subsequently sold for a total of approximately $102,405,999. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $124,462,000. Thus, those properties were sold for 82.3% of the value ascribed to them, a difference of 17.7%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 85.      Undisclosed additional liens:**

      **(a)      Minimum number of properties with additional liens: 157**

      **(b)      Total reduction in equity from additional liens: $19,028,675**

      **(c)      Weighted-average reduction in equity from additional liens: 64.0%**

**Item 96.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statement about the appraisals of the properties that secured the mortgage loans

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   originated by Morgan Stanley Mortgage Capital Inc.: "All appraisals conform to the Uniform

2   Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the

3   Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

4   MSM 2006-3AR Pros. Sup. S-57.

5   **Item 102.      Untrue or misleading statements about owner-occupancy of the properties**
                     **that secured the mortgage loans:**

6

7        In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the

8   following statements about the occupancy status of the properties that secured the mortgage loans

9   in the collateral pool of this securitization.

10       (a)   '   The percentage of the mortgage loans in Loan Group 1 secured by an "Owner-

11   Occupied" residence was 82.86%. MSM 2005-3AR Pros. Sup. S-7.

12       (b)       The percentage of the mortgage loans in Loan Group 2 secured by an "Owner-

13   Occupied" residence was 79.39%. MSM 2005-3AR Pros. Sup. S-7.

14       (c)       The percentage of the mortgage loans in Loan Group 3 secured by an "Owner-

15   Occupied" residence was 84.36%. MSM 2005-3AR Pros. Sup. S-8.

16       (d)       In the "Tabular Characteristics of the Mortgage Loans" section of the prospectus

17   supplement, described in Item 66, Morgan Stanley and Morgan Stanley Capital presented a table

18   entitled "Occupancy Types." This table divided the mortgage loans in Loan Group 1 into the

19   categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

20   statements about the number of mortgage loans, the aggregate principal balance outstanding, and

21   the percent of aggregate principal balance outstanding in each of these categories. MSM 2006-

22   3AR Pros. Sup. S-37.

23       (e)       In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

24   stated that 82.86% of the mortgage loans in Loan Group 1 were secured by a "Primary"

25   residence, 11.54% by an "Investment" property, and 5.6% by a "Second Home." MSM 2006-

26   3AR Pros. Sup. S-37.

27       (f)       In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley

28   and Morgan Stanley Capital presented another table entitled "Occupancy Types." This table

-6-

SCHEDULE 29 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   divided the mortgage loans in Aggregate Loan Group II into the categories "Primary,"

2   "Investment," and "Second Home." The table made untrue and misleading statements about the

3   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

4   aggregate principal balance outstanding in each of these categories. MSM 2006-3AR Pros. Sup.

5   S-43.

6         (g)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

7   stated that 81.99% of the mortgage loans in Aggregate Loan Group II were secured by a

8   "Primary" residence, 12.79% by an "Investment" property, and 5.22% by a "Second Home."

9   MSM 2006-3AR Pros. Sup. S-43.

10         (h)     In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley

11   and Morgan Stanley Capital presented another table entitled "Occupancy Types." This table

12   divided the mortgage loans in Loan Group 2 into the categories "Primary," "Investment," and

13   "Second Home. The table made untrue and misleading statements about the number of mortgage

14   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

15   outstanding in each of these categories. MSM 2006-3AR Pros. Sup. S-48.

16         (i)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

17   stated that 79.39% of the mortgage loans in Loan Group 2 were secured by a "Primary"

18   residence, 15.32% by an "Investment" property, and 5.28% by a "Second Home." MSM 2006-

19   3AR Pros. Sup. S-48.

20         (j)     In the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley

21   and Morgan Stanley Capital presented another table entitled "Occupancy Types." This table

22   divided the mortgage loans in Loan Group 3 into the categories "Primary," "Investment," and

23   "Second Home." The table made untrue and misleading statements about the number of mortgage

24   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

25   outstanding in each of these categories. MSM 2006-3AR Pros. Sup. S-52.

26         (k)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

27   stated that 84.36% of the mortgage loans in Loan Group 3 were secured by a "Primary"

28

SCHEDULE 29 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   residence, 10.47% by an "Investment" property, and 5.17% by a "Second Home." MSM 2006-

2   3AR Pros. Sup. S-52.

3   **Item 110.**     **Details of properties that were stated to be owner-occupied, but were not:**

4       (a)    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 118**

5

6       (b)    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 207**

7       (c)    **Number of loans on which the owner of the property owned three or more properties: 13**

8

9       (d)    **Number of loans that went straight from current to foreclosure or ownership by lender: 2**

10      (e)    **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 118**

11

12      (f)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (e) is true: 371**

13

14  **Item 113.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

15      On pages S-56 through S-57 of the prospectus supplement, Morgan Stanley and Morgan

16  Stanley Capital made statements about the underwriting guidelines of Morgan Stanley Mortgage

17  Capital Inc. All of those statements are incorporated herein by reference.

18      One of these statements was that: "[C]ertain exceptions to the loan purchasing guidelines

19  described herein are made in the event that compensating factors are demonstrated by a

20  prospective borrower." MSM 2006-3AR Pros. Sup. S-56.

21      Another of these statements was that: "Based on the data provided in the application and

22  certain verification (if required), a determination is made by the original lender that the

23  mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor

24  to meet its monthly obligations on the mortgage loan . . . ." MSM 2006-3AR Pros. Sup. S-56.

25  **Item 120.**     **Early payment defaults:**

26      (a)    **Number of the mortgage loans that suffered EPDs: 18**

27      (b)    **Percent of the mortgage loans that suffered EPDs: 0.9%**

28

-8-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 121.**   **90+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies: 588**

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies: 30.2%**

**Item 122.**   **30+ days delinquencies in this securitization:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 536**

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 27.5%**

**Item 124.**   **Statements about the ratings of the certificate(s) that Schwab purchased:**

On page v of the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and Morgan Stanley Capital stated that Schwab's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley and Morgan Stanley Capital also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth on page v of this prospectus supplement by Standard & Poor's Ratings Services . . . and by Moody's Investors Service, Inc." The requirement for class 1-A-1 certificates was for AAA from Standard & Poor's and Aaa from Moody's. MSM 2006-3AR Pros. Sup. S-14.

Morgan Stanley and Morgan Stanley Capital also stated that: "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on pages v and vi of this prospectus supplement by Standard & Poor's Ratings Services . . . and by Moody's Investors Service, Inc. . . . ." The requirement for class 1-A-1 certificates was for AAA from Standard & Poor's and Aaa from Moody's. MSM 2006-3AR Pros. Sup. S-132.

**Item 127.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated: 663**

    **(b)**   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 157**

    **(c)**   **Number of loans that suffered EPDs: 18**

-9-

(d)   Number of loans in which the properties were stated to be owner-occupied but were not: 371

(e)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 961

(f)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 49.3%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 30 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Morgan Stanley and Morgan Stanley Capital.

**Item 55.     Details of trust and certificate(s).**

(a)     **Dealer that sold the certificate(s) to Schwab**: Morgan Stanley.

(b)     **Description of the trust**: Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-11AR was a securitization in December 2005 of 1,801 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated or acquired by Morgan Stanley Mortgage Capital Inc., First National Bank of Nevada, Wachovia Mortgage Corporation, and various undisclosed originators. Morgan Stanley Mortgage Capital Inc. originated 66.24% of the loans in the collateral pool of this securitization, First National Bank of Nevada originated 10.21%, and Wachovia Mortgage Corporation originated 10.19%. MSM 2005-11AR Pros. Sup. S-19.

(c)     **Description of the certificate(s) that Schwab purchased**: Morgan Stanley offered and sold to Schwab a senior certificate in this securitization, in class A-2, for which Schwab paid $25,000,000 plus accrued interest on December 19, 2005.

(d)     **Ratings of the certificate(s) when Schwab purchased them**: Standard & Poor's: AAA; Moody's: Aaa.

(e)     **Current ratings of the certificate(s)**: Standard & Poor's: CCC; Moody's: Caa3.

(f)     **URL of prospectus supplement for this securitization**: http://www.sec.gov/Archives/edgar/data/762153/000095013605008327/file001.htm

**Item 66.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The weighted-average original LTV of the mortgage loans in the collateral pool was 73.51%. MSM 2005-11AR Pros. Sup. S-3.

-1-

1    (b)    The weighted-average original effective LTV of the mortgage loans in the

2    collateral pool was 73.46%. MSM 2005-11AR Pros. Sup. S-3.

3    (c)    "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than

4    100.00%." MSM 2005-11AR Pros. Sup. S-22.

5    (d)    In the section of the prospectus supplement entitled "Tabular Characteristics of the

6    Mortgage Pool," Morgan Stanley and Morgan Stanley Capital presented tables of statistics about

7    the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the

8    loans (for example, current principal balance) and divided the loans into categories based on that

9    characteristic (for example, loans with current principal balances of $0.01 to $100,000,

10    $100,000.01 to $200,000, $200,000.01 to $300,000, etc.). Each table then presented various data

11    about the loans in each category. Among these data was the "Weighted Average Original Subject

12    LTV." There were 18 such tables in the "Tabular Characteristics of the Mortgage Pool" section

13    for the loans in the collateral pool. In each table the number of categories into which the loans

14    were divided ranged from three to 18. Thus, in the "Tabular Characteristics of the Mortgage

15    Pool" section, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about

16    the original subject LTVs of the loans in the collateral pool. MSM 2005-11AR Pros. Sup. S-24 to

17    S-29.

18    (e)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans by

19    Aggregate Cut-off Date Loan Balance is approximately 73.51%." MSM 2005-11AR Pros. Sup. S-

20    25.

21    (f)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage

22    Loans by Aggregate Cut-off Date Loan Balance is approximately 73.46%." MSM 2005-11AR

23    Pros. Sup. S-25.

24    **Item 76.    Details of the results of the AVM analysis:**

25 

| Number of loans | 1,801 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 904 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 494 |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $46,539,192 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 169 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,314,704 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 106 |
| Weighted-average LTV, as stated by Defendants | 73.51% |
| Weighted-average LTV, as determined by the model | 84.6% |

**Item 79.      Evidence from subsequent sales of refinanced properties:**

Of the 1,801 mortgage loans in the collateral pool, 625 were taken out to refinance, rather than to purchase, properties. For those 625 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 625 properties, 100 were subsequently sold for a total of approximately $45,745,664. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $56,911,000. Thus, those properties were sold for 80.4% of the value ascribed to them, a difference of 19.6%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 85.      Undisclosed additional liens:**

   (a)      **Minimum number of properties with additional liens: 95**

   (b)      **Total reduction in equity from additional liens: $9,961,890**

   (c)      **Weighted-average reduction in equity from additional liens: 64.2%**

**Item 96.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statement about the appraisals of the properties that secured the mortgage loans originated by Morgan Stanley Mortgage Capital Inc.: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." MSM 2005-11AR Pros. Sup. S-32.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-3-

**Item 102.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) The percentage of the mortgage loans in the collateral pool secured by an "Owner-Occupied" residence was 70.61%. MSM 2005-11AR Pros. Sup. S-3.

(b) In the "Tabular Characteristics of the Mortgage Pool" section of the prospectus supplement, described in Item 66, Morgan Stanley and Morgan Stanley Capital presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MSM 2005-11AR Pros. Sup. S-26.

(c) In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital stated that 70.61% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 23.32% by an "Investment" property, and 6.07% by a "Second Home." MSM 2005-11AR Pros. Sup. S-26.

**Item 110.** **Details of properties that were stated to be owner-occupied, but were not:**

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 62**

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 134**

(c) **Number of loans on which the owner of the property owned three or more properties: 12**

(d) **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

(e) **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 85**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

**(f)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (e) is true: 239**

**Item 113.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-31 through S-32 of the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made statements about the underwriting guidelines of Morgan Stanley Mortgage Capital Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the loan purchasing guidelines described herein are made in the event that compensating factors are demonstrated by a prospective borrower." MSM 2005-11AR Pros. Sup. S-31.

Another one of these statements was that: "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan . . . ." MSM 2005-11AR Pros. Sup. S-32.

**Item 120.** **Early payment defaults:**

**(a)** **Number of the mortgage loans that suffered EPDs: 33**

**(b)** **Percent of the mortgage loans that suffered EPDs: 1.8%**

**Item 121.** **90+ days delinquencies:**

**(a)** **Number of the mortgage loans that suffered 90+ days delinquencies: 614**

**(b)** **Percent of the mortgage loans that suffered 90+ days delinquencies: 34.1%**

**Item 122.** **30+ days delinquencies in this securitization:**

**(a)** **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 578**

**(b)** **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 32.1%**

**Item 124.** **Statements about the ratings of the certificate(s) that Schwab purchased:**

On page iv of the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and Morgan Stanley Capital stated that Schwab's certificate was rated Aaa by Moody's

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

1   Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest

2   ratings available from these two rating agencies.

3       Morgan Stanley and Morgan Stanley Capital also stated that: "On the closing date, the

4   offered certificates must have ratings not lower than those set forth on page iv of this prospectus

5   supplement by Standard & Poor's Ratings Services . . . and by Moody's Investors Service, Inc."

6   The requirement for class A-2 certificates was for AAA from Standard & Poor's and Aaa from

7   Moody's. MSM 2005-11AR Pros. Sup. S-7.

8       Morgan Stanley and Morgan Stanley Capital also stated that: "It is a condition of the

9   issuance of the Certificates that they receive the respective ratings set forth on page iv of this

10   prospectus supplement by Standard and Poor's Ratings Services . . . and by Moody's Investors

11   Service, Inc. . . . ." The requirement for class A-2 certificates was for AAA from Standard &

12   Poor's and Aaa from Moody's. MSM 2005-11AR Pros. Sup. S-81.

**Item 127.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated: 494**

    **(b)**     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 95**

    **(c)**     **Number of loans that suffered EPDs: 33**

    **(d)**     **Number of loans in which the properties were stated to be owner-occupied but were not: 239**

    **(e)**     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 696**

    **(f)**     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 38.6%**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SCHEDULE 31 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants Morgan Stanley and Morgan Stanley Capital.

**Item 55.     Details of trust and certificate(s).**

    **(a)     Dealer that sold the certificate(s) to Schwab:** Morgan Stanley.

    **(b)     Description of the trust:** Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-6AR was a securitization in October 2005 of 1,498 mortgage loans,[3] in six groups. The mortgage loans in the collateral pool of this securitization were originated by Morgan Stanley Mortgage Capital Inc., GreenPoint Mortgage Funding, Inc., National City Mortgage Co., HSBC Mortgage Corporation (USA), Morgan Stanley Credit Corporation (f/k/a Morgan Stanley Dean Witter Credit Corporation), Countrywide Home Loans, Inc., Wachovia Mortgage Corporation, and various undisclosed originators. Morgan Stanley Mortgage Capital originated 63.69% of the loans in Loan Group 1, 51.72% of the loans in Loan Group 2, 51.89% of the loans in Loan Group 3, 9.17% of the loans in Loan Group 4, 0.03% of the loans in Loan Group 5, and 3.84% of the loans in Loan Group 6. GreenPoint Mortgage Funding originated 12.71% of the loans in Loan Group 1, 2.21% of the loans in Loan Group 2, and 0.33% of the loans in Loan Group 3. National City Mortgage originated 0.08% of the loans in Loan Group 1 and 18.23% of the loans in Loan Group 2. HSBC Mortgage Corporation originated 1.19% of the loans in Loan Group 1, 20.48% of the loans in Loan Group 2, 11.31% of the loans in Loan Group 3, 49.52% of the loans in Loan Group 4, 1.87% of the loans in Loan Group 5, and 62.86% of the loans in Loan Group 6. Morgan Stanley Credit Corp. originated 0.12% of the loans in Loan Group 1, 2.55% of the loans in Loan Group 2, 1.78% of the loans in Loan Group 3, 31.29% of the loans in Loan Group 4, 0.8% of the loans in Loan Group 5, and 33.3% of the loans in Loan Group 6. Countrywide Home Loans originated 0.26% of the loans in Loan Group 1 and

---

[3] MSM 2005-6AR was a prefunded securitization. On the closing date of the securitization there were 1,498 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 1,752 mortgage loans.

97.29% of the loans in Loan Group 5. Wachovia Mortgage Corp. originated 29.17% of the loans in Loan Group 3. Other originators accounted for 21.96% of the loans in Loan Group 1, 4.81% of the loans in Loan Group 2, 5.53% of the loans in Loan Group 3, and 10.01% of the loans in Loan Group 4. MSM 2005-6AR Pros. Sup. S-29 and S-30.

(c)     **Description of the certificate(s) that Schwab purchased**: Morgan Stanley offered and sold to Schwab a senior certificate in this securitization, in class 1-A-2, for which Schwab paid $25,000,000 plus accrued interest on October 21, 2005.

(d)     **Ratings of the certificate(s) when Schwab purchased them**: Standard & Poor's: AAA; Moody's: Aaa.

(e)     **Current ratings of the certificate(s)**: Standard & Poor's: AAA; Moody's: B1.

(f)     **URL of prospectus supplement for this securitization**:

http://www.sec.gov/Archives/edgar/data/762153/000095013605006798/file001.htm

**Item 66.     Untrue or misleading statements about the LTVs of the mortgage loans**:

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The weighted-average original LTV of the mortgage loans in Loan Group 1 was 72.9%, with a weighted-average original effective LTV of 72.9%. MSM 2005-6AR Pros. Sup. S-4.

(b)     The weighted-average original LTV of the mortgage loans in Loan Group 2 was 73.28%, with a weighted-average original effective LTV of 73.01%. MSM 2005-6AR Pros. Sup. S-4.

(c)     The weighted-average original LTV of the mortgage loans in Loan Group 3 was 71.75%, with a weighted-average original effective LTV of 71.75%. MSM 2005-6AR Pros. Sup. S-4.

(d)     The weighted-average original LTV of the mortgage loans in Loan Group 4 was 69.5%, with a weighted-average original effective LTV of 69.34%. MSM 2005-6AR Pros. Sup. S-5.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (e)    The weighted-average original LTV of the mortgage loans in Loan Group 5 was

2    77.4%, with a weighted-average original effective LTV of 77.36%. MSM 2005-6AR Pros. Sup.

3    S-5.

4    (f)    The weighted-average original LTV of the mortgage loans in Loan Group 6 was

5    71.41%, with a weighted-average original effective LTV of 69.55%. MSM 2005-6AR Pros. Sup.

6    S-6.

7    (g)    "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100%."

8    MSM 2005-6AR Pros. Sup. S-33.

9    (h)    In the "Description of the Mortgage Loans" section of the prospectus supplement,

10   Morgan Stanley and Morgan Stanley Capital presented tables of statistics about the mortgage

11   loans in the collateral pool. MSM 2005-6AR Pros. Sup. S-35 to S-71. Each table focused on a

12   certain characteristic of the loans (for example, current principal balance) and divided the loans

13   into categories based on that characteristic (for example, loans with current principal balances of

14   $0.01 to $100,000, $100,000.01 to $200,000, $200,000.01 to $300,000, etc.). Each table then

15   presented various data about the loans in each category. Among these data was the "Weighted

16   Average Original Subject LTV." There were 18 such tables in the "Description of the Mortgage

17   Loans" section for the loans in Loan Group 1. In each table, the number of categories into which

18   the loans were divided ranged from three to 23. Thus, in the "Description of the Mortgage Loans"

19   section, Morgan Stanley and MSCI made hundreds of statements about the original LTVs of the

20   loans in Loan Group 1. MSM 2005-6AR Pros. Sup. S-35 to S-40.

21   (i)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in

22   Loan Group 1 by Aggregate Cut-off Date Loan Group Balance is approximately 72.90%." MSM

23   2005-6AR Pros. Sup. S-36.

24   (j)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

25   Stanley Capital presented a table entitled "Original Effective Loan-to-Value Ratios." This table

26   divided the mortgage loans in Loan Group 1 into nine categories of original effective LTV (for

27   example, 0.01% to 10%, 10.01% to 20%, 20.01% to 30%, etc.). For each category, the table

28

-3-

1    stated the number of mortgage loans and gave five other pieces of information about them. MSM

2    2005-6AR Pros. Sup. S-36.

3        (k)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage

4    Loans in Loan Group 1 by Aggregate Cut-off Date Loan Group Balance is approximately

5    72.90%." MSM 2005-6AR Pros. Sup. S-36.

6        (l)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

7    Stanley Capital presented tables of statistics about the mortgage loans in the Combined Loan

8    Group. In these tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements

9    about the original LTVs of the loans in the Combined Loan Group. MSM 2005-6AR Pros. Sup.

10   S-41 to S-46.

11       (m)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in

12   Combined Loan Group by Aggregate Cut-off Date Loan Group Balance is approximately

13   74.22%." MSM 2005-6AR Pros. Sup. S-42.

14       (n)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

15   Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This

16   table divided the mortgage loans in the Combined Loan Group into nine categories of original

17   effective LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). For each

18   category, the table stated the number of mortgage loans and gave five other pieces of information

19   about them. MSM 2005-6AR Pros. Sup. S-42.

20       (o)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage

21   Loans in Combined Loan Group by Aggregate Cut-off Date Loan Group Balance is

22   approximately 73.96%." MSM 2005-6AR Pros. Sup. S-42.

23       (p)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

24   Stanley Capital presented tables of statistics about the mortgage loans in Loan Group 2. In these

25   tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the

26   original LTVs of the loans in Loan Group 2. MSM 2005-6AR Pros. Sup. S-47 to S-51.

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (q)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in

2  Loan Group 2 by Aggregate Cut-off Date Loan Group Balance is approximately 73.28%." MSM

3  2005-6AR Pros. Sup. S-48.

4    (r)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

5  Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This

6  table divided the mortgage loans in Loan Group 2 into seven categories of original effective LTV

7  (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

8  misleading statements about the number of mortgage loans, the aggregate principal balance

9  outstanding, and the percent of aggregate principal balance outstanding in each of these

10  categories. MSM 2005-6AR Pros. Sup. S-48.

11    (s)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage

12  Loans in Loan Group 2 by Aggregate Cut-off Date Loan Group Balance is approximately

13  73.01%." MSM 2005-6AR Pros. Sup. S-48.

14    (t)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

15  Stanley Capital presented tables of statistics about the mortgage loans in Loan Group 3. In these

16  tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the

17  original LTVs of the loans in Loan Group 3. MSM 2005-6AR Pros. Sup. S-52 to S-56.

18    (u)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in

19  Loan Group 3 by Aggregate Cut-off Date Loan Group Balance is approximately 71.75%." MSM

20  2005-6AR Pros. Sup. S-53.

21    (v)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

22  Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This

23  table divided the mortgage loans in Loan Group 3 into eight categories of original effective LTV

24  (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

25  misleading statements about the number of mortgage loans, the aggregate principal balance

26  outstanding, and the percent of aggregate principal balance outstanding in each of these

27  categories. MSM 2005-6AR Pros. Sup. S-53.

28

-5-

SCHEDULE 31 TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(w)     "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 3 by Aggregate Cut-off Date Loan Group Balance is approximately 71.75%." MSM 2005-6AR Pros. Sup. S-53.

(x)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented tables of statistics about the mortgage loans in Loan Group 4. In these tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the original LTVs of the loans in Loan Group 4. MSM 2005-6AR Pros. Sup. S-57 to S-61.

(y)     "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 4 by Aggregate Cut-off Date Loan Group Balance is approximately 69.50%." MSM 2005-6AR Pros. Sup. S-58.

(z)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This table divided the mortgage loans in Loan Group 4 into eight categories of original effective LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-58.

(aa)     "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 4 by Aggregate Cut-off Date Loan Group Balance is approximately 69.34%." MSM 2005-6AR Pros. Sup. S-58.

(bb)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented tables of statistics about the mortgage loans in Loan Group 5. In these tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the original LTVs of the loans in Loan Group 5. MSM 2005-6AR Pros. Sup. S-62 to S-66.

(cc)     "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 5 by Aggregate Cut-off Date Loan Group Balance is approximately 77.40%." MSM 2005-6AR Pros. Sup. S-63.

-6-

(dd)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This table divided the mortgage loans in Loan Group 5 into nine categories of original effective LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-63.

(ee)     "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 5 by Aggregate Cut-off Date Loan Group Balance is approximately 77.36%." MSM 2005-6AR Pros. Sup. S-63.

(ff)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented tables of statistics about the mortgage loans in Loan Group 6. In these tables, Morgan Stanley and Morgan Stanley Capital made hundreds of statements about the original LTVs of the loans in Loan Group 6. MSM 2005-6AR Pros. Sup. S-67 to S-71.

(gg)     "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 6 by Aggregate Cut-off Date Loan Group Balance is approximately 71.41%." MSM 2005-6AR Pros. Sup. S-68.

(hh)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan Stanley Capital presented another table entitled "Original Effective Loan-to-Value Ratios." This table divided the mortgage loans in Loan Group 6 into five categories of original effective LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-68.

(ii)     "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 6 by Aggregate Cut-off Date Loan Group Balance is approximately 69.55%." MSM 2005-6AR Pros. Sup. S-68.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 76.**      **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,250 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,125 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,099 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $83,280,494 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 350 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $27,461,322 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 199 |
| Weighted-average LTV, as stated by Defendants (Group 1) | 72.9% |
| Weighted-average LTV, as determined by the model (Group 1) | 82.16% |

**Item 79.**      **Evidence from subsequent sales of refinanced properties:**

Of the 1,498 mortgage loans in the collateral pool, 634 were taken out to refinance, rather than to purchase, properties. For those 634 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 634 properties, 230 were subsequently sold for a total of approximately $110,783,992. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to Schwab was $134,820,224. Thus, those properties were sold for 82.2% of the value ascribed to them, a difference of 17.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 85.**      **Undisclosed additional liens:**

(a)      **Minimum number of properties with additional liens:** 246

(b)      **Total reduction in equity from additional liens:** $25,560,790

(c)      **Weighted-average reduction in equity from additional liens:** 63.9%

**Item 96.**      **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the following statement about the appraisals of the properties that secured the mortgage loans originated by Morgan Stanley Mortgage Capital Inc.: "All appraisals conform to the Uniform

-8-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the

2  Appraisal Foundation and must be on forms acceptable to FNMA and/or FHLMC." MSM 2005-

3  6AR Pros. Sup. S-74.

4    In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the

5  following statement about the appraisals of the properties that secured the mortgage loans

6  originated by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie

7  Mae or Freddie Mac appraisal standards then in effect." MSM 2005-6AR Pros. Sup. S-78.

8    In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the

9  following statement about the appraisals of the properties that secured the mortgage loans

10  originated by Wachovia Mortgage Corporation: "Loans are documented generally in accordance

11  with Fannie Mae guidelines and all require a full appraisal report (Fannie Mae Forms 1004, 1025

12  or 1073)." MSM 2005-6AR Pros. Sup. S-82.

13  **Item 102. Untrue or misleading statements about owner-occupancy of the properties**
14  **      that secured the mortgage loans:**

15    In the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made the

16  following statements about the occupancy status of the properties that secured the mortgage loans

17  in the collateral pool of this securitization.

18    (a) In the "Description of the Mortgage Loans" section, described in Item 66, Morgan

19  Stanley and Morgan Stanley Capital presented a table entitled "Occupancy Types." This table

20  divided the mortgage loans in Loan Group 1 into the categories "Primary Residence,"

21  "Investment," and "Secondary Residence." The table made untrue and misleading statements

22  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

23  of aggregate principal balance outstanding in each of these categories. MSM 2005-6AR Pros.

24  Sup. S-37.

25    (b) In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

26  stated that 85.01% of the mortgage loans in Loan Group 1 were secured by a "Primary

27  Residence," 11.65% by an "Investment" property, and 3.34% by a "Secondary Residence." MSM

28  2005-6AR Pros. Sup. S-37.

1    (c)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

2 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

3 mortgage loans in the Combined Loan Group into the categories "Primary Residence,"

4 "Investment," and "Secondary Residence." The table made untrue and misleading statements

5 about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

6 of aggregate principal balance outstanding in each of these categories. MSM 2005-6AR Pros.

7 Sup. S-44.

8    (d)    In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

9 stated that 80.03% of the mortgage loans in the Combined Loan Group were secured by a

10 "Primary Residence," 12.06% by an "Investment" property, and 7.91% by a "Secondary

11 Residence." MSM 2005-6AR Pros. Sup. S-44.

12    (e)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

13 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

14 mortgage loans in Loan Group 2 into the categories "Primary Residence," "Investment," and

15 "Second Home." The table made untrue and misleading statements about the number of mortgage

16 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

17 outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-49.

18    (f)    In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

19 stated that 89.36% of the mortgage loans in Loan Group 2 were secured by a "Primary

20 Residence," 5.2% by an "Investment" property, and 5.44% by a "Second Home." MSM 2005-

21 6AR Pros. Sup. S-49.

22    (g)    In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

23 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

24 mortgage loans in Loan Group 3 into the categories "Primary Residence," "Investment," and

25 "Secondary Residence." The table made untrue and misleading statements about the number of

26 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

27 principal balance outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-54.

28

-10-

SCHEDULE 31 TO THE AMENDED COMPLAINT

1       (h)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

2 stated that 82.81% of the mortgage loans in Loan Group 3 were secured by a "Primary

3 Residence," 11.16% by an "Investment" property, and 6.03% by a "Secondary Residence." MSM

4 2005-6AR Pros. Sup. S-54.

5       (i)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

6 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

7 mortgage loans in Loan Group 4 into the categories "Primary Residence," "Investment," and

8 "Secondary Residence." The table made untrue and misleading statements about the number of

9 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

10 principal balance outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-59.

11       (j)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

12 stated that 86.37% of the mortgage loans in Loan Group 4 were secured by a "Primary

13 Residence," 1.43% by an "Investment" property, and 12.2% by a "Secondary Residence." MSM

14 2005-6AR Pros. Sup. S-59.

15       (k)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

16 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

17 mortgage loans in Loan Group 5 into the categories "Primary" "Investment," and "Second

18 Home." The table made untrue and misleading statements about the number of mortgage loans,

19 the aggregate principal balance outstanding, and the percent of aggregate principal balance

20 outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-65.

21       (l)     In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

22 stated that 70.84% of the mortgage loans in Loan Group 5 were secured by a "Primary"

23 residence, 19.68% by an "Investment" property, and 9.48% by a "Second Home." MSM 2005-

24 6AR Pros. Sup. S-65.

25       (m)     In the "Description of the Mortgage Loans" section, Morgan Stanley and Morgan

26 Stanley Capital presented another table entitled "Occupancy Types." This table divided the

27 mortgage loans in Loan Group 6 into the categories "Primary" "Investment," and "Second

28 Home." The table made untrue and misleading statements about the number of mortgage loans,

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-11-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  the aggregate principal balance outstanding, and the percent of aggregate principal balance

2  outstanding in each of these categories. MSM 2005-6AR Pros. Sup. S-70.

3      (n)    In the "Occupancy Types" table, Morgan Stanley and Morgan Stanley Capital

4  stated that 89.86% of the mortgage loans in Loan Group 6 were secured by a "Primary"

5  residence, 2.63% by an "Investment" property, and 7.51% by a "Second Home." MSM 2005-

6  6AR Pros. Sup. S-70.

7  **Item 110.     Details of properties that were stated to be owner-occupied, but were not:**

8      **(a)    Number of loans on which the owner of the property instructed tax
            authorities to send property tax bills to him or her at a different address: 220**

9

10     **(b)    Number of loans on which the owner of the property could have, but did not,
            designate the property as his or her homestead: 406**

11     **(c)    Number of loans on which the owner of the property owned three or more
            properties: 25**

12

13     **(d)    Number of loans that went straight from current to foreclosure or ownership
            by lender: 1**

14     **(e)    Number of loans on which the owner of the property did not receive bills at
            the address of the mortgaged property but did receive bills at a different
15          address: 261**

16     **(f)    Eliminating duplicates, number of loans about which one or more of
            statements (a) through (e) is true: 706**

17

18  **Item 113.     Untrue or misleading statements about the underwriting standards of the
            originators of the mortgage loans:**

19      On pages S-73 to S-74 of the prospectus supplement, Morgan Stanley and Morgan Stanley

20  Capital made statements about the underwriting guidelines of Morgan Stanley Mortgage Capital.

21  All of those statements are incorporated herein by reference.

22      One of these statements was that: "[C]ertain exceptions to the loan purchasing guidelines

23  described herein are made in the event that compensating factors are demonstrated by a

24  prospective borrower." MSM 2005-6AR Pros. Sup. S-73.

25      Another one of these statements was that: "Based on the data provided in the application

26  and certain verification (if required), a determination is made by the original lender that the

27  mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor

28  to meet its monthly obligations on the mortgage loan and other expenses related to the property

-12-

1  such as property taxes, utility costs, standard hazard insurance and other fixed obligations other

2  than housing expenses." MSM 2005-6AR Pros. Sup. S-74.

3      On pages S-74 to S-76 of the prospectus supplement, Morgan Stanley and Morgan Stanley

4  Capital made statements about the underwriting guidelines of HSBC Mortgage Corporation

5  (USA). All of those statements are incorporated herein by reference.

6      One of these statements was that: "From time to time, exceptions to underwriting policies

7  may be made on a loan by loan basis, at the discretion of HSBC's underwriter and with

8  management approval. Exceptions are made only after careful consideration of certain mitigating

9  factors such as the borrower's liquidity, capacity and repayment history, employment and

10  collateral stability as well as local market economic conditions." MSM 2005-6AR Pros. Sup. S-

11  75.

12      Another one of these statements was that: "These [underwriting] systems evaluate each

13  prospective borrower's credit profile, their monthly income available to meet monthly obligations

14  on the proposed mortgage loan, monthly housing expenses and other financial obligations, their

15  liquid financial assets and other characteristics of the property, including the Loan-to-Value

16  Ratio." MSM 2005-6AR Pros. Sup. S-74.

17      On pages S-76 to S-77 of the prospectus supplement, Morgan Stanley and Morgan Stanley

18  Capital made statements about the underwriting guidelines of Morgan Stanley Credit

19  Corporation. All of those statements are incorporated herein by reference.

20      One of these statements was that: "Debt-to-income exceptions must be approved by the

21  appropriate level underwriter, and supported by compensating factors." MSM 2005-6AR Pros.

22  Sup. S-76.

23      Another one of these statements was that: "Generally, a potential borrower may submit a

24  written or telephone application which provides pertinent information about the applicant's ability

25  to repay the proposed loan. . . . [Morgan Stanley Credit Corporation] obtains and reviews a

26  property appraisal, title policy, a credit bureau report of the applicant's credit history, analysis of

27  income supporting repayment ability and proof of insurance coverage." MSM 2005-6AR Pros.

28  Sup. S-76.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    On pages S-77 to S-81 of the prospectus supplement, Morgan Stanley and Morgan Stanley

2    Capital made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All

3    of those statements are incorporated herein by reference.

4    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting

5    guidelines may be made if compensating factors are demonstrated by a prospective borrower."

6    MSM 2005-6AR Pros. Sup. S-78.

7    Another one of these statements was that: "Countrywide Home Loans' underwriting

8    standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective

9    borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

10   property as collateral." MSM 2005-6AR Pros. Sup. S-77.

11   On page S-82 of the prospectus supplement, Morgan Stanley and Morgan Stanley Capital

12   made statements about the underwriting guidelines of Wachovia Mortgage Corporation. All of

13   those statements are incorporated herein by reference.

14   One of these statements was that: "The borrower's capacity to repay, creditworthiness,

15   source of funds for down payment and the adequacy of the collateral securing the mortgage are

16   evaluated per guidelines stated within the Wachovia online Products and Underwriting Manual,

17   which is updated twice monthly." MSM 2005-6AR Pros. Sup. S-82.

18   **Item 120.**      **Early payment defaults:**

19        (a)      **Number of the mortgage loans that suffered EPDs: 20**

20        (b)      **Percent of the mortgage loans that suffered EPDs: 1.3%**

21   **Item 121.**      **90+ days delinquencies:**

22        (a)      **Number of the mortgage loans that suffered 90+ days delinquencies: 911**

23        (b)      **Percent of the mortgage loans that suffered 90+ days delinquencies: 60.8%**

24   **Item 122.**      **30+ days delinquencies in this securitization:**

25        (a)      **Number of the mortgage loans that were 30+ days delinquent on March 31,**
            **2010: 854**

26

27        (b)      **Percent of the mortgage loans that were 30+ days delinquent on March 31,**
            **2010: 57.0%**

28

-14-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 124.**      **Statements about the ratings of the certificate(s) that Schwab purchased:**

On pages iii to iv, S-12, and S-163 of the prospectus supplement, Morgan Stanley and Morgan Stanley Capital made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and Morgan Stanley Capital stated that Schwab's certificate was rated AAA by Standard & Poor's Rating Services and Aaa by Moody's Investors Service, Inc. These were the highest ratings available from these two rating agencies.

Morgan Stanley and Morgan Stanley Capital also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth on pages iii and iv of this prospectus supplement by Standard & Poor's . . . and by Moody's Investors Service, Inc." MSM 2005-6AR Pros. Sup. S-12. The requirement for class 1-A-2 certificates was AAA from Standard & Poor's and Aaa from Moody's.

Morgan Stanley and Morgan Stanley Capital also stated that: "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on pages iii and iv of this prospectus supplement by Standard and Poor's . . . and by Moody's Investors Service, Inc. . . . ." MSM 2005-6AR Pros. Sup. S-163. The requirement for class 1-A-2 certificates was AAA for Standard & Poor's and Aaa from Moody's.

**Item 127.**      **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)      **Number of loans whose LTVs were materially understated:** 1,099

(b)      **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 246

(c)      **Number of loans that suffered EPDs:** 20

(d)      **Number of loans in which the properties were stated to be owner-occupied but were not:** 706

(e)      **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,642

(f)      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 50.5%

-15-